**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BITCOIN DEPOT INC., *et al.*, | ) | Case No. 26–90528 (CML) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |
| | ) | |

**DECLARATION OF THOMAS STUDEBAKER**
**IN SUPPORT OF THE CHAPTER 11 CASES AND FIRST DAY MOTIONS**

I, Thomas Studebaker, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.     I am a Managing Director and the Co-Head of Turnaround & Restructuring of Triple P TRS, LLC, a restructuring advisory firm with numerous offices throughout the United States.  Triple P TRS, LLC ("***Portage Point***") and its service provider affiliates are wholly owned by Portage Point Partners, LLC.  Portage Point has been retained as proposed financial advisor by each of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***").  I have also been appointed the Debtors' chief restructuring officer (the "***CRO***").  Prior to and since becoming the Debtors' CRO, I also have led the Portage Point team who served as financial advisor to the Debtors beginning in April 2026.

2.     I  hold a Bachelor of Business Administration in Accounting and Psychology from the University of Notre Dame and a Master of Business Administration in Finance and Strategy from Northwestern University's Kellogg School of Management.  I have been employed at Portage Point for over three years and have been a Managing Director throughout that time.  During that

---

[1]     The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bitcoindepot.   The location of the Debtors' corporate headquarters is:  8601 Dunwoody Place, Sandy Springs, Georgia 30350.

time I have been involved in numerous restructurings and financing transactions on behalf of companies, lenders, investors and other constituencies. I have negotiated plans of reorganization, conducted sales of distressed assets, and participated in several chapter 11 cases, including: *In re RUNITONETIME LLC*, Case No. 25-90191 (ARP) (Bankr. S.D. Tex. Aug. 13, 2025); *In re Linqto Texas, LLC*, Case No. 25-90186 (ARP) (Bankr. S.D. Tex. July 7, 2025); *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Aug. 8, 2024); *In re Supply Source Enterprises, Inc.*, Case No. 24-11054 (BLS) (Bankr. D. Del. May 21, 2024); *In re Appgate, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. May 6, 2024); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y. Aug. 30, 2023); and *In re AppHarvest Products, LLC*, Case No. 23-90745 (DRJ) (Bankr. S.D. Tex. July 23, 2023), among others.

3.      On May 17, 2026 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). The Debtors have filed these chapter 11 cases (the "**Chapter 11 Cases**") to allow them to preserve and maximize the value of their estates, all as more fully described below.

4.      I am authorized to submit this Declaration on behalf of the Debtors. I am over twenty-one (21) years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein. All facts and opinions set forth in this declaration (the "**Declaration**") are based upon: (i) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (ii) information I learned from my review of relevant documents, including unaudited financial documents; (iii) information supplied to me or verified by other members of the Portage Point team working directly with me or under my supervision, direction, or control, and the management team of Bitcoin Depot Inc.

("**Bitcoin Depot**," and, together with its debtor and non-debtor subsidiaries, the "**Company**"), and the Company's other third-party advisors; and/or (iv) my opinions based upon my knowledge, training, and experience. Unless otherwise indicated, any financial information contained in this Declaration is subject to change but is true and correct as of the date of this Declaration. Such financial information is presented on a consolidated basis for the Debtors, except where specifically noted.

5.      The Debtors have filed certain contemporaneous motions seeking "first day" relief (collectively, the "**First Day Motions**"). I have reviewed the First Day Motions, and I believe the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors' estates resulting from the filing of the Chapter 11 Cases. As set forth below and described in greater detail in the First Day Motions, I also submit that immediate access to cash collateral and authority to make certain essential prepetition payments is essential to enabling the Debtors to undertake certain postpetition activities necessary to preserve the value of their estates and to administer these Chapter 11 Cases (without value-destructive interruption) for the benefit of all stakeholders, and that without such access and authority the Debtors would suffer immediate and irreparable harm to their estates.

6.      This Declaration is organized into four (4) parts as follows. Part I provides background information on the Company and its operations. Part II provides an overview of the Debtors' prepetition capital structure. Part III describes the challenges the Company has faced and strategies the Company has implemented in response to such challenges. Part IV and **Exhibit A** attached to this Declaration summarize the relief requested in and the factual bases supporting the First Day Motions.

## I.     THE COMPANY'S BUSINESSES

7.     Historically, the Company's core product has been its network of Bitcoin ATMs ("**BTMs**" or "**Kiosks**").  Bitcoin is a form of cryptocurrency, which is a medium of exchange that uses encryption techniques to control the creation of units and to verify the transfer of funds. Bitcoin users create accounts identified by a unique public key and secured with an associated private key.  By executing and digitally signing a Bitcoin transaction with a private key, people can send Bitcoin to and receive it from anyone in the world.  The Company owns and operates the largest network of BTMs across North America, which enable customers to buy and sell Bitcoin using cash.  The Company provides its customers with access to Kiosks equipped to assist with these transactions by offering one-way exchanges of cash-to-Bitcoin.  The Company also offers related software products that support BTM operational capabilities and programs allowing its customers to purchase Bitcoin through an in-person process and a mobile app, as described further below.  Bitcoin Depot's subsidiaries are located in 9 countries including the United States, and as of December 31, 2025, the Company operated Kiosks across the United States, Canada, and Australia.

### A.     The Company's History

8.     The Company traces its origins to Lux Vending, LLC ("**Lux**"), a Georgia limited liability company founded by Brandon Mintz and formed on June 7, 2016.  Lux was solely owned by BT Assets, Inc. ("**BT Assets**"), which also served as Lux's sole manager.  In July 2021, Lux obtained a controlling interest in BitAccess Inc., a Canadian corporation, via a business combination.  Lux and BT Assets later entered into a transaction agreement with GSR II Meteora Acquisition Corp., a Delaware SPAC formed in October 2021, for the purpose of effectuating a merger.  This de-SPAC transaction closed on June 30, 2023, resulting in the formation of Bitcoin

4

Depot, with Bitcoin Depot Operating LLC surviving as an indirect wholly-owned subsidiary of Bitcoin Depot.

9.      Following the de-SPAC transaction, the Company continued its efforts to develop and expand its businesses, with a particular focus on its network of Kiosks.  As part of its expansion efforts, the Company also took steps to expand its Bitcoin businesses overseas, including the formation of certain of its foreign subsidiaries and outreach to potential vendors and contract counterparties in countries such as Mexico and Brazil.  In connection with the Company's decision to commence these Chapter 11 Cases, as more fully described in Part III below, the Company is winding down its foreign subsidiaries in parallel with its domestic operations in order to preserve value both domestically and abroad.

**B.      The Company's Operations**

10.      The Company operates three principal Bitcoin-centered product lines, consisting of:

a.      the Kiosks;

b.      the Company's BDCheckout program ("***BDCheckout***"), which allows customers to purchase Bitcoin at retail checkout counters via a transaction initiated on the Bitcoin Depot mobile app (the "***BD App***"); and

c.      BitAccess, a leading BTM device and transaction processing system that provides software and operational capabilities necessary for BTMs.

11.      The Company also owns Kutt, Inc., a peer-to-peer social betting platform that allows individual users to bet directly against each other on the outcome of sports, pop culture, political and other events, and ReadyBucks, a standalone online platform offering business advances to small businesses and gig and contract workers.

5

a.      **Kiosks**

12.      The Kiosks have historically been the core of the Company's operations and constitute the bulk of the Company's valuable assets.  As of December 31, 2025, the Company operated approximately 9,700 owned and leased Kiosks across 48 U.S. states, 10 Canadian provinces, and 6 Australian states.  These Kiosks are located in convenience stores, gas stations, pharmacies, grocery chains, and shopping malls, and are situated in zip codes containing approximately 69% of the U.S. population.  The Kiosks generated $613.6 million in revenue for the year ended December 31, 2025, representing approximately 99.8% of the Company's total revenue.  In the six months prior to the Petition Date, the highest concentration of active Kiosks were operating in Texas, and Texas Kiosks had the second-highest numbers of individual customers and total dollar spend.  Within Texas, the highest concentration of active Kiosks were operating in Houston, and Houston Kiosks had the second-highest numbers of individual customers and total dollar spend.  As of the Petition Date, the Kiosks have been taken offline and are not currently operating.

13.      The Kiosks are designed to provide an intuitive user interface.  First-time users are prompted to provide certain information for account creation and verification, a process that typically takes under two minutes; returning users can complete transactions in under one minute. Users select from three ranges of cash amounts to insert into the Kiosk.  The user then provides the address of their digital wallet by scanning a QR code.  Cash is inserted, the Kiosk confirms the dollar amount and transaction details, and once complete, the Bitcoin is electronically delivered to the user's digital wallet.  The Company maintains control of the Bitcoin until the transaction is completed and the Company initiates a blockchain transaction to send the Bitcoin to the user.  The Company does not maintain custody of a user's Bitcoin.  The Company uses a sophisticated

Bitcoin management process, maintaining a relatively low balance (typically between $1.0 and $2.0 million) of Bitcoin at any given time to fulfill customer transactions. Bitcoin is purchased on a just-in-time basis, and the Company does not engage in any mining of Bitcoin itself.

14. The transaction price for the customer is the price of the cryptocurrency based on the real-time exchange value, plus a markup and a flat fee. The Company contracts with leading armored courier services to collect and transport cash deposited by customers from Kiosks, with cash collected either on a regular schedule or when a particular Kiosk has reached a specified threshold dollar amount, which the Company can track on a real-time basis.

15. Beginning in 2020, the Company began entering into floorspace agreements (the "*Floorspace Agreements*") with certain counterparties to secure space for the Company's Kiosks in high-traffic retail locations. The Floorspace Agreements are generally executed pursuant to a master placement agreement which sets out the terms of the agreement between the Company and the applicable counterparty. Typically, the Company pays either a flat monthly fee or a per-transaction fee for the right to place individual Kiosks in the specified locations. As of the Petition Date, the Company is party to approximately 7,700 Floorspace Agreements.

16. Over the course of 2024 and 2025, the Company entered into approximately a dozen kiosk franchise profit sharing arrangements (the "*Kiosk Profit-Share Agreements*") with certain counterparties. Under the terms of the Kiosk Profit-Share Agreements, the counterparties pay upfront consideration to the Company, a portion of which is a nonrefundable payment used to purchase Kiosks and a portion of which is a "float" payment to cover incidental costs, which is refundable upon termination of the Kiosk Profit-Share Agreements. In exchange, the counterparties receive a share in the profits generated by the specific Kiosks identified in the Kiosk Profit-Share Agreements for a specified period of time. The Company retains full ownership rights

in the Kiosks and provides maintenance and other services for them under the Kiosk Profit-Share Agreements.

**b.      BDCheckout**

17.      BDCheckout, launched in June 2022, allows users to purchase Bitcoin without the use of a Kiosk at the checkout counter of retail locations.  As of December 31, 2025, BDCheckout was available at approximately 16,300 retail locations across North America, including convenience stores, gas stations, pharmacies, grocery chains, and shopping malls.  Transactions are initiated on the BD App, which is available for free download from major app stores.  Users load cash into their accounts at the checkout counter of a retailer location, and then use those funds to purchase Bitcoin.  The primary difference from a Kiosk transaction is that a BDCheckout transaction is completed via interaction with a cashier and relies more heavily on the BD App, rather than a user interfacing with a Kiosk.  As with Kiosk transactions, the Company's performance obligation is satisfied when control of the cryptocurrency is transferred to the customer's wallet and validated on the blockchain.  The markup percentage for BDCheckout transactions has historically averaged 15% since the product's rollout in 2022.

**c.      BitAccess**

18.      The Company also operates BitAccess, a leading BTM device and transaction processing system that historically provided software and operational capabilities to third-party BTM operators and more recently has provided software and operational capabilities to affiliates of Debtor BitAccess, Inc.  BitAccess software is designed to operate with a variety of systems and devices, which requires continuous modification and enhancement to keep pace with changes in technologies.  While BitAccess has not been an independent source of revenue while providing software capabilities to Company-owned BTMs, the Company believes that it may be valuable to

certain third-party purchasers and intends to seek a potential sale of the BitAccess system through the chapter 11 process, either separately or in connection with a sale of the Kiosks.

**d.      BD App**

19.      The BD App serves as a complementary platform across all Company product lines. It offers users the ability to locate points-of-transaction (Kiosks and BDCheckout retailers), create an un-hosted non-custodial digital wallet, transfer Bitcoin between digital wallets, and initiate BDCheckout transactions.   The BD App also includes a buy-online feature that connects consumers to a third-party service that allows consumers to buy Bitcoin without going to a Kiosk or using BDCheckout.   The Company receives a 12% commission on website transactions facilitated through this feature.

**e.      Kutt, Inc.**

20.      On February 27, 2026, Bitcoin Depot acquired Kutt, Inc. ("*Kutt*"), a peer-to-peer social betting platform founded in 2019 that enables users to create and participate in wagers directly with one another on publicly verifiable outcomes, for $4.5 million.   The platform allows users to set the terms of their bets across a range of markets, including sports and entertainment, but unlike traditional sportsbooks, Kutt does not act as the counterparty to wagers.   Instead, Kutt provides a consumer-friendly platform for users to engage directly with one another in a social, community-driven environment.   As of the Petition Date, Kutt remains in operation.

**f.      ReadyBucks**

21.      On March 10, 2026, the Company launched ReadyBucks, a business advance platform that provides working capital solutions to small businesses, gig workers, and independent contractors.   ReadyBucks operates as a standalone product separate from the Company's core Bitcoin businesses.   The platform offers business advances ranging from $500 to $2,000 to small

businesses and independent workers as part of its initial rollout across certain U.S. states. Rather than functioning as a traditional loan or requiring a credit pull, the platform uses a revenue-based funding arrangement in which customers sell a fixed portion of future business revenue in exchange for immediate capital, with repayments made over a fixed term. As of the Petition Date, ReadyBucks has ceased offering new advances and is continuing operations only for purposes of collecting payments on advances that are currently outstanding.

### C.        The Company's Organizational Structure

22.        The Company's organizational structure consists of 24 entities. Bitcoin Depot is the ultimate parent entity and is publicly owned. Brandon Mintz remains the controlling shareholder of Bitcoin Depot, with remaining shares owned by public shareholders. Bitcoin Depot directly or indirectly owns 23 subsidiaries, 17 of which are also Debtors in these Chapter 11 Cases, including the borrower and each entity that is a guarantor under the Silverview Credit Facility (as defined below). The non-Debtor entities are all foreign entities which, with the exception of non-Debtor AUS BTM PTY LTD, have few or no creditors and *de minimis* assets and operations. Non-Debtor AUS BTM PTY LTD owns approximately 140 Kiosks in Australia and is commencing a wind-down of its assets and operations through an Australian insolvency proceeding. All of the remaining non-Debtor entities have also begun or will imminently begin the process of liquidating and winding down their affairs in their respective jurisdictions. The Company's Canadian subsidiaries are Debtors in these Chapter 11 Cases and intend to commence insolvency recognition proceedings in Canada following the filing of these Chapter 11 Cases. A simplified organizational chart of the Company with the Debtors highlighted in yellow is attached as **Exhibit B**.

**II.    PREPETITION CAPITAL STRUCTURE**

23.    As of the Petition Date, the Debtors' funded debt liabilities total approximately $15,771,000 in principal amount outstanding.  The Debtors' significant funded debt obligations include:

| Facility | Maturity | Total Approx. Principal Amount Outstanding |
|---|---|---|
| Silverview Credit Facility | December 15, 2027 | $13,338,000 |
| Equipment Agreements | 2026 - 2027 | $2,433,000 |
| *Total Debt* | | $15,771,000 |

**A.    Silverview Credit Facility**

24.    Kiosk HoldCo LLC, a wholly-owned indirect subsidiary of Bitcoin Depot, is the borrower under that certain *Second Amended and Restated Credit Agreement*, dated as of November 1, 2024, (as amended by that certain Amendment No. 1, dated as of March 14, 2025 and as further amended by that certain Amendment No. 2, dated as of December 19, 2025, the "*Silverview Credit Agreement*") among Kiosk HoldCo LLC, as borrower, BT HoldCo LLC, and the subsidiary guarantors from time to time party thereto, the lenders from time to time party thereto, and Silverview Credit Partners LP, as administrative agent (in such capacity, the "*Term Loan Agent*").  The Silverview Credit Agreement provides for a term loan credit facility in the initial aggregate principal amount of $36,450,000 (the "*Silverview Credit Facility*").  In connection with Amendment No. 2, the borrower was required to make a prepayment of $7,000,000, applied to reduce the aggregate principal amount outstanding under the Silverview Credit Facility.  The obligations under the Silverview Credit Facility are purported to be secured by a first-priority lien on substantially all of the assets of Debtors Kiosk Holdco LLC, BT Holdco

11

LLC, Bitcoin Depot Operating LLC, Intuitive Software LLC, Digital Gold Ventures Inc., BitAccess Inc., Mintz Assets, Inc., Express Vending Inc., and Kiosk Technicians, LLC.

25.     The Silverview Credit Facility bears interest at a rate of 17.00% per annum and is scheduled to mature on December 15, 2027.  As of the Petition Date, the Debtors anticipate that their prepetition secured lender will likely assert that the Debtors owe approximately $13,338,000 in principal, a $3,100,000 exit fee, and $198,784 in accrued but unpaid interest under the Silverview Credit Facility.

### B.     Equipment Agreements

26.     In 2024, Debtor Bitcoin Depot Operating LLC entered into five 36-month collateralized term loans with VFS LLC (the "*VFS Equipment Agreements*") for a total amount of approximately $2,600,000 to facilitate the purchase of certain Kiosks.  The VFS Equipment Agreements are collateralized by the applicable Kiosks and are subject to annual interest rates between 16.86% and 17.42%, with interest and principal payments due monthly.  As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the VFS Equipment Agreements total approximately $1,473,000.

27.     In 2023 and 2024, Debtor Bitcoin Depot Operating LLC also became party to around ten equipment lease agreements with NFS Leasing, Inc. (the "*NFS Equipment Agreements*," and, together with the VFS Equipment Agreements, the "*Equipment Agreements*"), with terms of between 24 and 36 months, approximately five of which have not yet terminated. Interest and principal payments under the NFS Equipment Agreements are due monthly, and obligations under the NFS Equipment Agreements are purported to be secured by a first priority security interest in the applicable Kiosks.  As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the NFS Equipment Agreements total approximately $960,000.

### C.      Trade Claims and Other Unsecured Claims

28.      The Debtors' operations involve equipment and services which require regular monitoring, updates, and access to equipment locations.  As such, the Debtors rely on numerous key trade vendors who provide these essential goods and services to operate their businesses and preserve the value of their estates.  The Debtors are also subject to claims in the approximate amounts of $10,972,000 on account of the Kiosk Profit-Share Agreements and $4,234,000 on account of the Floorspace Agreements.  The Debtors also may be subject to certain litigation judgments (which the Debtors may dispute) in the approximate amount of $20,000,000.  As of the Petition Date, approximately $9,000,000 in trade claims exist against the Debtors.

## III.     EVENTS LEADING TO THE CHAPTER 11 CASES

### A.      Challenges Facing the Company

29.      Beginning in approximately 2024 and continuing through the present, the Company has faced significant legal, regulatory, and operational challenges.  These challenges include lawsuits and investigations from 11 state agencies, many of which generally allege that certain of the Company's operating platforms are being used by third parties to perpetuate fraud in violation of federal and state statutes and anti-money laundering regulations.  The Company is also the subject of a voluntary information request by the Securities and Exchange Commission and an investigation by the Federal Trade Commission based on similar allegations.  In addition to government actions, the Company is also a defendant in various private civil actions, including an action brought by Cash Cloud, Inc. ("*Cash Cloud*") against Debtor BitAccess, Inc. for breach of contract and alleged product defects, which resulted in an arbitration award in favor of Cash Cloud in the approximate amount of $18.5 million.  Beyond these legal actions, the Company faces additional pressure from an unfavorable regulatory environment, with various states evaluating

new legislation that would negatively impact the Company's cryptocurrency-related operations and increase the burden of regulatory compliance.

30.     In August 2025, Alex Holmes, the former Chairman and Chief Executive Officer ("*CEO*") of MoneyGram International, Inc., and a globally recognized leader in payments, compliance, and blockchain innovation with more than 25 years of experience with financial services companies, was appointed to the board of directors of Bitcoin Depot (the "*Board*") as an independent director.  With the benefit of Mr. Holmes' expertise and with the recommendation of the Company's Chief Legal Officer ("*CLO*") at that time, Christopher Ryan, and in connection with the Company's attempt to mitigate third-party fraud and enhance compliance, in October 2025 the Company announced implementation of a Know Your Customer ("*KYC*") verification process that required customers to provide identification before transacting for any amount of money at a Kiosk.  Generally, verification involved collecting users' names, email addresses, phone numbers, driver's licenses or other ID, social security numbers and photos of each user. Further, the Kiosks were equipped to take photos throughout the transaction process, allowing the Company to verify that users matched the identifying information provided during the KYC process.  The compliance systems routinely rejected user applicants that failed authentication requirements, and banned users from transacting at Kiosks and via BDCheckout when the Company's compliance team flagged suspicious activity or when the users violated the Company's terms of service.  These user bans represented approximately 4% of the Company's overall transaction volumes in a given month. Following implementation of the KYC verification procedures, the Company's revenues declined significantly in Q4 2025 and Q1 2026.  The Company recorded a net loss in the fourth quarter of 2025 of $24.9 million compared to net income of $5.4 million in the fourth quarter of 2024, and a net loss of $9.5 million for the first quarter of

14

2026 compared to net income of $12.2 million for the first quarter of 2025. Revenue decreased by $80.7 million, or 49.2%, for the first quarter of 2026 as compared to the first quarter of 2025, primarily due to a decrease in transaction volume driven by a combination of regulatory impacts and enhanced compliance controls.

31.     In November 2025, the Company announced that effective January 1, 2026, Bitcoin Depot would complete a strategic leadership transition, with Brandon Mintz resigning his role as CEO and taking on a role as Executive Chairman, Scott Buchanan (the Company's former Chief Operating Officer ("*COO*")) succeeding Mr. Mintz as CEO, and Elizabeth Simer succeeding Mr. Buchanan as COO.

32.     On February 13, 2026, Christopher Ryan resigned his position as CLO[2] and Corporate Secretary and Philip Brown resigned as Chief Compliance Officer ("*CCO*"), both citing concerns about the Company's compliance practices as the basis for their resignations. On February 24, 2026, the Company announced that it has initiated a phased rollout of a new compliance enhancement requiring customers to provide identification for every transaction at its Kiosks. Thereafter, in March 2026, Scott Buchanan resigned as CEO, Elizabeth Simer resigned as COO, and Brandon Mintz stepped down as Executive Chairman. Mr. Mintz remains a member of the Board. Mr. Buchanan and Ms. Simer are no longer affiliated with the Company.

33.     In response to the resignations of Mr. Ryan and Mr. Brown, a special committee of the Board consisting of independent directors Bradley Strock, Daniel Stabile, and Alex Holmes engaged Goodwin Procter ("*Goodwin*") to assist with conducting an internal investigation

---

[2]     Christopher Ryan has since rejoined the Company as Chief Legal Officer and Corporate Secretary, as further described below.

15

regarding the Company's compliance practices and identifying any necessary remedial measures. Goodwin presented its initial findings and recommendations to this committee in April 2026.

### B.      A New Management Team is Engaged and the Path Forward

34.      In response to Mr. Buchanan's resignation as CEO and the leadership shakeup, in March 2026, the Board appointed Alex Holmes as CEO and Chairman of the Board of Bitcoin Depot.  As noted above, Mr. Holmes has previously served as an independent director for the Company and is the former Chairman and CEO of MoneyGram International, Inc.  Shortly thereafter Christopher Ryan rejoined Bitcoin Depot as General Counsel and Corporate Secretary. This new management team was tasked with designing strategies to improve performance and maximize value of the Company's businesses, while also continuing to enhance compliance performance.  On April 13, 2026, Anthony Gagliardi III was appointed as CCO.  I understand that shortly after commencing employment, Mr. Gagliardi also raised concerns with the Company's business model and customer composition, and worked with Mr. Holmes and Mr. Ryan to design additional compliance rules to further mitigate consumer fraud.[3]  In April 2026 the Company also retained Portage Point as financial advisor to work with the Company on assessing the current business model, forecasting cash flow, analyzing and preserving liquidity, and evaluating a potential marketing process or strategic alternatives.  Mr. Holmes and the Board also immediately tasked the Portage Point team with performing a deep dive analysis of the viability and trends of the Company's businesses to help inform its decisions around the Company's next steps, initiatives, and prospects.[4]

---

[3]      Mr. Gagliardi has since resigned from that position and is no longer affiliated with the Company.

[4]      Given the high volume of management turnover and uncertainty regarding the Company's path forward, the Company determined in its business judgment to pay retention bonuses on May 8, 2026 and May 15, 2026 to certain high-level key employees who are critical to the success of the Company's efforts to achieve a value-maximizing outcome.

16

35.     Following their initial evaluation, including review of these analyses conducted by the Advisors (as defined below), the new management team had serious concerns regarding the Company's ability to implement necessary compliance measures and preserve the profitability of its enterprise, particularly in light of the additional costs associated with ongoing regulatory scrutiny, litigation, and governmental enforcement actions.  By way of example, the Company accrued over $20 million in legal judgments in the fourth quarter of 2025 and continues to allocate substantial resources to manage ongoing litigation matters.  Management and the Advisors concluded that the Company faces mounting financial and performance obstacles with no clear path to resolution, including new and ongoing legal actions and investigations.  Following the performance of this analysis, the Company retained Vinson & Elkins LLP ("*V&E*" and, together with Portage Point, the "*Advisors*") as restructuring counsel effective April 24, 2026, to assist with evaluating potential strategic alternatives.

36.     While the Company continued to assess the value-maximizing path forward, on May 1, 2026, the Board authorized the Advisors and management to begin contingency planning for a potential chapter 11 process.  Management also determined to reduce consumer transaction thresholds as part of its ongoing efforts to target and prevent potential third-party fraud based on its internal analyses, which, as anticipated, resulted in further decreases in revenue.  Lastly, the Company undertook certain cost-cutting measures, including electing percentage-based rather than fixed monthly payments under certain of the Floorspace Agreements to reduce expenditures on under-performing Kiosks.

37.     Bitcoin Depot was obligated to file its Form 10-Q for the quarter ended March 31, 2026 on May 11, 2026; however, in the week before that filing deadline, the Company's auditors determined that they would not be able to complete their analysis in connection with an element

of the material weakness disclosed in Bitcoin Depot's Form 10-K as of December 31, 2025 concerning the reconciliation process for cash in transit by the deadline.  On May 12, 2026, Bitcoin Depot filed Form 12b-25 indicating that it would not be able to file its Form 10-Q in a timely manner and that there were substantial doubts about the Company's ability to continue as a going concern as a result of the litigation and regulatory pressures it faces and the resultant effects on the Company's revenue and operations.  Specifically, the Company disclosed that state and municipal regulations banning or restricting BTMs, capping fees, and limiting transaction sizes, together with the Company's voluntary adoption of increasingly enhanced KYC processes and other compliance measures across its network, had driven substantial year-over-year declines in revenue and resulting net income.  Those declines, together with mounting litigation costs and deterioration in the Company's cash position and revenue outlook, led the Company to consider potential strategic alternatives, including the wind-down of its businesses.

38.     On May 13, 2026, the Board appointed Ivona Smith to the Board as an independent director.  The following day, the Board appointed me the Company's CRO and approved the formation of a disinterested special committee of the Board (the "***Restructuring Committee***"), consisting of Alex Holmes and Ivona Smith, which Restructuring Committee is tasked with, among other things, advising the Board on matters related to the evaluation of Bitcoin Depot's strategic alternatives and approving conflict matters.  Ms. Smith is also the sole member of the Investigation Subcommittee, a subcommittee of the Restructuring Committee, with the authority to investigate, evaluate, and advise the Board on whether the Company holds any valuable claims or causes of action, including, without limitation, claims against current or former officers, directors, insiders, or third parties, and to make a final determination of appropriate action with respect to any such claims.  In the event that Ms. Smith determines that any estate claims and

causes of action are valuable and viable, the Debtors expect to establish a litigation trust through the chapter 11 process for the benefit of their creditors.

39.     Ultimately, the new management team's prudent assessment of the business has caused the Company to determine to take the Company's BTMs offline and otherwise pause the majority of its operations to focus on asset monetization through a chapter 11 process for the benefit of all stakeholders.  Contemporaneously with the filing of this Declaration, the Company is issuing notices, which, to the extent applicable, satisfy notification requirements pursuant to the Worker Adjustment and Retraining Notification Act (the "***Termination Notices***") to all of its U.S.-based employees.  The Termination Notices inform each employee that they will remain on the payroll for 60 days from the date of the notice, after which their employment with the Company will terminate.

40.     The Debtors are filing these Chapter 11 Cases to preserve and maximize the value of their estates and to administer these Chapter 11 Cases for the benefit of all stakeholders.  The Debtors intend to file in the near-term a motion for approval of bidding and sale procedures in connection with the sale process they intend to run to sell all or substantially all of their assets. The Debtors intend to use the chapter 11 process to effectuate these asset sales and to establish a liquidation trust for the benefit of their stakeholders, with the aim of monetizing their assets and maximizing recovery to all stakeholders.  The Debtors expect to be able to pay all Court-allowed amounts outstanding under the Silverview Credit Facility in full and aim to maximize available recoveries for all other claimants.  The Debtors have sufficient liquidity to fund the case via use of cash collateral, as outlined in the First Day Motions.

IV.     **FIRST DAY MOTIONS**

41.     Contemporaneously with this Declaration, the Debtors have filed certain First Day Motions seeking orders granting various forms of relief intended to avoid immediate and

irreparable harm to the Debtors' estates resulting from the filing of these Chapter 11 Cases.  The Debtors intend to seek entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules for the United States Bankruptcy Court for the Southern District of Texas.  I have reviewed each of the First Day Motions, and I believe that if the Court declines to grant the relief requested therein, the Debtors will suffer immediate and irreparable harm for the reasons stated in the First Day Motions and in **Exhibit A**.

42. A description of the relief requested and the facts and opinions supporting each of the First Day Motions is detailed in **Exhibit A**.

[*Remainder of page intentionally left blank.*]

20

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 18, 2026

/s/Thomas Studebaker
Thomas Studebaker
Chief Restructuring Officer
Bitcoin Depot Inc.

21

# EXHIBIT A

## Evidentiary Support for First Day Motions[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Declaration and/or the applicable First Day Motions.

I.      **ADMINISTRATIVE MOTIONS[1]**

A.      **Emergency Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")**

1.      In the Joint Administration Motion, the Debtors seek entry of an order consolidating the administration of these chapter 11 cases for procedural purposes only as follows:

    i.   the Office of the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*") shall conduct joint informal meetings with the Debtors, as required, and, unless otherwise directed by the Court, to the extent required, a joint first meeting of creditors;

    ii.  one plan and disclosure statement may be filed for all of the Debtors by any plan proponent; however, substantive consolidation of the Debtors' estates is not being requested at this time;

    iii. unless otherwise required by the Court, to the extent the Debtors are required to file schedules of assets and liabilities and statements of financial affairs, each Debtor will file separate schedules of assets and liabilities, statements of financial affairs, and lists of equity security holders;

    iv.  proofs of claim filed by creditors of any Debtor shall reflect the caption and case number of the Debtor to which the claim relates and in which chapter 11 case such claim is to be filed; and

    v.   a separate claims register shall be maintained for each Debtor.

2.      The Debtors respectfully request that the Court maintain one file and one docket for all of the jointly administered cases under the lead case of Bitcoin Depot Inc. and that the Court administer these Chapter 11 Cases under a consolidated caption, as follows:

---

[1]   Each defined term used in this Exhibit A shall only be applicable to the specific section where it is defined.

1

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| BITCOIN DEPOT INC., *et al.*, | ) |
|  | ) Case No. 26 – [_____] (__) |
| Debtors.[2] | ) |
|  | ) (Jointly Administered) |
|  | ) |
|  | ) |

3.      The lead case docket, as well as the dockets for each of the other Chapter 11 Cases, will be available on the website of the Debtors' proposed claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/bitcoindepot.

4.      The Debtors also request that a notation substantially similar to the following be entered on each of the Debtors' respective dockets (other than Debtor Bitcoin Depot Inc.) to reflect the joint administration of these Chapter 11 Cases:

An order has been entered in this case in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas directing the joint administration of the chapter 11 cases of: Bitcoin Depot Inc.; BCD Merger Sub LLC; Bitcoin Depot Operating LLC; BT HoldCo LLC; BTM International Holdings I LLC; BTM International Holdings II LLC; Cash Ramp LLC; Digital Gold Ventures Inc.; Express Vending Inc.; Intuitive Software LLC; Kiosk HoldCo LLC; Kiosk Technicians, LLC; Kutt, Inc.; Lux Vending Kiosk, LLC; MCA Services Group, LLC; and Mintz Assets, Inc. The

---

[2]     The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bitcoindepot. The location of the Debtors' corporate headquarters is: 8601 Dunwoody Place, Sandy Springs, Georgia 30350.

docket in Case No. 26-90528 (CML) should be consulted for all matters affecting these cases. **All further pleadings and other papers shall be filed in and all further docket entries shall be made in Case No. 26-90528 (CML).**

5.      The Debtors further respectfully request that the Court order that the foregoing caption satisfies the requirements set forth in section 342(c)(1) of the Bankruptcy Code.

6.      Bitcoin Depot Inc. is a direct or indirect affiliate of each of the Debtors.

7.      I understand that the Debtors anticipate that notices, applications, motions, other pleadings, hearings, and orders in these chapter 11 cases may affect all of the Debtors.  I believe that if each Debtor's case were administered independently, there would be a number of duplicative filings and overlapping service, which would be an unnecessary duplication of identical documents that would be wasteful of the resources of the Debtors' estates, as well as the resources of the Court and of other parties in interest.

8.      Joint administration will permit the Clerk of the Court to use a single general docket for all of the Debtors' chapter 11 cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding all of the Debtors' chapter 11 cases.  Moreover, supervision of the administrative aspects of the Debtors' chapter 11 cases by the U.S. Trustee will be simplified.  Therefore, I believe that joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

9.      I do not believe joint administration will give rise to any conflict of interest among the Debtors' estates, and I believe that the rights of the Debtors' respective creditors will not be adversely affected by the proposed joint administration because each of the Debtors will continue as separate and distinct legal entities, will continue to maintain separate books and records, and

3

will provide information as required in the consolidated monthly operating reports on a debtor-by-debtor basis. I further understand that each creditor may file a proof of claim against the applicable estate in which it allegedly has a claim or interest and will retain whatever claims or interests it has against the particular estate. As such, I believe the recoveries of all creditors will be enhanced by the reduction in costs resulting from joint administration of the Debtors' chapter 11 cases. I also believe that the Court will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files

10. Based on the foregoing, I believe any delay in granting the relief requested in the Joint Administrative Motion would hinder the Debtors' operations and cause immediate and irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Joint Administration Motion be approved.

**B.** **Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of the Thirty Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information, (II) Approving the Form and Manner of Notice of Commencement, (III) Waiving the Requirement to File a List of Equity Security Holders of Bitcoin Depot Inc. and Provide Direct Notice Thereto, and (IV) Granting Related Relief (the "*Consolidated Creditor Matrix Motion*")**

11. In the Consolidated Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) file a consolidated creditor matrix; (ii) file a consolidated list of the thirty largest unsecured creditors; and (iii) redact certain personal identification information; (b) approving the form and manner of the notice of commencement of these Chapter 11 Cases; (c) waiving the requirement to file a list of equity security holders of Bitcoin Depot Inc., and (d) granting related relief.

12. I believe that preparing separate lists for each Debtor would be an unnecessarily burdensome task and could result in duplicate mailings. Moreover, the Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled

4

to receive notice, as applicable, and other documents in these Chapter 11 Cases.  I believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with requisite notice and other documents filed in these Chapter 11 Cases.  Therefore, the Debtors respectfully request authority to file a consolidated list of creditors (the "***Creditor Matrix***") for all of the Debtors on the lead case docket.

13.     The Debtors respectfully request authority to file a single list of their thirty largest general unsecured creditors (the "***Top 30 List***") on a consolidated basis.  Because the Top 30 Lists of the Debtors could overlap, and certain Debtors may have fewer than thirty significant unsecured creditors, I believe that filing separate Top 30 Lists for each Debtor would be of limited utility.  I believe that a single consolidated Top 30 List would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.  In addition, I believe that the exercise of compiling separate Top 30 Lists for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.  I further believe that a single Top 30 List will also help alleviate administrative burden, costs, and the possibility of duplicative service.

14.     Accordingly, I believe that filing a consolidated Top 30 List is necessary for the efficient and orderly administration of these Chapter 11 Cases, appropriate under the facts and circumstances, and in the best interests of the Debtors' estates.

15.     I believe that cause exists to authorize the Debtors to redact address information of the Debtors' employees and individual creditors, including individual equity holders of the Debtors, from the Creditor Matrix because such information could be used to perpetrate identity theft or to harm such individuals.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the Court, the U.S. Trustee, counsel to any official committee of unsecured

5

creditors appointed in these Chapter 11 Cases, and any party in interest who, for cause, requests such information from the Debtors or the Court.

16.     The Debtors, through Kroll Restructuring Administration LLC, their proposed claims and noticing agent, propose to serve the notice of commencement, substantially in the form attached to the Order as Annex A (the "***Notice of Commencement***"), on all parties listed on the Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  I believe that providing service of the Notice of Commencement on the Creditor Matrix will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' Creditor Matrix and will preserve judicial resources and prevent creditor confusion through the efficient service of critical information.  Accordingly, I believe that service of a single Notice of Commencement is warranted and appropriate in these Chapter 11 Cases.

17.     I believe that the requirements to file a list of and to provide notice directly to equity security holders should be waived as to Bitcoin Depot Inc.  As stated herein, Bitcoin Depot Inc. is a public company and, as of the Petition Date, has in excess of 11 million shares of common stock outstanding, held by more than 90 holders. Bitcoin Depot Inc. only maintains a list of its registered equity security holders and therefore must obtain the names and addresses of its beneficial shareholders from a securities agent.  I believe that preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties will create undue expense and administrative burden with limited corresponding benefit to the Debtors' estates or parties in interest.

18.     Bitcoin Depot Inc. has taken or will take several actions to inform its equity security holders of the commencement of these Chapter 11 Cases as soon as is practicable after the date

6

hereof: (a) the Debtors will serve the notices required under Bankruptcy Rule 2002(d) on the registered holders of Bitcoin Depot Inc.'s equity securities and all banks, brokers, intermediaries, Continental Stock Transfer & Trust Company participants, and other nominees or their mailing agents that hold Bitcoin Depot Inc. equity securities in "street name" for the beneficial holders (with instructions to serve down to beneficial holders, as applicable); (b) the Debtors will prominently post the Notice of Commencement on the Debtors' case website located at https://restructuring.ra.kroll.com/bitcoindepot; and (c) the Debtors will file a Form 8-K with the Securities and Exchange Commission (the "*SEC*") notifying their equity holders and other parties of the commencement of these Chapter 11 Cases.

19.     I understand that equity security holders routinely monitor SEC filings about the Company and also will receive notice through the registered holders of Bitcoin Depot Inc.'s common stock.  In light of the multiple channels through which the Debtors will provide notice of the commencement of these Chapter 11 Cases, all of which are likely to provide notice to equity security holders, the Debtors request that the Court waive the requirements to file a list of and to provide notice directly to Bitcoin Depot Inc.'s equity security holders (other than registered holders of Bitcoin Depot Inc.'s common stock).  Therefore, out of an abundance of caution, the Debtors respectfully ask the Court to approve the form and manner of notice as it relates to equity security holders in the manner described above.

20.     Based on the foregoing, I believe any delay in granting the relief requested in the Consolidated Creditor Matrix Motion would hinder the Debtors' operations and cause immediate and irreparable harm.  Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Consolidated Creditor Matrix Motion be approved.

**C.     Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, And Solicitation Agent (the "*Claims and Noticing Agent Application*")**

21.     The Debtors seek entry of an order authorizing the Debtors to employ Kroll Restructuring Administration LLC ("*Agent*") as claims, noticing, and solicitation agent (the "*Claims and Noticing Agent*") in accordance with the terms and conditions set forth in the engagement letter dated May 5, 2026 (the "*Engagement Letter*") attached to the Claims and Noticing Agent Application as Exhibit B, which is also supported by the *Declaration of Benjamin J. Steele in Support of Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (the "*Declaration*") attached as Exhibit C to the Claims and Noticing Agent Application.

22.     The Debtors request approval to employ Agent to serve as Claims and Noticing Agent in these Chapter 11 cases to provide the services outlined in the Engagement Letter.  I believe that Agent's employment is in the best interest of the estates, the Agent's rates are competitive and reasonable, and the Agent has the expertise required in a complex chapter 11 case.

23.     The Debtors request that Agent's fees and expenses be paid as an administrative expense in the ordinary course of the Debtors' business without further application or order of the Court.  I understand that should a dispute develop, the matter will be brought to the Court for resolution.  I further understand that Agent agrees to maintain records of all services showing dates, categories of services, fees charged, and expenses incurred.  I also understand that the Agent will provide a monthly invoice to the Debtors, Debtors' counsel, the U.S. Trustee, counsel for any official committee, and any party-in-interest who specifically requests service of the monthly invoices.

8

24.     Prior to the Petition Date, the Debtors provided Agent an advance in the amount of $50,000, and I understand that Agent will apply these funds in accordance with the Engagement Letter.

25.     I understand that the Debtors have agreed to indemnify the Agent as set forth in the Engagement Letter; however, notwithstanding anything to the contrary, the Agent will not be indemnified for liability arising out of gross negligence, willful misconduct, and certain other matters identified in the Order.

26.     Finally, I understand that Agent has reviewed its conflicts system to determine whether it has any relationships with the Debtors' creditors and parties-in-interest.  Except as disclosed in the Declaration, Agent represents that it neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed.  I understand that Agent agrees that it will supplement its disclosure to the Court if any facts or circumstances are discovered that would require such additional disclosure.

27.     I believe that the Claims and Noticing Agent Application should be granted because the Agent's services are required to effectuate the Debtors' transition into bankruptcy and to immediately begin providing effective notice of pleadings and orders to interested parties. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Claims and Noticing Agent Application be approved.

**D.     Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements Of Financial Affairs and (B) Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief (the "*Motion for Extension of Time to File Schedules*")**

28.     In the Motion for Extension of Time to File Schedules, the Debtors seek entry of an order (the "***Proposed Order***"), substantially in the form attached to the Motion for Extension

9

of Time to File Schedules as Exhibit A: (a) extending the deadline by which the Debtors must file (i) their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "*Schedules and Statements*") by 30 days, for a total of 44 days from the Petition Date, through and including June 30, 2026 and (ii) initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3 (the "*2015.3 Reports*") by 37 days, for a total of 44 days from the Petition Date, through and including June 30, 2026, in each case without prejudice to the Debtors' ability to request additional extensions for cause shown, (b) modifying the requirements of Local Rule 2015-3 to permit the Debtors to file 2015.3 Reports every six months, and (c) granting related relief.

29. I believe that ample cause exists to grant the relief requested herein. To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of creditors, assets, leases, and contracts from each Debtor entity. To accurately prepare their Schedules and Statements will require a significant expenditure of time and effort on the part of the Debtors' employees. I believe that complying with the short timeline granted under the Bankruptcy Code and the Bankruptcy Rules would place significant strain on the Debtors' financial team and would likely impact the Debtors' ability to facilitate these Chapter 11 Cases.

30. In the days leading up to the Petition Date, the primary focus of the Debtors' financial team has been preparing for these Chapter 11 Cases. I believe focusing the attention of key personnel on critical business and chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates and all stakeholders. I understand that the Debtors are not in a position to

10

complete the initially required reports for the reasons described above regarding the Schedules and Statements.

31.     I understand that certain Debtors maintain interests in non-Debtor affiliates that are subject to Bankruptcy Rule 2015.3 and, as such, are required to file 2015.3 Reports.[3]   These non-Debtor affiliates are all foreign entities with few or no creditors and *de minimis* assets and operations, all of which have begun or will imminently begin the process of liquidating and winding down their affairs.  I believe that cause exists to extend the deadline for filing the 2015.3 Reports based on (a) the size, scope, and complexity of the businesses; (b) the substantial burdens associated with complying with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases; and (c) the limited utility of immediate 2015.3 Reports for non-Debtor entities that are liquidating rather than operating active businesses.  In addition, the Debtors are not in a position to complete the initial 2015.3 Reports within the time required under Bankruptcy Rule 2015.3 for the reasons described above regarding the Schedules and Statements.

32.     I believe that extending the deadline to file Schedules and Statements will enable the Debtors to work with their advisors and other entities to determine what those reports should include and whether any changes should be made to the reporting rules. Accordingly, the Debtors request that the Court extend the time by which the Debtors must file initial Schedules and Statements through and including June 30, 2026, without prejudice to the Debtors' ability to request further extensions for cause shown.

33.     The Debtors also request that the Court to permit the Debtors to file certain Reports every six months.   I understand that filing monthly Reports would create an unnecessary

---

[3]     Such non-Debtor affiliates are:  Bitcoin Depot, S. de R.L. de C.V. (Mexico), Brazil BTM Limitada (Brazil), BTM Solutions India Private Ltd. (India), HK BTM Ltd. (Hong Kong), NZ BTM Ltd. (New Zealand),  UK BTM Ltd. (United Kingdom) and AUS BTM PTY LTD (Australia).

administrative burden for the Debtors' estates.  To prepare these Reports, the Debtors must compile information from books, records, and documents relating to their non-Debtor affiliates across several jurisdictions.  Given that such non-Debtor affiliates are winding down, I believe that any utility of such monthly reporting is significantly outweighed by the disproportionate burden to the Debtors' estates.  I understand that collecting the necessary information requires a substantial expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors on a consistent, monthly basis, when these resources would be best used to facilitate the Debtors' restructuring efforts and administration of these Chapter 11 Cases.

34.     I believe that granting the relief requested in the Motion for Extension of Time to File Schedules is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.  I believe that failure to receive such authorization and other relief during the first twenty-one days of these Chapter 11 Cases could impact the Debtors' operations at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates.  The requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value for the benefit of all stakeholders.  And I further believe that any delay in granting such relief could result in immediate and irreparable harm to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Motion for Extension of Time to File Schedules be approved.

E.     **Emergency Motion for Entry of an Order (I) Authorizing Bitcoin Depot, Inc. to Act as Foreign Representative and (II) Granting Related Relief (the "*Foreign Representative Motion*")**

35.     In the Foreign Representative Motion, the Debtors seek entry of an order ("*Order*") authorizing, but not directing, Bitcoin Depot Inc. to act as foreign representative on behalf of the Debtors' estates (the "*Foreign Representative*") in legal proceedings in Canada in relation to the Chapter 11 Cases.

36.     Digital Gold Ventures Inc., BitAccess Inc., and Express Vending Inc. (collectively, the "*Canadian Debtors*") are wholly-owned or majority-owned indirect subsidiaries of Bitcoin Depot Inc.[4] and were each formed under the laws of Canada.  The Debtors' Canadian operations are primarily run through the Canadian Debtors.

37.     The Canadian Debtors are seeking recognition of the Chapter 11 cases of Bitcoin Depot, Inc. in the Canadian Court. The Debtors request authority to appoint Bitcoin Depot Inc. as Foreign Representative in connection with the Canadian Proceeding.

38.     Without an order issued by this Court appointing Bitcoin Depot Inc. as Foreign Representative, I understand that the Debtors may struggle to satisfy the requirements of Canadian law for an application for recognition of these Chapter 11 Cases.  Accordingly, the Debtors request that the Court enter the Order authorizing Bitcoin Depot Inc. to act as the Foreign Representative in the Canadian Proceeding.  At this time, the Debtors have no intention of seeking relief in any other foreign jurisdiction aside from Canada.

39.     I believe that the entry of the proposed Order will allow the Debtors to coordinate the Chapter 11 Cases and the Canadian Proceeding for the benefit of the Debtors' estates. Specifically, I understand that the Debtors will seek orders from the Canadian Court to, among other things, ensure that certain relief granted in this Court will be enforceable in Canada and that Canadian creditors will be stayed from taking action against the Debtors and their estates during the pendency of these Chapter 11 Cases.

40.     I believe that authorizing Bitcoin Depot Inc. to act as Foreign Representative on behalf of the Debtors' estates in legal proceedings in Canada in relation to the Chapter 11 Cases,

---

[4]     Bitcoin Depot Inc. indirectly and wholly owns Express Vending Inc. and Digital Gold Ventures Inc.  Digital Gold Ventures Inc. directly owns 80% of BitAccess Inc., with the remaining ownership interests held by minority stockholders.

as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors. I believe that failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases could impact the Debtors' operations at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates. I further believe that the requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value for the benefit of all stakeholders. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Foreign Representative Motion be approved.

## II.     OPERATIONAL MOTIONS REQUESTING IMMEDIATE RELIEF

**A.     Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "*Wages Motion*")**

41.     In the Wages Motion, the Debtors seek entry of an order (the "***Order***") authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits Programs (as defined below) and (b) continue to administer the Compensation and Benefits Programs in the ordinary course of business, including payment of prepetition obligations related thereto.

42.     I believe that an immediate and orderly transition into chapter 11 is critical to the preservation of value at this important juncture and the successful restructuring of Bitcoin Depot, Inc. I believe that any delay in granting the relief requested could cause immediate and irreparable harm to the Debtors.

43.     As of the Petition Date, the Debtors employ individuals located in the United States and in Canada. Debtor BitAccess Inc. ("***BitAccess***") employs approximately 7 individuals located in Canada (collectively, the "***BitAccess Employees***") on a full-time basis. Debtor Bitcoin Depot

14

Operating LLC ("*OpCo*") employs approximately 107 individuals located in the U.S. (the "*OpCo Employees*") on a full-time basis.  Additionally, Debtor Kutt, Inc. ("*Kutt*") employs 2 individuals located in the U.S. (the "*Kutt Employees*," together with the BitAccess Employees and the OpCo Employees, the "*Employees*") on a full-time basis.

44.     Approximately 13 Employees are paid on an hourly basis and approximately 103 Employees receive a salary.   Additionally, the Debtors utilize 13 independent contractors, primarily consisting of various engineering, sales and other support services who are vital to the Debtors' asset preservation and value-maximization efforts (the "*Independent Contractors*," and, together with the Employees, the "*Workforce*").

45.     Concurrently with the filing of these Chapter 11 Cases, the Debtors issued notices to their U.S.-based Employees, which I understand that, to the extent applicable, satisfy notification requirements under the Worker Adjustment and Retraining Notification Act (the "*WARN Act*," and the notices issued thereunder, the "*Termination Notices*").  I understand that the WARN Act generally requires 60 days of advance notice to affected employees and governmental entities prior to the implementation of a mass layoff or plant closing, as defined in the WARN Act.  The Debtors, as fiduciaries of their estates, continue to evaluate the role of the Workforce in these Chapter 11 Cases on an ongoing basis.

46.     As of the Petition Date, the Debtors have not terminated any of the Employees who received a Termination Notice; rather, the Termination Notices provide the Employees notice of their planned employment termination date that is 60 days from the date of the Termination Notice. During the notice period, Employees will remain on the payroll, continuing to receive their regular wages and benefits, and will be expected to provide services as directed by the Company. However, the Debtors request authority to pay claims asserted under the WARN Act (such claims,

15

the "*WARN Claims*") if the Debtors elect to terminate Employees prior to the expiration of the notice period as an administrative expenses of their estates.

47.     The Workforce continues to perform a wide variety of functions critical to the administration of and transition into these Chapter 11 Cases.  Their skills, knowledge, and understanding of the Debtors' businesses are essential to executing the Debtors' strategic objectives and preserving estate value.  I believe that without the continued, uninterrupted services of the Workforce, the Debtors' ability to preserve and maximize estate value for the benefit of all stakeholders would suffer immediate and irreparable harm. Therefore, notwithstanding issuance of the Termination Notices, I believe it is critical that the Debtors continue to make payments under the Compensation and Benefits Programs (as defined below) in the ordinary course of business during the 60-day notice period.

48.     I understand that the vast majority of the Workforce relies exclusively on their compensation and benefits from the Debtors to pay their daily living expenses and support their families.  Thus, the Workforce will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits in the ordinary course.  I therefore believe that the relief requested is necessary and appropriate.

49.     To avoid immediate and irreparable harm to the Debtors' estates, and to minimize the personal hardship the Workforce would suffer if the Debtors' obligations are not paid when due or as expected, the Debtors are seeking authority to pay and honor certain prepetition claims relating to compensation and benefits programs.  Specifically, the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, corporate credit cards, other compensation, federal, state, and provincial taxes and other withholdings, health insurance, life and accidental death and dismemberment insurance,

16

disability coverage, workers' compensation benefits, paid time off, and other benefits that the Debtors have historically directly or indirectly provided to the Workforce in the ordinary course of business, as well as all incidental costs thereof (collectively, the "***Compensation and Benefits Programs***," and the obligations arising therefrom, the "***Compensation and Benefits Obligations***").

50.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.  Out of an abundance of caution, however, the Debtors request the right to modify, change, or discontinue certain of the Compensation and Benefits Programs and to implement new programs, policies, and benefits, in their discretion and in the ordinary course of business during these Chapter 11 Cases and without the need for further Court approval, subject to the terms of the Order and applicable law.

51.     The Debtors are seeking relief with respect to the prepetition amounts owed on account of the Compensation and Benefits Programs as follows.[5]

| Obligation | Approximate Amount |
|---|---|
| Compensation & Related Obligations | |
| Unpaid Wages | $600,000 |
| Unpaid Withholding Obligations | $50,000 |
| Unpaid Corporate Credit Card Program Obligations | $100,000 |
| Employee Benefit Programs | |
| Unpaid Health Insurance Program Obligation | $62,000 |
| Unpaid 401(k) Obligations | $37,000 |
| **TOTAL** | $849,000 |

   a) **Employee Wages:** In the ordinary course of business, the Debtors incur and pay, and continue to incur and pay the Employees' wages, salaries, and other compensation, on a

---

[5]     This table is for illustrative purposes only and is qualified by the Motion and the Interim Order and Final Order.

bi-weekly or semi-monthly basis (collectively, the "*Employee Compensation*").[6] Historically, the Debtors pay the Employees' wage and salary obligations (collectively, the "*Wages*") on either a salaried or hourly basis.  On average, the Debtors paid approximately $530,000 per bi-weekly pay period (as it relates to OpCo and Kutt) and approximately $40,000 per semi-monthly pay period (as it relates to BitAccess) on account of Wages. The Debtors' most recent bi-weekly payroll pay date for OpCo and Kutt employees was on May 8, 2026 and most recent semi-monthly payroll date for BitAccess was on May 15, 2026.  As of the Petition Date, the Debtors believe that approximately $600,000 in unpaid Wages has accrued and is outstanding (the "*Unpaid Wages*"), all of which will become due and payable in the first twenty-one days after the Petition Date.  The Debtors seek authority, but not direction, to pay the Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue paying the Unpaid Wages on a postpetition basis in the ordinary course of business and consistent with past practice. The Debtors do not believe there are prepetition amounts owed to any individual on account of Wages that exceed $17,150, the priority expense amount set forth in section 507(a)(4) of the Bankruptcy Code, and the Debtors are not seeking authority to pay Wages to any Employee in excess of such amount.

b) **Independent Contractor Obligations:** In the ordinary course of business, the Debtors incur and pay the Independent Contractors' compensation (the "*Independent Contractor Obligations*").  In 2025, the Debtors paid approximately $171,000 on account of the Independent Contractor Obligations.  Historically, the Debtors have paid an average of approximately $15,000 per month on account of the Independent Contractor Obligations. As of the Petition Date, the Debtors are not aware of any accrued and outstanding Independent Contractor Obligations.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any unpaid Independent Contractor Obligations in the ordinary course of business and consistent with past practice, and to continue to pay the Independent Contractor Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

c) **Withholding Obligations:**  During each applicable pay period, the Debtors, through UKG (Ultimate Kronos Group) and Gusto, Inc. (the "*Payroll Processors*"), routinely deduct and withhold certain amounts from Employees' paychecks for, among other things, garnishments, child support, and pre- or post-tax deductions payable pursuant to certain of the benefit programs (collectively, the "*Deductions*").  Certain of the Deductions are processed and forwarded to the appropriate third party at the same time the Employees' payroll checks are disbursed.  On average, OpCo and Kutt remitted approximately $40,000 and BitAccess remitted approximately $4,000 per pay period on account of the Deductions. The Debtors also are required under U.S. and Canadian law, as applicable, to withhold from Employee Compensation amounts related to, among other things, federal, state, provincial, and local income taxes, as well as Social Security and Medicare (for U.S.-based Employees) and Canada or Quebec Pension Plan (for Canada-based Employees) (collectively, the "*Employee Payroll Taxes*") for remittance to the appropriate federal,

---

[6]   The Debtors use third-party payroll processors by which all disbursements and withholdings (as set forth herein) are processed.

state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for unemployment insurance under U.S. (both state and federal) and Canadian law (together with the Employee Payroll Taxes, the "***Payroll Taxes***" and, together with the Deductions, the "***Withholding Obligations***"). As of the Petition Date, the Debtors believe that approximately $50,000 in Withholding Obligations has accrued and is outstanding (the "***Unpaid Withholding Obligations***"), all of which will become due and payable within the first twenty-one days after the Petition Date. The Debtors seek authority, but not direction, to pay and/or remit the Unpaid Withholding Obligations in the ordinary course of business and consistent with past practice, and to continue paying and/or remitting the Withholding Obligations and any associated processing costs on a postpetition basis in the ordinary course of business.

d) **Expense Reimbursements:** In the ordinary course of business, the Debtors reimburse the Employees for reasonable and customary expenses that such Employees, as applicable, personally incur in the scope of their employment. Among other things, expense reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses incurred in the course of an Employee's duties (the "***Expense Reimbursements***"). Generally, eligible expenses are personally incurred by an Employee and reimbursed by the Debtors. The Debtors contract with Brex, Inc. ("***Brex***") to process and administer the Expense Reimbursements. Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse their Employees with respect to any Expense Reimbursements likely would impose significant hardships on those Employees. Because of the irregular nature of requests for Expense Reimbursements, it is difficult for the Debtors to determine the amount of unpaid Expense Reimbursements at any given time, but historically, the Expense Reimbursements are approximately $4,000 per month. As of the Petition Date, the Debtors are not aware of any accrued and outstanding Expense Reimbursements. However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any unpaid Expense Reimbursements in the ordinary course of business and consistent with past practice, and to continue to pay the Expense Reimbursements on a postpetition basis in the ordinary course of business and consistent with past practice.

e) **Corporate Credit Card Program:** The Debtors are party to three corporate credit card programs with Brex, American Express National Bank, and JPMorgan Chase Bank, N.A. (collectively, the "***Credit Card Providers***") whereby the Credit Card Providers provide credit cards to approximately 50 Employees that are primarily utilized to pay for business-related purchases (the "***Corporate Credit Card Program***"). Under the Corporate Credit Card Program, the Debtors receive monthly statements for purchases made via the Corporate Credit Card Program during the preceding month. Payment in respect of these statements is typically made on a monthly basis. In 2025, the Debtors paid an average of $400,000 per month to the Credit Card Providers collectively on account of the Corporate Credit Card Program. As of the Petition Date, the Debtors believe that approximately $100,000 in obligations due on account of the Corporate Credit Card Program has accrued and is outstanding (the "***Unpaid Corporate Credit Card Program Obligations***"), all of

which will become due and payable within the first 21 days after the Petition Date.  The Debtors seek authority, but not direction, to pay the Unpaid Corporate Credit Card Program Obligations in the ordinary course of business and consistent with past practice, and to continue paying the Corporate Credit Card Program obligations on a postpetition basis in the ordinary course of business.

f) **The Payroll Processors:** As noted above, the Debtors' Payroll Processors process the Debtors' payroll and federal tax forms and complete payroll tax filings, including federal, state, and local filings.  The Payroll Processors also provide timekeeping and attendance-tracking solutions, among other administrative services. The Debtors pay the Payroll Processors approximately $5,000 in subscription fees on a monthly basis (the "*Payroll Processor Fees*"). As of the Petition Date, the Debtors are not aware of any accrued and outstanding Payroll Processor Fees.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any unpaid Payroll Processor Fees in the ordinary course of business and consistent with past practice, and to continue paying the Payroll Processor Fees on a postpetition basis in the ordinary course of business and consistent with past practice.

g) **Health and Insurance Programs:**  As of the Petition Date, the Debtors believe that approximately $62,000 in obligations due on account of the OpCo Health Insurance Programs, Kutt Health Insurance Programs, and BitAccess Health Insurance Programs (each as defined below) has accrued and is outstanding (the "*Unpaid Health Insurance Program Obligations*"), all of which will become due and payable within the first 21 days after the Petition Date.  The Debtors seek authority, but not direction, to pay the Unpaid Health Insurance Program Obligations in the ordinary course of business and consistent with past practice, and to continue paying the Health Insurance Program obligations on a postpetition basis in the ordinary course of business in the manner discussed in detail below.

  a. **OpCo Health Insurance Programs:** OpCo offers the OpCo Employees the opportunity to participate in a number of health benefit plans, including the OpCo Medical Plan, the HSAs, the OpCo Dental Plan, and the OpCo Vision Plan (each, as defined below and collectively, including their respective administrative costs, the "*OpCo Health Insurance Programs*").

  i. **The OpCo Medical, Dental, and Vision Plans:**  OpCo offers medical coverage (the "*OpCo Medical Plans*") to the OpCo Employees through Cigna Health and Life Insurance Company ("*Cigna*").  OpCo Employees are provided with multiple plan options with varying required premiums. The OpCo Medical Plans provide coverage for, among other things, outpatient and inpatient services, preventative care, and prescription drug services.  OpCo Employees, as well as their spouses, children, and/or eligible dependents, may be covered under the OpCo Medical Plans.  As of the Petition Date, approximately 63 OpCo Employees participate in the OpCo Medical Plans.  OpCo also offers dental coverage (the "*OpCo Dental Plan*") to the OpCo Employees through Cigna.  OpCo Employees, as well as their spouses, children, and/or eligible dependents, may be covered under

the OpCo Dental Plan.  As of the Petition Date, approximately 77 OpCo Employees participate in the OpCo Dental Plan.  Finally, OpCo offers vision coverage (the "*OpCo Vision Plan*") to the OpCo Employees through Cigna.  The OpCo Vision Plan provides coverage or discounts for exams, prescription eyeglasses, and contact lenses.  OpCo Employees, as well as their spouses, children, and/or eligible dependents may be covered under the OpCo Vision Plan.  As of the Petition Date, approximately 76 OpCo Employees participate in the OpCo Vision Plan. After taking applicable Deductions, historically, OpCo has paid approximately $150,000 per month with respect to the OpCo Medical, Dental, and Vision Plans, including associated administrative fees.

ii.   **Health Savings Accounts:**  OpCo Employees who participate in the high deductible health plan may contribute a portion of their compensation into an optional health savings account (the "HSAs"), administered by Admin America ("*Admin America*"), which may be used for qualified medical expenses.  Participating OpCo Employees can make contributions to the HSA through payroll deductions on a pre-tax basis to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service.  As of the Petition Date, approximately 17 OpCo Employees maintain an HSA.  OpCo does not make any contributions on account of the HSAs.  OpCo pays Admin America approximately $50 in administrative fees on a monthly basis on account of the HSAs.

b.  **Kutt Health Insurance Programs:**   Kutt offers the Kutt Employees the opportunity to participate in a number of health benefit plans, including the Kutt Medical Plan, the Kutt Dental Plan, and the Kutt Vision Plan (each, as defined below and collectively, including their respective administrative costs, the "*Kutt Health Insurance Programs*").

i.   **The Kutt Medical, Dental, and Vision Plans:** As of May 1, 2026, Kutt offers medical coverage (the "*Kutt Medical Plans*") to the Kutt Employees through UnitedHealthcare Insurance Company ("*United*").   Kutt Employees are provided with multiple plan options with varying required premiums.  The Kutt Medical Plans provide coverage for, among other things, outpatient and inpatient services, preventative care, and prescription drug services.  Kutt Employees, as well as their spouses, children, and/or eligible dependents, may be covered under the Kutt Medical Plans.  As of the Petition Date, 2 Kutt Employees participate in the Kutt Medical Plans. Kutt also offers dental coverage (the "*Kutt Dental Plan*") to the Kutt Employees through United.  Kutt Employees, as well as their spouses, children, and/or eligible dependents, may be covered under the Kutt Dental Plan.  As of the Petition Date, 2 Kutt Employees participate in the Kutt Dental Plan. Finally, Kutt offers vision coverage (the "*Kutt Vision Plan*") to the Kutt Employees through United.  The Kutt Vision Plan provides coverage or discounts for exams, prescription eyeglasses, and contact

21

lenses.  Kutt Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Kutt Vision Plan.  As of the Petition Date, 2 Kutt Employees participate in the Kutt Vision Plan.  Kutt anticipates paying approximately $2,000 per month with respect to the Kutt Medical, Dental, and Vision Plans, including associated administrative fees.  The Kutt Medical Plans began on May 1, 2026, and the Debtors anticipate beginning monthly payments under the Kutt Medical Plans during these Chapter 11 Cases.

c. **BitAccess Health Insurance Programs:**  BitAccess offers the BitAccess Employees the opportunity to participate in a number of health benefit plans, including the BitAccess Medical Plan, the BitAccess Dental Plan, and the BitAccess Vision Plan (each, as defined below and collectively, including their respective administrative costs, the "*BitAccess Health Insurance Programs*" and, together with the OpCo Health Insurance Programs and the Kutt Health Insurance Programs, the "*Health Insurance Programs*"). BitAccess offers medical coverage (the "*BitAccess Medical Plans*") to the BitAccess Employees through Canada Life Assurance Company ("*Canada Life*").  BitAccess Employees are provided with multiple plan options with varying required premiums.  The BitAccess Medical Plans provide coverage for, among other things, outpatient and inpatient services, preventative care, and prescription drug services.  BitAccess Employees, as well as their spouses, children, and/or eligible dependents may be covered under the BitAccess Medical Plans.  As of the Petition Date, 7 BitAccess Employees participate in the BitAccess Medical Plans.  BitAccess also offers dental coverage (the "*BitAccess Dental Plan*") to the BitAccess Employees through Canada Life. BitAccess Employees, as well as their spouses, children, and/or eligible dependents may be covered under the BitAccess Dental Plan.  As of the Petition Date, 7 BitAccess Employees participate in the BitAccess Dental Plan.  Finally, BitAccess offers vision coverage (the "*BitAccess Vision Plan*") to the BitAccess Employees through Canada Life.  The BitAccess Vision Plan provides coverage or discounts for exams, prescription eyeglasses, and contact lenses.  BitAccess Employees, as well as their spouses, children, and/or eligible dependents may be covered under the BitAccess Vision Plan.  As of the Petition Date, 7 BitAccess Employees participate in the BitAccess Vision Plan.  After taking applicable Deductions, historically, BitAccess has paid approximately $2,600 per month with respect to the BitAccess Medical, Dental, and Vision Plans, including associated administrative fees.

d. **COBRA Policies:** The Debtors provide former Employees coverage under the Consolidated Omnibus Budget Reconciliation Act ("*COBRA*"), which provides such former Employees who lose their health coverage the right to continue benefits for a limited period of time (the "*COBRA Policies*").  The COBRA Policies are administered by Cigna and Anuvi, Inc.  As of the Petition Date, 4 former employees receive coverage under COBRA, and 52 former Employees and their dependents are eligible to receive coverage under COBRA.  The Debtors pay approximately $115 in administrative fees on a monthly basis on account of the COBRA Policies.

22

e. **Life, AD&D, and Disability Insurance Programs**:  The Debtors each offer their Employees the opportunity to participate in a number of life, AD&D, and disability benefit programs (each, as defined below and collectively, including their respective administrative costs, the "***Life, AD&D, and Disability Insurance Programs***").   As of the Petition Date, the Debtors do not believe there are prepetition amounts owed on account of the Life, AD&D, and Disability Insurance Programs.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any unpaid Life, AD&D, and Disability Insurance Programs obligations in the ordinary course of business and consistent with past practice, and to continue paying the Life, AD&D, and Disability Insurance Programs obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

   i. **OpCo and Kutt Life and AD&D Insurance Programs:**  OpCo and Kutt offer life and accidental death and dismemberment insurance coverage (the "***Basic Life and AD&D Insurance***") to their respective Employees through The Guardian Life Insurance Company ("***Guardian***"), which provides maximum coverage of up to $25,000 for all full-time OpCo Employees and $15,000 for the Kutt Employees in the event of the Employee's death, accidental death, or dismemberment.  Employees do not make any contributions on account of the Basic Life and AD&D Insurance.  As of the Petition Date, approximately 107 Employees maintain Basic Life and AD&D Insurance.  The Debtors pay approximately $1,000 per month with respect to the Basic Life and AD&D Insurance premiums, including associated administrative fees. OpCo Employees may also purchase voluntary life insurance and voluntary accidental death and dismemberment insurance (the "***Voluntary Life and AD&D Insurance***") through Guardian.  OpCo does not make any contributions on account of the Voluntary Life and AD&D Insurance.  As of the Petition Date, approximately 55 OpCo Employees maintain Voluntary Life and AD&D Insurance.  OpCo Employees may also purchase voluntary short- and long-term disability insurance (the "***Voluntary Disability Insurance***") through Guardian.  As of the Petition Date, approximately 30 OpCo Employees maintain Voluntary Disability Insurance.  Finally, OpCo Employees may purchase voluntary critical illness insurance (the "***Voluntary Critical Illness Insurance***") through Guardian.  As of the Petition Date, approximately 14 OpCo Employees maintain Voluntary Critical Illness Insurance.

   ii. **BitAccess Life and AD&D Insurance Programs**: BitAccess offers life and accidental death and dismemberment insurance coverage (the "***BitAccess Life and AD&D Insurance***") to its Employees through Canada Life, which provides maximum coverage of up to $50,000 for all full-time BitAccess Employees in the event of a BitAccess Employee's death, accidental death, or dismemberment.   As of the Petition Date, approximately 6 BitAccess Employees and 1 former Employee maintain

23

BitAccess Life and AD&D Insurance.  BitAccess pays approximately $100 per month with respect to the BitAccess Life and AD&D Insurance premiums, including associated administrative fees.

h) **Workers' Compensation Programs**:  The Debtors maintain workers' compensation insurance (the "***Workers' Compensation Programs***") at the level required by law in the states and provinces in which the Debtors operate for Employee claims arising from or related to their employment with the Debtors and to satisfy the Debtors' obligations arising under or related to the Workers' Compensation Programs.  All Employees are entitled to participate in the Workers' Compensation Programs to the extent required by applicable law.  Additionally, the Debtors maintain third-party workers' compensation insurance for U.S. based Employees through The Hartford Insurance Group, Inc., pursuant to which the Debtors pay approximately $4,500 on a monthly basis in premiums and administrative fees (together with other obligations arising under the Workers' Compensation Programs, the "***Workers Compensation Obligations***").  As of the Petition Date, the Debtors are not aware of any accrued and outstanding Workers' Compensation Obligations.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any unpaid Workers' Compensation Obligations in the ordinary course of business and consistent with past practice, and to continue to pay the Workers' Compensation Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

i) **Leave Benefits:** In the ordinary course of business, the Debtors maintain certain paid leave benefit programs for Employees, providing paid time off for vacation, sick leave, holidays (collectively, "***PTO***") and Other Leave (as defined below) (collectively, the "***Leave Benefits***").  OpCo and Kutt Employees receive twenty days of PTO on January 1 of each year, and are not entitled to carry over accrued but unused PTO into the next year.  Accrued but unused PTO is forfeited upon the Employee's termination, except as required under applicable law. BitAccess Employees are entitled to twelve days of PTO per calendar year.  Accrued but unused PTO carries over into the next calendar year, but BitAccess Employees may not accrue more than twenty days of PTO.  Once this limit is reached, the BitAccess Employee must take time off to bring accrued PTO within the acceptable range.  None of the Debtors' Employees are entitled to cash payments in connection with accrued and unused PTO, except as required under applicable state or provincial law.  In the ordinary course of business, the Debtors provide certain other paid and unpaid leave, including bereavement, jury duty, voting, military, inclement weather, leave provided for under the Family Medical Leave Act, and all legally required leaves (collectively, the "***Other Leave***").  Employees are not entitled to any cash payments in connection with the Other Leave.  As of the Petition Date, the Debtors do not believe there are prepetition amounts owed on account of the Leave Benefits.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue the Leave Benefits programs and pay any obligations accruing thereunder on a postpetition basis in the ordinary course of business and consistent with past practice.

j) **OpCo 401(k) Plan:**  OpCo provides all eligible OpCo Employees with the ability to participate in a defined contribution 401(k) plan (the "***401(k) Plan***"), which is administered by Vestwell Advisors, LLC  ("***Vestwell***").  OpCo pays Vestwell approximately $1,000 in

24

administrative fees on a monthly basis in connection with the 401(k) Plan (the "*401(k) Administrative Fees*"). OpCo Employees generally are automatically enrolled in a 401(k) Plan immediately upon employment with the ability to affirmatively opt out. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as certain post-tax deductions. Employee contributions to the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "*401(k) Deductions*"). As of the Petition Date, 70 Employees are contributing to the 401(k) Plan and approximately 40 former Employees hold 401(k) balances. OpCo makes contributions to the 401(k) Plans, according to the formula set forth in the 401(k) Plan (the "*401(k) Match Obligations*" and, together with the 401(k) Deductions and the 401(k) Administrative Fees, the "*401(k) Obligations*"). In general, OpCo pays approximately $13,000 in 401(k) Match Obligations per bi-weekly pay cycle. As of the Petition Date, the Debtors believe that approximately $37,000 in obligations due on account of the 401(k) Plan has accrued and is outstanding (the "*Unpaid 401(k) Obligations*"), consisting of approximately $24,000 unremitted 401(k) Deductions and approximately $13,000 unpaid 401(k) Match Obligations, all of which will become due and payable within the first twenty-one days after the Petition Date. The Debtors seek authority, but not direction, to remit and/or pay the Unpaid 401(k) Obligations in the ordinary course of business, consistent with past practices, and to continue remitting and/or paying the 401(k) Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

k) **BitAccess RRSP:** BitAccess provides all eligible BitAccess Employees with the ability to participate in the Company Group Registered Retirement Savings Plan (the "*RRSP*"), which is administered by Wealthsimple Technologies Inc. ("*Wealthsimple*"). BitAccess pays Wealthsimple approximately $500 in administrative fees on a monthly basis in connection with the RRSP (the "*RRSP Administrative Fees*"). BitAccess matches Employee obligations under the RRSP in an amount of up to $100 per BitAccess Employee per month (the "*RRSP Match Obligations*," and, together with the RRSP Administrative Fees, the "*RRSP Obligations*"). In general, BitAccess pays approximately $450 in RRSP Match Obligations per semi-monthly pay cycle. As of the Petition Date, the Debtors are not aware of any accrued and outstanding obligations due on account of the RRSP Obligations. However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue to pay any unpaid RRSP Obligations in the ordinary course of business and consistent with past practice, and to continue to pay the RRSP Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

52.     The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction and withholding from the Employees' paychecks. I understand that the Withholding Obligations may not be property of the

25

Debtors' estates.  As a result, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.  The Debtors further request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

53.     I understand that the Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor unpaid Compensation and Benefits Obligations.  I believe that absent the payment of the obligations owed to the Employees and Independent Contractors, the Debtors may experience  instability at this critical time in these Chapter 11 Cases.  I therefore believe that (a) payment of the prepetition Compensation and Benefits Obligations and (b) continuation of payment of the same on a postpetition basis is a necessary and critical element of the Debtors' efforts to preserve value in these Chapter 11 Cases.

54.     I understand that any WARN Claims asserted by and determined by the Debtors to be owed to the Employees in the event of termination prior to the expiration of the 60 day notice period constitute postpetition wages entitled to administrative priority.  Therefore, to the extent any such postpetition termination in violation of the WARN Act's notice requirements occurs, the Debtors request authority, but not direction, to pay the resulting WARN Claims as administrative expenses of the estates.

55.     I believe that the Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Compensation and Benefits

26

Obligations. Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.

56. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in this Motion. Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or fund transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

57. I believe that authorizing the Debtors to satisfy the Compensation and Benefits Obligations, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.

58. I believe that failure to receive such authorization and other relief during the first twenty-one days of these Chapter 11 Cases could impact the Debtors' operations at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates. I further believe that the requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value of the Debtors' estates for the benefit of all stakeholders. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Wages Motion be approved.

**B.** **Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Cash Management System, (B) Continue Using Existing Business Forms, and (C) Continue Intercompany Transfers, (II) Providing Administrative Expense Priority Status for Postpetition Intercompany Claims, (III) Extending Time to Comply with Section 345(b) of the Bankruptcy Code, (IV) Waiving Compliance with Certain of the U.S. Trustee's Operating Guidelines, and (V) Granting Related Relief (the "*Cash Management Motion*")**

59. In the Cash Management Motion, the Debtors seek entry of interim and final orders substantially in the forms attached to the Cash Management Motion (a) authorizing, but not

27

directing, the Debtors to:  (i) maintain their existing Bank Accounts and close their Cryptocurrency Wallets and maintain the Cash Management System (each as defined below); (ii) continue using their existing Business Forms (as defined below); (iii) pay any undisputed prepetition Bank Fees and Cryptocurrency Wallet Fees (each as defined below), continue to pay the Bank Fees in the ordinary course of business, and pay the Closing Fees (as defined below); and (iv) continue to engage in Intercompany Transfers (as defined below) in the ordinary course of business and consistent with past practice; (b) providing administrative expense priority status for postpetition payments made on account of Intercompany Transfers; (c) extending time to comply with section 345(b) of the Bankruptcy Code; (d) waiving compliance with certain of the U.S. Trustee's Operating Guidelines (as defined below); and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these Chapter 11 Cases to consider approval of this Motion on a final basis.

60.     In the ordinary course of business the Debtors manage their cash, receivables, and payables through a centralized and consolidated cash management system (the "***Cash Management System***").  The Debtors concentrate payments and other revenue they receive primarily through the *PeopleFirst x9792* Bank Account (the "***Main Operating Account***"), which funds are distributed to other accounts held by the Debtors.  The Debtors use the Cash Management System to efficiently collect, transfer, concentrate, invest, and disburse funds.  The Cash Management System also enables the Debtors and their non-Debtor affiliates to monitor the collection and disbursement of funds and the administration of the Bank Accounts.  The Debtors maintain accounting controls with respect to each of the Bank Accounts and are able to accurately trace the funds through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable, including in connection with the Intercompany Transfers,

28

all as more fully described below.  The Debtors will continue to maintain their books and records relating to the Cash Management System during the Chapter 11 Cases to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, the Debtors will be able to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of their bankruptcy estates.

61.    Historically, as a part of the Cash Management System, the Debtors maintained seven cryptocurrency wallets to store, access, manage, send, and receive their cryptocurrency holdings (the "***Cryptocurrency Wallets***").  Given the Debtors' decision to wind-down business operations, the Debtors do not anticipate the use of the Cryptocurrency Wallets during the chapter 11 cases.  Accordingly, the Debtors request authority, but not direction, to close the Cryptocurrency Wallets, convert any cryptocurrency held therein to cash, which cash will be deposited in the Main Operating Account, and pay any fees associated with the conversion of cryptocurrency or closing of the Cryptocurrency Wallets (the "***Closing Fees***").

62.    The Debtors' Cash Management System currently consists of a total of 21 bank accounts (collectively, the "***Bank Accounts***") at 9 different banks (collectively, the "***Banks***"). Non-Debtor affiliates also maintain 4 bank accounts to fund their operations.  A list identifying each of the Bank Accounts and the non-Debtor affiliate bank accounts, along with the type of account, the Bank at which such account is held, and the last four digits of each account number, is attached to the Cash Management Motion as Exhibit C, and a diagram depicting the Cash Management System, the relationship between the Bank Accounts, and the general flow of funds

is attached to the Cash Management Motion as Exhibit D.  A general description of the Debtors'

Bank Accounts, and the non-Debtor affiliates' bank accounts, is provided in the table below:[7]

| Debtor Accounts | Description of Accounts |
|---|---|
| *Bitcoin Depot Operating LLC* | |
| **New Operating**<br>**PeopleFirst Bank**<br>**Account Ending: 9792** | This is the Company's primary concentration / operating account. This account receives funding from kiosk collection accounts and funds payroll, vendor payments, and other bank accounts as required. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $1.2 million. |
| **Collections**<br>**PeopleFirst Bank**<br>**Account Ending: 8904** | This account receives deposits from kiosks which funds it then transfers to the Main Operating Account. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $1.1 million. |
| **Refunds**<br>**PeopleFirst Bank**<br>**Account Ending: 1696** | This account is dormant. Prior to becoming dormant, it was used to process customer refunds, with the last transaction occurring approximately two years ago. The current refund process now flows through the Bill Pay account. This account is not subject to a deposit account control agreement.<br><br>The Debtors intend to close this account as soon as reasonably practicable.<br><br>As of the Petition Date, this account had a balance of approximately $100. |
| **ICS**<br>**PeopleFirst Bank**<br>**Account Ending: 2024** | This account is used to generate interest on idle cash. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $147,000. |
| **Current Bill Pay**<br>**PeopleFirst Bank**<br>**Account Ending: 6400** | This account is used to process certain vendor payments. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $139,000. |
| **Operating**<br>**Brex Column**<br>**Account Ending: 8064** | This account is used to fund payroll, vendors, and certain expenses of the Company's Canadian affiliates. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $11.7 million. |

---

[7]   Certain "dormant" Bank Accounts as set forth below are excluded from the diagram attached to the Cash Management Motion as Exhibit D.  The Debtors intend to close these Bank Accounts as soon as reasonably practicable.

| Debtor Accounts | Description of Accounts |
|---|---|
| **Treasury**<br>**Brex Treasury**<br>**Account Ending: 2695** | This account is used to make short-term money market fund investments. Funds are drawn from and transferred to the account ending x8604 based on business needs. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $6.9 million. |
| **TCB**<br>**The Commercial Bank**<br>**Account Ending: 0456** | This account receives deposits from kiosks which funds it then transfers to the Main Operating Account. This account is subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $222,000. |
| **Surety**<br>**Surety Bank**<br>**Account Ending: 8759** | This account receives deposits from kiosks which funds it then transfers to the Main Operating Account. This account is subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $392,000. |
| **BDCheckout**<br>**Surety Bank**<br>**Account Ending: 4937** | This account receives deposits related to BDCheckout transactions which funds it then transfers to the Main Operating Account. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $5,000. |
| **Bitcoin Depot Inc. Professional Fees Account**<br>**Evolve Bank & Trust**<br>**Account Ending: 1151** | This account was recently established and serves as an escrow account for professional fees. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a zero balance. |
| *BT HoldCo LLC* | |
| **BT HoldCo**<br>**PeopleFirst Bank**<br>**Account Ending: 2304** | This account is used to manage transactions for certain vendors. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $295,000. |
| *Bitcoin Depot Inc.* | |
| **PubCo**<br>**PeopleFirst Bank**<br>**Account Ending: 2312** | This account is used for payments related to public company costs such as SEC fees, FINRA fees, and professional fees and to provide intercompany funding for Kutt. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $51,000. |
| *Mintz Assets, Inc.* | |

| Debtor Accounts | Description of Accounts |
|---|---|
| **Mintz**<br>**PeopleFirst Bank**<br>**Account Ending: 2952** | This account is dormant and has never had any transaction activity. This account is not subject to a deposit account control agreement.<br><br>The Debtors intend to close this account as soon as reasonably practicable.<br><br>As of the Petition Date, this account had a balance of approximately $1,000. |
| *Lux Vending Kiosk LLC* | |
| **Lux Vending**<br>**PeopleFirst Bank**<br>**Account Ending: 3968** | This account is dormant. This account is not subject to a deposit account control agreement.<br><br>The Debtors intend to close this account as soon as reasonably practicable.<br><br>As of the Petition Date, this account had a balance of approximately $49,000. |
| *BitAccess Inc.* | |
| **Brex BitAccess**<br>**Brex Column**<br>**Account Ending:  9836** | This account was recently created to fund payroll and certain vendor disbursements in Canada. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $107,000. |
| *Kiosk Technicians, LLC* | |
| **Kiosk Tech**<br>**Brex Column**<br>**Account Ending:  5675** | This account is used to manage transactions related to specific gaming machines. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $7,700. |
| *MCA Services Group, LLC* | |
| **Readybucks**<br>**Brex Column**<br>**Account Ending:  0119** | This account manages merchant cash advances for the ReadyBucks business. No further advances are being issued. Additional collections are still underway. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $15,000. |
| *Kutt, Inc.* | |
| **Kutt – Customer**<br>**Lexicon**<br>**Account Ending: 5624** | This account processes deposits and withdrawals by customers for the Kutt platform. This account is not subject to a deposit account control agreement.<br><br>As of the Petition Date, this account had a balance of approximately $108,000. |
| **Kutt – Operating**<br>**Lexicon**<br>**Account Ending: 5616** | This account is dormant.  This account is not subject to a deposit account control agreement.<br><br>The Debtors intend to close this account as soon as reasonably practicable.<br><br>As of the Petition Date, this account had a balance of approximately $1,000. |

| Debtor Accounts | Description of Accounts |
|---|---|
| **Kutt – Operating** <br> **Chase** <br> **Account Ending: 3367** | This account is Kutt's main operating account, covering payroll and vendor disbursements. This account is not subject to a deposit account control agreement. <br><br> As of the Petition Date, this account had a balance of approximately $51,000. |

| Non-Debtor Accounts | Description of Accounts |
|---|---|
| *Bitcoin Depot S DE RL DE CV* | |
| **Mexico** <br> **Santander** <br> **Account Ending: 847-4** | This account supports operations in Mexico. This account is not subject to a deposit account control agreement. <br><br> The Company intends to close this account in connection with the wind-down of its Mexican affiliate. <br><br> As of the Petition Date, this account had a balance of approximately $56,000. |
| *Brazil BTM Limitada* | |
| **Brazil** <br> **Santander** <br> **Account Ending: 9298** | This account supports operations in Brazil. This account is not subject to a deposit account control agreement. <br><br> The Company intends to close this account in connection with the wind-down of its Brazilian affiliate. <br><br> As of the Petition Date, this account had a zero balance. |
| *AUS BTM PTY LTD* | |
| **AUS - Collection** <br> **Bendigo** <br> **Account Ending: 4188** | This account is used to collect kiosk deposits in Australia, pay Bitcoin Depot Operating for the cost of crypto sold at kiosks in Australia, and provide funding for the account ending x3314. This account is not subject to a deposit account control agreement. <br><br> The Company intends to close this account in connection with the wind-down of its Australian affiliate. <br><br> As of the Petition Date, this account had a balance of approximately $213,000. |
| **AUS - Vendor** <br> **Bendigo** <br> **Account Ending: 3314** | This account is used to pay vendors in Australia. This account is not subject to a deposit account control agreement. <br><br> The Company intends to close this account in connection with the wind-down of its Australian affiliate. <br><br> As of the Petition Date, this account had a zero balance. |

63.     The Debtors respectfully request that the Court authorize, but not direct, them to maintain and use the Bank Accounts, and authorize the Banks to maintain, service, and administer

33

the Bank Accounts without interruption and in the ordinary course of business.  In this regard, the Debtors request that the Banks be authorized to receive, process, honor, and pay any and all checks, drafts, wires, credit card payments, automated clearing house ("**ACH**") transfers, and other instructions, payable through, drawn, or directed on such Bank Accounts after the Petition Date by the Debtors, provided that sufficient funds are on deposit in the applicable Bank Accounts to cover such payments.

64.     To the best of my knowledge, the Debtors intend to have discussions with the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") to ensure compliance or substantial compliance with the applicable law.  To ensure productive discussions regarding what, if any, modifications need to be made to the Bank Accounts and the Cash Management System, the Debtors request a 30-day extension (or such additional time to which the U.S. Trustee may agree) of the time period in which to either come into compliance with the applicable law or to make other arrangements that would be acceptable to the U.S. Trustee (without prejudice to the Debtors' rights to request further extensions or a waiver).  As noted above, the Debtors intend to close certain Bank Accounts that are dormant as soon as reasonably practicable. The Debtors also intend to work with the U.S. Trustee to explore consolidating certain Bank Accounts and closing additional Bank Accounts as needed to simplify their Cash Management System while preserving their ability to collect estate funds from their kiosk system.

65.     I understand that the U.S. Trustee has established certain operating guidelines (the "**U.S. Trustee Guidelines**") for debtors in possession.  I further understand that the U.S. Trustee Guidelines require, among other things, that upon the filing of a bankruptcy petition, the debtor must immediately close all of its existing bank accounts and open new bank accounts that are designated as debtor-in-possession accounts with authorized depositories (a) whose deposits are

34

insured by the Federal Deposit Insurance Corporation (the "**FDIC**") and (b) that agree to comply with the requirements of the U.S. Trustee.  And I understand that the U.S. Trustee Guidelines further require debtors to deposit all estate funds in such newly opened debtor-in-possession accounts, with one account maintained solely for the purpose of setting aside estate monies required for the payment of taxes and another, separate account for cash collateral.

66.     I understand that certain of the Banks including Brex / Column N.A., PeopleFirst Bank, The Commercial Bank, Surety Bank, Lexicon, and Brex Treasury, while not authorized depositories under the U.S. Trustee Guidelines, are FDIC insured.  The Debtors intend to engage in discussions with the U.S. Trustee regarding the Banks that are not authorized depositories under the U.S. Trustee Guidelines and, as set forth in the Interim Order, will undertake reasonable efforts to have such banks execute a uniform depository agreement ("**UDA**").

67.     The Debtors respectfully request that the Court authorize the Debtors to maintain, service, and administer the Bank Accounts maintained by the Banks, without interruption and in the ordinary course of business notwithstanding that certain of the Banks are not authorized depositories under the U.S. Trustee Guidelines.

68.     As part of the Cash Management System, the Debtors use numerous pre-printed business forms (including, without limitation, letterhead, purchase orders, invoices, and pre-printed and future checks, collectively, the "**Business Forms**") in the ordinary course of business.  I understand that the U.S. Trustee Guidelines require that checks for all debtor-in-possession accounts bear the name of the debtor, the designation "Debtor in Possession," the bankruptcy case number, and the type of account.

69.     To minimize expenses to the Debtors' estates and to avoid confusion on the part of employees, customers, and vendors during the pendency of these Chapter 11 Cases, the Debtors

request that the Court waive such requirements and authorize the Debtors' continued use of all correspondence and Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as otherwise would be required under the U.S. Trustee Guidelines.  To the extent the Debtors exhaust their existing supply of checks during these Chapter 11 Cases, the Debtors will transition to using checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number on all such checks.

70.     In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, a number of fees, charges, and expenses related to the cost of renting vault space and administering the Bank Accounts, including among other things, wire transfer and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "***Bank Fees***").

71.     The Bank Fees are either debited directly from the Debtors' Bank Accounts or charged monthly. The amount of Bank Fees owed each month varies based on account activity and average monthly balance maintained in the Bank Accounts.  The Debtors paid the Banks approximately $179,000 per month in Bank Fees on average for the last six months.  The Debtors estimate that $179,000 on account of Bank Fees will become due and payable during the interim period, of which $179,000 will be attributable to the prepetition period.  The Debtors seek authority, but not direction, to pay these Bank Fees during the interim period and to continue paying the Bank Fees in the ordinary course of business consistent with past practices.

72.     The Debtors incur monthly service charges and brokerage-related costs, fees, and expenses in connection with the maintenance of their Cryptocurrency Wallets (collectively, the

"*Cryptocurrency Wallet Fees*").  The Cryptocurrency Wallet Fees are paid automatically with each transaction in addition to a minimum monthly fee.  The Cryptocurrency Wallet Fees include a $2,000 monthly fee and additional fees based on the volume of transactions processed by the Debtors through the Cryptocurrency Wallets.

73.     The Debtors paid approximately $2,000 per month in Cryptocurrency Wallet Fees on average over the last six months.  I believe that approximately $3,000 on account of Cryptocurrency Wallet Fees will become due and payable during the interim period, all of which will be attributable to the prepetition period.  The Debtors seek the authority, but not direction, to pay these Cryptocurrency Wallet Fees during the interim period.  To the best of my knowledge, given the Debtors' intention to close the Cryptocurrency Wallets, the Debtors do not expect additional Cryptocurrency Wallet Fees, other than the Closing Fees, to become due and payable. However, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any Cryptocurrency Wallet Fees that do arise in the ordinary course of business consistent with past practices.

74.     In the ordinary course of business, the Debtors maintain business relationships with each other, conducting intercompany financial transactions (such transactions, the "*Intercompany Transfers*") from time to time that result in intercompany receivables and payables (such receivables and payables, the "*Intercompany Balances*").  As set forth above, the Debtors manage their disbursements and receipts through the centralized Cash Management System.  The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transfers and will continue to do so on a postpetition basis.

75.     At any given time there may be Intercompany Balances owing from one Debtor to another Debtor.  Intercompany Transfers are made to reimburse certain Debtors for various

expenditures associated with their businesses, to fund certain Debtors' Bank Accounts in anticipation of such expenditures, as needed, and to transfer excess funds to the Main Operating Account.  In the operation of the Cash Management System, the Debtors transfer funds out of the Main Operating Account into various disbursement accounts.

76.     I understand that the Intercompany Transfers are necessary due to the complex corporate structure of the Debtors.  This system not only maximizes efficiency but also simplifies third-party interactions with the Debtors as an enterprise.  If the Intercompany Transfers were to be discontinued, the Cash Management System and the Debtors' ability to maintain the value of their assets and estates would be unnecessarily disrupted to the detriment of the Debtors and their estates.  I believe that continuing the Intercompany Transfers is essential and is in the best interests of the Debtors' respective estates.  To minimize disruptions and preserve value for the Debtors' estates, the Debtors seek authority to continue the Intercompany Transfers in the ordinary course of business postpetition, consistent with the Debtors' customary prepetition practices.

77.     To ensure that each Debtor will not fund the operations of another entity at the expense of such Debtors' creditors, the Debtors request that all valid postpetition payments from a Debtor to or on behalf of another Debtor on account of a postpetition Intercompany Transfer shall be accorded administrative expense status.

78.     As set forth above, the Debtors request authority, but not direction, to use their Bank Accounts, continue the Cash Management System, and to implement ordinary course changes to the Cash Management System consistent with prepetition practices.

79.     I believe that the Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary,

reduce borrowing costs and administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices. I understand that the Cash Management System reduces operating expenses by enabling the Debtors to use funds in the optimal and most efficient manner, thereby preserving the value of the Debtors' estates. Accordingly, I believe that ongoing use of the Cash Management System (including by collecting remaining funds from their kiosk network) without interruption is vital to the Debtors' ability to maintain the value of their assets and estates and the success of these Chapter 11 Cases.

80.     In furtherance of the foregoing, the Debtors request that all Banks at which the Bank Accounts are maintained be authorized to continue to administer such accounts as they were maintained prepetition, without interruption, and in the ordinary course of business. The Debtors also request authority to pay any prepetition Bank Fees and Cryptocurrency Wallet Fees that remain unpaid as of the Petition Date. Payment of the prepetition Bank Fees and Cryptocurrency Wallet Fees is in the best interests of the Debtors, their estates, and all parties in interest, as it will prevent any disruption to the Cash Management System. Moreover, because the Banks may avail themselves of potential setoff rights with respect to the prepetition Bank Fees, payment of any prepetition Bank Fees will not affect unsecured creditors and would merely create a difference of timing. The Banks should also be authorized to pay any and all drafts, wires, and ACH transfers issued on the Bank Accounts for payment of any claims arising on or after the Petition Date—or before the Petition Date to the extent payment of such claims are approved by an order of the Court—in each case so long as sufficient funds exist in the Bank Accounts.

81.     The Debtors request that the Court waive certain requirements of the U.S. Trustee Guidelines and allow the Debtors to continue using their existing Bank Accounts. I understand

that the U.S. Trustee Guidelines generally require chapter 11 debtors to: close all existing bank accounts and open new debtor-in-possession bank accounts, including (i) an account maintained solely for the purposes of setting aside estate monies required for the payment of taxes, and (ii) an account for cash collateral; deposit all estate funds into an account with an authorized depository financial institution whose deposits are insured by the FDIC; and obtain and utilize new checks for all debtor-in-possession accounts that bear the designation "Debtor in Possession," the bankruptcy case number, and the type of account.

82.     I believe that requiring the Debtors to adopt an entirely new cash management system and open new bank accounts at the same or different depository institutions at this early and critical stage of these Chapter 11 Cases would generate substantial and gratuitous expense, impose needless administrative burden, and cause undue disruption to the Debtors' ability to maintain the value of their assets and estates.  I further believe that such distraction and disruption may adversely affect the Debtors' ability to maximize value for the benefit of creditors and other parties in interest.  I believe that the Bank Accounts and the Cash Management System provide a safe, efficient, and proven means for the Debtors to maintain and manage their cash.

83.     To the extent that the requirements of section 345(b) of the Bankruptcy Code are applicable to the Bank Accounts, and the Debtors are not in compliance with such section, the Debtors submit that an extension of the time to comply with section 345(b) of the Bankruptcy Code is appropriate.  To the best of my knowledge, the Debtors propose to engage with the U.S. Trustee to determine what modifications, if any, to the Bank Accounts and Cash Management System would be appropriate under the circumstances and request an interim waiver of the requirements of section 345(b) of the Bankruptcy Code to proceed on this basis.

84.     I believe that a waiver of certain requirements of the U.S. Trustee Guidelines and section 345(b) of the Bankruptcy Code is appropriate under these circumstances.  I further believe that maintenance of the Bank Accounts and Cash Management System will minimize the disruption to the Debtors' ability to maintain the value of their assets and estates and promote an orderly and efficient transition into chapter 11.  The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtors and their estates, including the ability to: (a) control corporate funds; (b) ensure the maximum availability of funds, as and when necessary (including the collection of remaining funds from their kiosk network); and (c) reduce administrative expenses by facilitating the movement of funds and providing timely and accurate account information.

85.     The Debtors request authority, but not direction, to:  (a) maintain and continue to use any or all of their existing Bank Accounts in the names and with the account numbers existing immediately prior to the commencement of these Chapter 11 Cases, provided that the Debtors reserve the right, as noted above, to close some or all of their existing Bank Accounts and, as needed, open new debtor-in-possession accounts upon providing written notice to the U.S. Trustee; (b) deposit funds into and withdraw funds from any Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, electronic funds transfers, or other debits; and (c) treat their existing Bank Accounts (that are not set for closure and any accounts opened postpetition) for all purposes as debtor-in-possession accounts.

86.     I understand that, to ensure that all transfers and transactions will be documented in their books and records, the Debtors will continue to maintain records of all transfers within the Cash Management System and use the Debtors' accounting team to administer the Bank Accounts. I further understand that, to guard against improper transfers resulting from the postpetition

41

honoring of prepetition checks, the Debtors have issued "stop payment" orders to the Banks instructing the Banks not to honor any checks drawn on the Debtors' Bank Accounts prior to the Petition Date, again subject to any exceptions approved by this Court.  The Debtors request that the Banks be authorized to presume conclusively that such approval has been obtained with respect to any checks or other debits initiated by any Debtor prior to the Petition Date with respect to which such "stop payment" orders have not been issued.

87.     I believe that the maintenance of the Cash Management System (together with the reporting requirements discussed above) will accomplish the dual goals of minimizing disruption to the Debtors' ability to maintain the value of their assets and estates and satisfying the aims of the U.S. Trustee Guidelines.  I believe that the recording of transactions within the Cash Management System would afford a complete accounting of the Debtors' funds and should provide the U.S. Trustee comfort that the spirit of the U.S. Trustee Guidelines will be observed.

88.     The Debtors additionally request that the Court waive the U.S. Trustee Guidelines requiring debtors in possession to obtain new checks that bear the designation "Debtor in Possession" until the Debtors have exhausted their existing supply of checks.  To avoid disruption of the Cash Management System and unnecessary expense, the Debtors seek a waiver of the requirement to immediately purchase new checks that include the term "Debtor in Possession" and the case number assigned to the relevant chapter 11 case, as the Debtors' inventory of checks would go to waste if new checks were to be ordered and used prematurely.

89.     Additionally, I understand that requiring the Debtors to obtain new checks that bear the designation "Debtor in Possession" for the Bank Accounts would cause the Debtors to incur undue expense and delay under the circumstances.  I further believe that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their checks substantially in the forms

existing immediately before the Petition Date.  To preserve funds and assist in the efficient administration of their estates, the Debtors seek authority to use pre-existing Business Forms (including check stock) with respect to the Bank Accounts.  If the Debtors exhaust their existing supply of Business Forms during these Chapter 11 Cases, the Debtors will transition to using checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number on all such checks.

90.     As described above, the Debtors routinely engaged in Intercompany Transfers prior to the Petition Date.  Out of an abundance of caution, the Debtors seek express authority, but not direction, to engage in such transactions on a postpetition basis.  The Intercompany Transfers are the type of transactions that are common among many complex business enterprises that operate through multiple affiliates.  I believe that the Intercompany Transfers are integral to the Debtors' ability to operate their businesses.  I further believe that requiring the Debtors to modify their current practices would impose a costly and time-consuming undertaking, distracting the Debtors and their employees from other critically important tasks to preserve and maximize value.  Accordingly, out of an abundance of caution, the Debtors request express authority to engage in the Intercompany Transfers on a postpetition basis.

91.     The Debtors also request that the Court grant administrative expense status to all Intercompany Balances against a Debtor by another Debtor that arise postpetition as a result of an Intercompany Transfer.  If the Intercompany Transfers are accorded administrative expense priority, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its own ordinary course transactions, and no individual Debtor, at the expense of its creditors, will fund the operations of another Debtor.

92.    To the best of my knowledge, the Debtors have sufficient liquidity to pay the amounts described in the Cash Management Motion in the ordinary course of business.  In addition, I understand that under the Debtors' existing Cash Management System, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Bank Fees and Cryptocurrency Wallet Fees.  Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.  The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in the Cash Management Motion.  Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or fund transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

93.    I believe that authorizing the Debtors to (a) maintain the Cash Management System, continue using existing Business Forms, pay Bank Fees and Cryptocurrency Wallet Fees, and continue Intercompany Transfers, (b) providing administrative expense priority for postpetition intercompany claims, (c) extending time to comply with section 345(b) of the Bankruptcy Code, (d) waiving compliance with certain of the U.S. Trustee's Operating Guidelines, and (e) granting any related relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.  I further believe that failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases could impact the Debtors' ability to maintain the value of their assets and estates at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates.  I believe that the

44

requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value for the benefit of all stakeholders. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Cash Management Motion be approved.

**C.      Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "*Taxes Motion*")**

94.      By the Taxes Motion, the Debtors seek entry of an order (the "***Order***"), substantially in the form attached to the Taxes Motion as Exhibit A:  (a) authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition taxes and fees in the ordinary course of business on a postpetition basis; (b) authorizing, but not directing, the Debtors to continue to pay taxes and fees that accrue postpetition in the ordinary course of business; and (c) granting related relief.  In addition, for the avoidance of doubt, the Debtors seek authority to pay taxes and fees for so-called "straddle" periods.

95.      In the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and incur taxes and fees, including property taxes, franchise and income taxes, certain administrative, governmental, and regulatory fees, and assessments (collectively, the "***Taxes and Fees***").  The Debtors pay and remit the Taxes and Fees quarterly, semi-annually, or annually, as applicable, to various international, federal, state, provincial, and local governments, including taxing and licensing authorities (collectively, the "***Governmental Authorities***").  A schedule identifying substantially all Governmental Authorities is attached to the Taxes Motion as Exhibit B.  The Debtors pay the Taxes and Fees through checks and electronic funds transfers that are processed through their banks and other financial institutions.  From time to time, the Debtors may also receive tax credits for overpayments or refunds with respect to Taxes and Fees.

45

96.     Additionally, the Debtors may become subject to further routine audit investigations on account of Audits (as defined below) during these Chapter 11 Cases.  I understand that Audits may result in additional Assessments (as defined below) against the Debtors.  Accordingly, the Debtors seek authority, but not direction, to pay, remit, contest, and/or appeal tax obligations on account of such Assessments as they arise in the ordinary course of business.

97.     As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Taxes and Fees is approximately $2.4 million, as estimated below.  The Debtors respectfully request, upon entry of the Order, the authority, but not direction, to pay and remit prepetition Taxes and Fees as they become due and payable, and continue to pay and remit Taxes and Fees on a postpetition basis in the ordinary course of business.

| Category | Approximate Amount Accrued as of Petition Date |
|---|---|
| Property Taxes | $364,000 |
| Franchise Taxes and Income Taxes | $1,400,000 |
| Sales and Use Taxes | $596,000 |
| Regulatory and Other Taxes & Fees | N/A |
|  | $2,360,000 |

98.     The Debtors incur various state and local property taxes against the Debtors' personal property (collectively, "*Property Taxes*").  The Debtors are required to pay Property Taxes on an annual basis to avoid the imposition and/or enforcement of statutory liens on their

personal property.  In 2025, the Debtors paid approximately $760,000 on account of Property Taxes.

99.     As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Property Taxes is approximately $364,000.  The Debtors respectfully request, upon entry of the Order, the authority, but not direction, to pay and remit prepetition Property Taxes as they become due and payable, and continue to pay and remit Property Taxes on a postpetition basis in the ordinary course of business.

100.    The Debtors incur various state and local franchise taxes and fees on account of doing business in certain states and certain communities (collectively, "*Franchise Taxes*").  I understand that the Debtors are required to pay Franchise Taxes in order to remain in good standing and continue conducting their businesses pursuant to applicable state and local laws.  I also understand that depending on the taxing jurisdiction, Franchise Taxes may be assessed based on the applicable Debtor's capital structure, as a percentage of gross receipts or income, or as a fixed amount.  The Debtors also incur various corporate income taxes on their taxable net income (collectively, "*Income Taxes*").  Income Taxes are generally calculated as a percentage of net or gross income, as applicable.  I understand that the Debtors are required to remit and pay Income Taxes on an annual basis in order to remain in good standing pursuant to applicable federal, state, and local laws.  I further understand that State Income Taxes are generally calculated as a percentage of net income, but certain states assess a minimum amount of Income Taxes for doing business in that state regardless of net income.  In 2025, the Debtors paid approximately $10 million on account of Franchise Taxes and Income Taxes.

101.    As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Franchise Taxes and Income Taxes is approximately $1.4 million.  The Debtors respectfully

47

request, upon entry of the Order, the authority, but not direction, to pay and remit prepetition Franchise Taxes and Income Taxes as they become due and payable, and continue to pay and remit Franchise Taxes and Income Taxes on a postpetition basis in the ordinary course of business.

102.    In the ordinary course of business, the Debtors incur, collect, and remit sales and use taxes (including interest and penalties on any late payments) to the relevant Governmental Authorities in connection with the sale, purchase, and use of goods and services (collectively, the "*Sales and Use Taxes*").  I understand that Sales and Use Taxes are general consumption taxes charged at either the point of purchase for goods and services or the point of sale of goods or services purchased.  The Debtors generally accrue and remit Sales and Use Taxes on a monthly, quarterly, or annual basis, as required by the applicable jurisdiction.  In 2025, the Debtors paid approximately $1.6 million on account of Sales and Use Taxes.

103.    As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Sales and Use Taxes is approximately $596,000.  The Debtors respectfully request, upon entry of the Order, the authority, but not direction, to pay and remit Sales and Use Taxes as they become due and payable, and continue to pay and remit Sales and Use Taxes on a postpetition basis in the ordinary course of business.

104.    The Debtors collect or incur various federal, state, and local taxes and fees related to business licensing, money transmission and money services business activities, and other regulatory matters (collectively, "*Regulatory and Other Taxes and Fees*").  The Debtors regularly pay accrued Regulatory and Other Taxes and Fees in the ordinary course of business as they come due.

105.    In 2025, the Debtors paid approximately $381,000 on account of Regulatory and Other Taxes and Fees.

106.   As of the Petition Date, the Debtors do not believe that there are any accrued and outstanding prepetition Regulatory and Other Taxes and Fees, but out of an abundance of caution, the Debtors respectfully request, upon entry of the Order, the authority, but not direction, to pay and remit prepetition Regulatory and Other Taxes and Fees as they become due and payable, and continue to pay and remit Regulatory and Other Taxes and Fees on a postpetition basis in the ordinary course of business.

107.   As of the Petition Date, the Debtors are subject to an ongoing audit investigation by the Texas Comptroller of Public Accounts on account of Debtors' Texas franchise tax obligations for tax years 2022–2025 (the "*Texas Audit*"), and may be subject to future audit investigations by certain Governmental Authorities on account of tax returns and/or obligations from prior years (together with the Texas Audit, the "*Audits*").  The Governmental Authorities performing the Audits may seek to impose additional prepetition Taxes and Fees, including interest on late payment of taxes (if applicable) (such additional Taxes and Fees, the "*Assessments*"). While the Debtors have not retained any professionals specifically for the Texas Audit, they have consulted and will continue to consult with their regularly engaged tax professionals in connection with the audit.

108.   Additionally, I understand that the Debtors may be contesting Audits and Assessments in appropriate judicial or administrative proceedings, as well as the amount that may need to be posted as collateral to contest asserted Assessment amounts.

109.   Although paying the Taxes and Fees is critical to the Debtors' businesses, I believe that the Debtors may have appropriate grounds and wish to contest certain Taxes and Fees.  As such, the Debtors respectfully request that such relief granted in this Motion be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem

49

appropriate or the Debtors' ability to request further relief related to the Taxes and Fees in the future. The Debtors propose that prior to making a payment to any of the Governmental Authorities under this Motion, the Debtors be authorized, in their discretion, to settle all or some of the prepetition claims of such Governmental Authorities for less than their face amount without further notice or hearing.

110. I understand that in many states and under certain local laws, officers and directors of the collecting entity may be held personally liable for the payment of certain trust fund taxes to the Governmental Authorities. I further understand if certain of the Taxes and Fees are not paid, the Debtors' officers and directors may be subject to lawsuits during the pendency of these Chapter 11 Cases. I believe that such lawsuits would prove distracting for the Debtors and the named officers and directors, whose immediate and full-time attention is required to focus on preserving and maximizing the value of the Debtors' estates. I believe it is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming, costly, and potentially damaging distractions. For the avoidance of doubt, the Debtors hereby request authority to remit and pay the Taxes and Fees as provided herein regardless of whether such Taxes and Fees constitute trust fund obligations.

111. I believe that the Debtors' payment of the Taxes and Fees when they become due and payable, in all likelihood, would affect only the timing of the payments and would reduce the amount of Taxes and Fees owed if later paid under a plan (due to the potential of higher interest rates and late fees attributable to delinquent tax payments). Therefore, I further believe that other creditors and parties in interest would not be prejudiced if the relief sought herein were granted by this Court.

50

112.    I believe it is a sound exercise of the Debtors' business judgment to pay the Taxes and Fees as the Debtors' failure to remit and pay the Taxes and Fees could have a material adverse impact on their ability to preserve the value of the Debtors' property, as the Governmental Authorities could attempt to prevent or delay the efficient administration of these Chapter 11 Cases if the Taxes and Fees are not paid by taking administrative and legal actions, including but not limited to imposing penalties and fees, pursuing time and resource-consuming audits, filing liens, and/or pursuing lift stay motions.

113.    I believe that the payment of the Taxes and Fees is necessary to avoid potential administrative difficulties.  I understand that if the Taxes and Fees were not paid, the Governmental Authorities may attempt to take precipitous action, including additional state audits, lien filings, and lift stay motions.  I understand that paying prepetition taxes thereby avoids the accumulation of additional penalties and interest that would otherwise erode estate value, prevents the assertion of tax liens that could impede asset dispositions, and ensures the Debtors' compliance with applicable tax laws—each of which is critical to the preservation of estate value and the maximization of recoveries for all creditors.  I understand that only the prompt and regular payment of the Taxes and Fees will avoid these and other unnecessary governmental actions.

114.    For the foregoing reasons, the Debtors seek authority to pay, perform, or otherwise honor, any or all obligations with respect to Taxes and Fees.

115.    To the best of my knowledge, the Debtors have sufficient liquidity to pay the amounts described in the Taxes Motion in the ordinary course of business.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Taxes and Fees.  Accordingly, I believe that there is minimal risk that checks, wire transfers, and

51

electronic fund transfer requests that the Court has not authorized will be honored inadvertently. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in the Taxes Motion. Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or fund transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases. According, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**D.    Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance Of Payment For Future Utility Services; (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (III) Approving the Debtors' Proposed Procedures Resolving Additional Assurance Requests; and (IV) Granting Related Relief (the "*Utilities Motion*")**

116.    In the Utilities Motion, the Debtors seek entry of an order (the "*Order*"), substantially in the form attached to the Utilities Motion as Exhibit A, (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) prohibiting utility companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving additional adequate assurance requests; and (d) granting related relief.

117.    Certain companies (the "*Utility Companies*") provide the Debtors with traditional utility services (the "*Utility Services*"), such as electricity, gas, water, waste disposal, telecommunications, internet, and other similar services that the Debtors utilize in the ordinary course of business and are necessary to preserve the value of the Debtors' businesses during the Chapter 11 Cases. A non-exclusive list of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit B (the "*Utility Services List*"). The relief requested herein is with respect to all Utility Companies supplying Utility Services to the Debtors and is not limited to those on the Utility Services List.

52

118.    I believe that uninterrupted Utility Services are critical to the Debtors' ability to operate and maintain the value of their businesses for the benefit of their estates. I further believe the Debtors could not operate their businesses without the Utility Services. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, I believe the Debtors' business operations could be significantly disrupted, which could immediately and irreparably harm the Debtors' estates. Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

119.    To the best of my knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services. The Debtors pay approximately $3,120 each month for Utility Services (the "*Average Monthly Utility Company Cost*").

120.    The Debtors intend to pay postpetition obligations owed to the Utility Companies in the ordinary course of business in a timely manner, and, I believe that the Debtors' anticipated access to cash collateral will provide sufficient liquidity to pay obligations related to Utility Services in accordance with prepetition practices.

121.    To provide the Utility Companies with adequate assurance of payment, the Debtors propose to deposit $1,550 (the "*Adequate Assurance Deposit*") into a segregated account (the "*Adequate Assurance Account*"). The amount of the Adequate Assurance Deposit is an amount equal to approximately half of the Average Monthly Utility Company Cost for such Utility Company. The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the duration of these Chapter 11 Cases and may be applied to any postpetition defaults in payment to the Utility Companies.

53

122.    I believe that the Utility Companies are adequately assured against any risk of nonpayment for future services during these Chapter 11 Cases, especially in light of the Debtors' general history of paying utility bills on time and in the ordinary course.  I believe that the Adequate Assurance Deposit and the Debtors' ongoing ability to meet obligations as they come due in the ordinary course as a result of the Debtors' proposed budget provide assurance of the Debtors' payment of their future obligations during these Chapter 11 Cases.  Moreover, I believe termination of Utility Services could result in the Debtors' inability to facilitate the orderly administration of their estates to the detriment of all stakeholders.

123.    To the best of my knowledge, the Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the utility payments.  Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in this Motion.  Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or fund transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

124.    I believe that authorizing the Debtors' proposed adequate assurance of payment for future Utility Services, prohibiting Utility Companies from altering, refusing, or discontinuing services, and approving the Debtors' proposed Adequate Assurance Procedures for resolving

additional adequate assurance requests, as well as granting the other relief requested in the Utilities Motion is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.  I believe that failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases could impact the Debtors' operations at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates. I further believe that the requested relief is necessary to preserve the ongoing value of the Debtors' operations, and maximize value of the Debtors' estates for the benefit of all stakeholders. Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion should be approved.

**E.     Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) Critical Vendors, (B) Lien Claimants, and (C) Foreign Vendors; and (II) Granting Related Relief (the "*Vendors Motion*")**

125.    By the Vendor Motion, the Debtors seek entry of an interim order (the "*Interim Order*"), substantially in the form attached to the Vendors Motion as Exhibit A, and subsequently a final order (the "*Final Order*"), substantially in the form attached to the Vendors Motion as Exhibit B:  (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business, based on their sound business judgment, prepetition amounts owed to (i) Critical Vendors (as defined below), (ii) Lien Claimants (as defined below), and (iii) Foreign Vendors (as defined below) (together with the Critical Vendors and the Lien Claimants, the "*Vendors*," and the Vendors' prepetition claims, collectively, the "*Vendor Claims*"); and (b) granting related relief.[8] The Debtors respectfully request authority to pay Vendor Claims in an amount not to exceed $448,000 on an interim basis and in an amount not to exceed $888,000 on a final basis, in each

---

[8]    To the best of the Debtors' knowledge, Vendor Claims do not include prepetition claims of non-Debtor affiliates, insiders of the Debtors (as defined in section 101(31) of the Bankruptcy Code), or affiliates of any insiders, and for the avoidance of doubt, the Debtors do not seek authority to pay prepetition claims of non-Debtor affiliates, insiders of the Debtors (as defined in section 101(31) of the Bankruptcy Code), or affiliates of any insiders.

case as they become due in the ordinary course of business and only on such terms and conditions as the Debtors deem appropriate, in their business judgment, to minimize any disruptions to the Debtors' businesses.[9]  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these Chapter 11 Cases to consider approval of the Vendor Motion on a final basis.

126.    The Debtors rely on uninterrupted access to and relationships with various Vendors that supply goods and services critical to an orderly wind-down of the Debtors' operations.  The value of the Debtors' estates is largely comprised of the Debtors' fleet of kiosks, and to maximize and preserve the value of the kiosks through a wind-down process the Debtors depend on Vendors that provide: (i) necessary software and internet services that allow the Debtors to operate the kiosks and conduct other operational tasks necessary to the wind-down process; (ii) warehousing services to properly store kiosks not in use, pending liquidation of those assets; (iii) high-traffic retail space for in-use kiosks to maintain the value of those kiosks through a sale or wind-down process; and (iv) armored carrier services to move cash from the kiosks into the Debtors' operating accounts.  I believe these goods and services are essential for maintaining and maximizing the value of the Debtors' estates, and failure to pay the Vendor Claims may cause such Vendors to refuse to provide the goods and services necessary for the Debtors' postpetition activities, including limited operations related to liquidation of their kiosk fleet and the wind-down of their businesses.  Accordingly, the Debtors seek authority to pay certain prepetition Vendor Claims in the amounts summarized below.

---

[9]    In the event Debtors will exceed the aggregate amounts to be paid to the Vendors during the interim period, the Debtors shall file a notice with the Court describing the category and overage amount.

| Vendors[10] | Requested Interim Amount | Requested Final Amount[11] |
|---|---|---|
| Critical Vendors | $424,000 | $848,000 |
| Lien Claimants | $4,500 | $10,000 |
| Foreign Vendors | $19,500 | $30,000 |
| | **$448,000** | **$888,000** |

a) **Critical Vendors:** In the ordinary course of business and continuing during the wind-down process, the Debtors engage a number of providers of essential products and services, which the Debtors historically require to run their operations and service their businesses. In order to effectuate necessary wind-down activities, the Debtors will rely on a small subset of specialized providers of products and services (the "*Critical Vendors*" and such Critical Vendors' prepetition claims, the "*Critical Vendor Claims*") that are unaffiliated with the Debtors and whose continued provision of such goods and/or services is crucial to allowing the Debtors to conduct such an orderly wind-down of their operations. The Debtors only intend to make payments contemplated herein to the extent that the Debtors believe a Critical Vendor's failure to do business with the Debtors would materially harm the Debtors' ability to effectuate an orderly wind-down. Prior to filing these Chapter 11 Cases, the Debtors reviewed their accounts payable and vendor lists and consulted with the Debtors' advisors to identify those vendors most essential to the Debtors' postpetition activities that will be critical to maximizing the value of their estates in light of a variety of factors, including, among other things:

- whether a vendor is critical to maximizing property of the estates during a sale process;
- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' limited business operations;
- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal or better terms and, if so, whether the Debtors would be able to transition business thereto;
- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales of future revenue) exceed the amount of a vendor's prepetition claim;

---

[10] For the avoidance of doubt, the amounts proposed to be paid to each Vendor on account of its claims are only captured once. For instance, if a Critical Vendor Claim (defined below) is subject to a valid lien, that claim will instead be categorized as a Lien Claim (defined below). Additionally, amounts proposed to be paid to the Vendors do not include claims of creditors whose prepetition claims are addressed in any other first-day motion filed contemporaneously herewith.

[11] For the avoidance of doubt, requested amounts of Critical Vendor Claims, Lien Claims, and Foreign Vendor Claims the Debtors seek authority to pay on a final basis are inclusive of Critical Vendor Claims, Lien Claims, and Foreign Vendor Claims, respectively, paid on an interim basis.

57

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms without paying such vendor's prepetition claim at the outset of these Chapter 11 Cases;
- whether certain specification or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;
- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or replacement parts or to provide critical services on a postpetition basis; and
- whether authorization for payment of a particular vendor is being sought under another motion of the Debtors for first day relief.

Following this analysis, the Debtors identified a limited number of Critical Vendors who constitute less than 10% of the total prepetition vendor population for purposes of the relief requested herein. The Debtors believe that their relationships with these Critical Vendors may materially deteriorate without such payments, thereby causing disruption to the Debtors' limited operations and wind-down process if the Debtors are unable to pay Critical Vendor Claims as provided herein. The Critical Vendors which the Debtors have identified fall into the following categories:

1. Software and Internet Providers: The Debtors must maintain an internal enterprise resource planning system to manage their cash management system and other operational functions necessary to an orderly wind-down. The Debtors must also maintain their data providers for internal operational functions during the wind-down process.

2. Warehousers: The Debtors currently have approximately 438 kiosks in storage with third-party warehousers. These kiosks are estate property, the maintenance and possible sale of which are integral to maximizing and preserving value of the estates.

3. Armored Carriers and Cash Logistics Providers: The Debtors' business relies on armored carriers to retrieve cash from the Debtors' kiosks on varying collection schedules and to facilitate the deposit of cash into the Debtors' operating accounts. Due to the geographically dispersed and expansive network of the Debtors' operations, the Debtors are required to maintain multiple armored carrier vendors and cash logistics providers to cover all geographic locations wherein the Debtors have operations to be wound down.

4. Retail Hosts: The Debtors have key relationships with retailers across the country that allow the Debtors to place their kiosks in high-traffic retail locations. Certain of such retail locations account for a significant portion of revenue streams from the Debtors' kiosks, and it is critical to preserving the value of the Debtors' assets and estates that the Debtors are able to keep their kiosks in such retail locations.[12]

---

[12] To the best of my knowledge, the Debtors have made good-faith efforts to identify and disclose the categories of Critical Vendors that may be paid pursuant to this Motion. While the Debtors believe that the categories described herein accurately represent the Critical Vendor Claims (as defined below), nothing in this Motion shall limit the

I believe the Debtors' estates would be immediately and irreparably harmed if they were to lose access to the goods and services provided by the Critical Vendors. The Debtors therefore seek authority to honor prepetition obligations to Critical Vendors and pay all or a portion of the Critical Vendors' prepetition claims on an interim basis in an amount not to exceed $424,000, and on a final basis in an amount not to exceed $848,000 (the "*Critical Vendor Claims*"). I further believe that the requested relief will allow them to preserve the value of their estates by paying the prepetition claims of certain parties that are critical to an orderly and value-maximizing wind-down of their businesses. Moreover, the relief requested herein is necessary because many of the Critical Vendors have no obligation to continue providing goods and services under relevant contracts, and, as a result, the Debtors would be unable to force those vendors to continue to perform under section 365 of the Bankruptcy Code. Additionally, the Debtors do not seek authorization to honor prepetition obligations arising under contract, except where the Debtors determine, in their business judgment, such parties may be capable of terminating their contracts notwithstanding section 362(a) of the Bankruptcy Code or may otherwise inflict immediate and irreparable harm on the Debtors by their refusal to continue providing goods or services.

b) **Lien Claimants**: The Debtors also rely on services from certain third parties, including carriers and warehousers, who may hold, or claim to hold, a variety of statutory, common law, or possessory liens (such parties, collectively, the "*Lien Claimants*"), that, if asserted, could materially impair the Debtors' postpetition asset sale and wind-down efforts. Unless the Lien Claimants are paid for outstanding prepetition amounts, I believe that the Lien Claimants may refuse to continue performing obligations to the Debtors – including refusal to release from their possession certain property of the Debtors – causing immediate harm to the Debtors and their estates. I further believe that such refusal may materially impede the Debtors' ability to efficiently liquidate certain of their assets. The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the cost, including the expenses and delay of contesting asserted liens, to their estates. The Debtors have determined, in their business judgment, that paying approximately $10,000 in prepetition Lien Claims will benefit their estates, approximately $4,500 of which will become due and payable within the first 21 days after the Petition Date.

c) **Foreign Vendors:** Certain of the Debtors' vendors are foreign entities (the "*Foreign Vendors*") with prepetition claims (the "*Foreign Vendor Claims*") against the Debtors. As of the Petition Date, I believe that approximately $30,000 in Foreign Vendor Claims has accrued and is outstanding, approximately $19,500 of which will become due and payable within the first 21 days after the Petition Date. Based on the reactions of foreign suppliers in other chapter 11 cases, I believe there is a significant material risk that the nonpayment of even a single invoice could cause a Foreign Vendor to stop shipping goods or providing supplies to the Debtors on a timely basis and/or completely sever its business relationship

Debtors' authority to pay any Critical Vendor on the basis of these categories, provided that the aggregate amount of Critical Vendor Claims paid does not exceed the total amount authorized.

59

with the Debtors.  I understand that suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process and react skeptically to its debtor protections. I also believe that short of severing their relations with the Debtors, nonpayment of certain Foreign Vendor Claims may also cause Foreign Vendors to take other harmful actions.  I further believe that timely access to services, such as armored carrier services for kiosks located abroad, is critical to the Debtors' business and postpetition wind-down operations. Accordingly, the Debtors seek authority, in their sole discretion and business judgment, to make payments on account of such Foreign Vendor Claims.

127.    The Debtors seek authority, but not direction, to pay Vendor Claims in the ordinary course of business; *provided* that any such payment of Vendor Claims shall be contingent upon each Vendor's (a) agreement to continue—or recommence—providing goods or services to the Debtors on "Customary Trade Terms,"[13] and (b) agreement that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and services to the Debtors during the course of these Chapter 11 Cases (*provided*, that the Debtors continue to pay for such goods and services and are not otherwise in breach of such contract or agreement).

128.    The Debtors further propose that if any Vendor accepts payment for a Vendor Claim and thereafter refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms for the applicable period, then the Debtors may assert and request that the Court order: (a) that the payment of such Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Vendor in cash upon written demand, (b) that the Vendor immediately return such payments in respect of its Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights,

---

[13]    As used herein, "***Customary Trade Terms***" means, with respect to a Vendor, (a) the normal and customary trade terms, practices, and programs that were most favorable to the Debtors and in effect between such Vendor and the Debtors in the 12-month period prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Vendor that, in the reasonable business judgment of the Debtors, are more favorable to the Debtors than the terms in the preceding clause (a).

adjustments, or offsets of any type whatsoever, and (c) upon recovery of such payment by the Debtors, such Vendor Claim shall be reinstated in such an amount as to restore the Debtors and the applicable Vendor to their original positions, as if the payment of the Vendor Claim had not been made.

129. To ensure that Vendors transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures as a condition to paying any Vendor Claim: (a) the Debtors may (i) require a Vendor to enter into a contractual agreement evidencing such Customary Trade Terms substantially in the form attached to the Vendors Motion as Exhibit C (a "***Vendor Agreement***"), or (ii) otherwise obtain a written communication from the Vendor evidencing such Vendor's agreement to such Customary Trade Terms, and (b) that payment of the Vendor Claim include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, dated [●], 2026, in the jointly administered Chapter 11 Cases of Bitcoin Depot Inc., entitled "*[Interim] [Final] Order (I) Authorizing the Debtors to Pay (A) Critical Vendors, (B) Lien Claimants, and (C) Foreign Vendors; and (II) Granting Related Relief*" and submits to the jurisdiction of that Court for enforcement thereof.

130. By the Vendors Motion, the Debtors respectfully request authorization to enter into Vendor Agreements when the Debtors determine that entry into such Vendor Agreements is in the best interest of the Debtors' estates. The Debtors also request authorization to make payments on account of Vendor Claims in the absence of a Vendor Agreement if the Debtors determine, in their business judgment, that entry into such Vendor Agreement will result in harm to the Debtors' estates. The Debtors further request the discretion to enter into Vendor Agreements because certain of the Vendors hold claims of modest size, and the anticipated cost to the Debtors' estates,

in both time and expense, for the Debtors and their advisors to enter into Vendor Agreements with these Vendors would outweigh the size of the potential Vendor Claims being resolved.  However, the Debtors request that to the extent the Debtors do not enter into a Vendor Agreement with a Vendor, such Vendor's acceptance of payment on account of its Vendor Claim be deemed as the Vendor's agreement (a) to continue providing goods or services on Customary Trade Terms and (b) that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods or services to the Debtors during the course of these Chapter 11 Cases (*provided*, that the Debtors continue to pay for such goods and services and are not otherwise in breach of such contract or agreement).

131.    The Debtors further request authority to require, as a further condition of receiving payment on account of a Vendor Claim, that a Vendor agree to take whatever action is necessary to remove any existing liens on the Debtors' property at such Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

132.    I understand that if the Debtors do not pay certain of the Foreign Vendor Claims, certain Foreign Vendors may refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims. I further understand that the Foreign Vendors may take other actions against the Debtors based on the incorrect belief that they are not bound by the automatic stay. As a result, the Debtors would be unable to procure related products and services, potentially causing the Debtors to fail or delay their wind-down and asset sale processes.

133.    The Debtors depend on the goods and services provided by the Critical Vendors and the Foreign Vendors and will continue to do so in connection with their wind-down activities. I believe that ensuring these Critical Vendors and Foreign Vendors continue to supply certain goods and provide services is therefore vital to the ability of the Debtors to maximize the value of

their estates.  Accordingly, I believe that it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims and Foreign Vendor Claims.

134.     I understand that the Lien Claimants may assert liens against the Debtors' property under applicable law (the "*Liens*"), which Liens and/or interests arising from the same (the "*Interests*").  I also understand that under most state laws, a carrier may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.  I further understand that as a result, certain carriers may refuse to deliver or release property of the estates in their possession or control before the prepetition amounts owed to them by the Debtors are satisfied and their liens redeemed.

135.     I understand that the Lien Claimants also may possess a state-law lien on certain equipment or property for which prepetition services or improvements were provided. Unless the Debtors are authorized to pay the Lien Claims, I believe that the Debtors may fall victim to "self-help" remedies, thereby disrupting the Debtors' wind-down process and dramatically reducing the value of the Debtors' estates to the detriment of the Debtors' creditors and all parties in interest.

136.     I believe that payment of the Lien Claims is not only important to the wind-down down of the Debtors' operations, but also critical to preserving the value of the Debtors' estates. I believe that Payment of the Lien Claims will save the Debtors the considerable time and expense of having to negotiate or litigate for the return of or right to use property of the estate that may be subject to these lien claims.

137.     To the best of my knowledge, Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business.  Under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund

transfer requests as relating to an authorized payment in respect of the Vendor Claims. Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfers, or electronic fund transfer requests in respect of the relief requested in the Vendor Motion. Further, the Debtors also seek authority to issue new postpetition checks, wire transfers, or electronic fund transfer requests to replace any prepetition checks, wire transfers, or fund transfers that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

138.     I believe that authorizing the Debtors to pay Vendor Claims, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors. I further believe that failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases could impact the Debtors' operations at this important juncture and inhibit the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates. I believe the requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value for the benefit of all stakeholders. Accordingly, I understand that the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Vendors Motion be approved.

**F.     Motion for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief (the "*OCP Motion*")**

139.     By the OCP Motion, the Debtors seek entry of an order (the "***Order***"), substantially in the form attached to the OCP Motion as Exhibit A: (a) authorizing, but not directing, the Debtors

64

to retain and compensate professionals utilized in the ordinary course of business and (b) granting related relief.

140. The Debtors employ various attorneys, tax advisors, financial advisors, and other professionals in the ordinary course of their businesses (collectively, the "*OCPs*"). I further understand that the OCPs provide services for the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including specialized legal services, auditing and tax services, and certain other advisory services. Nonexclusive lists of the Debtors' current OCPs (the "*OCP Lists*") are attached to the OCP Motion as Exhibit B, Exhibit C, and Exhibit D. The Debtors may also seek to employ additional OCPs as necessary in the course of these Chapter 11 Cases, subject to the procedures set forth in Exhibit 1 to the Order (collectively, the "*OCP Procedures*").

141. I believe that the continued employment and compensation of the OCPs is in the best interests of the Debtors' estates, their stakeholders, and other parties in interest. I understand that the OCPs have significant knowledge, expertise, and familiarity with the Debtors' circumstances and businesses. Although the Debtors anticipate that the OCPs will wish to continue to serve the Debtors during these Chapter 11 Cases, I understand that many would not be in a position to do so if the Debtors cannot pay them on a regular basis. I believe that without the OCPs' knowledge, expertise, and familiarity with the Debtors and their businesses, the Debtors would incur additional and unnecessary expenses in educating and retaining replacement professionals.

142. In particular, certain of the OCPs serve as counsel to, and otherwise represent and assist, the Debtors in connection with, among other things, their foreign businesses and ongoing state actions that are likely excepted from the automatic stay pursuant to section 362(b)(4) of the Bankruptcy Code as exercises of the applicable governmental units' police and regulatory powers.

I understand that such OCPs have developed substantial institutional knowledge which cannot be readily replicated or transferred to replacement counsel without material cost and delay.

143.   I believe that the prompt retention and continued engagement of the OCPs is essential to preserving estate value and that the Debtors' estates and stakeholders are best served by avoiding any disruption in the OCPs' professional services.

144.   The OCP Procedures will establish a streamlined process for the retention and compensation of OCPs during these Chapter 11 Cases upon notice to the following key parties: (a) proposed counsel to the Debtors, Vinson & Elkins LLP, The Grace Building, 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036-7708, Attn: David S. Meyer and Jessica C. Peet, and 845 Texas Avenue, Suite 4700, Houston, Texas 77002, Attn: Paul E. Heath and Sara Zoglman; (b) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Andrew Jimenez and Ha Nguyen; (c) Alston & Bird, as counsel to the Term Loan Agent; (d) the official committee of unsecured creditors (if any) appointed in these Chapter 11 Cases and their counsel; and (e) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "*Notice Parties*").

145.   I understand that the OCP Procedures will enable the Debtors to employ OCPs upon the filing of a declaration of disinterestedness, substantially in the form attached as Exhibit 2 to the Order (each, a "*Declaration of Disinterestedness*"), which will state that the respective OCP does not have any material interest adverse to the Debtors or their estates.  I understand that the Notice Parties will have an opportunity to object to any proposed retention pursuant to the OCP Procedures.  The OCP Procedures further provide that while these Chapter 11 Cases are pending, the fees of each OCP set forth on: (a) Exhibit B to the OCP Motion, excluding costs and

66

reimbursable expenses, may not exceed $50,000 per month on average over a rolling three-month period (the "*Tier 1 OCP Cap*"); (b) Exhibit C to the OCP Motion, excluding costs and reimbursable expenses, may not exceed $25,000 per month on average over a rolling three-month period (the "*Tier 2 OCP Cap*"); and (c) Exhibit D to the OCP Motion, excluding costs and reimbursable expenses, may not exceed $8,500 per month on average over a rolling three-month period (the "*Tier 3 OCP Cap*" and together with the Tier 1 OCP Cap and Tier 2 OCP Cap, the "*OCP Caps*").

146.    I understand that to the extent any OCP seeks compensation in excess of the applicable OCP Caps (the "*Excess Fees*"), the OCP shall file a notice of fees in excess of the OCP Cap (a "*Notice of Excess Fees*") with the Court and an invoice setting forth, in reasonable detail, the nature of the services rendered and disbursements actually incurred.  The Notice Parties and any other party in interest shall then have fourteen days to file an objection to the Notice of Excess Fees with the Court.  If after fourteen days no objection is filed, the Excess Fees shall be deemed approved, and the applicable OCP may be paid 100% of its fees and 100% of its expenses without the need to file a fee application.  If an objection is timely filed and such objection cannot be resolved by the parties within fourteen days, the Debtors will schedule the matter for a hearing before the Court.

147.    By the OCP motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

148.    I understand that the OCPs will not be involved in the administration of these Chapter 11 Cases.  I understand that the OCPs are not "professionals" requiring formal retention proceedings under applicable law.  Instead, I understand that the OCPs will provide services in connection with the Debtors' businesses, which services are ordinarily provided by non-

67

bankruptcy professionals. Nevertheless, to provide clarity and an opportunity for oversight, the Debtors seek the relief requested herein to establish clear mechanisms for retention and compensation of the OCPs pursuant to the OCP Procedures and thereby avoid any subsequent controversy with respect thereto.

149. I believe that: (a) the retention of the OCPs as provided herein is reasonably necessary to the preservation of the Debtors' estates; (b) expenses for the OCPs will be monitored closely by the Debtors; and (c) the OCPs will not perform substantial bankruptcy-related services without filing an application with the Court for separate retention as a non-ordinary course professional.

150. Moreover, in light of the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient, and costly for the Debtors and their advisors to prepare and submit individual applications and proposed retention orders for each OCP. Therefore, I believe that it is in the best interests of all creditors and parties in interest to retain the OCPs in accordance with the OCP Procedures and avoid any disruption in the professional services that are essential to preserve value of the Debtors' estates.

151. Although some of the OCPs may hold unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition, I understand that none of the OCPs have an interest materially adverse to the Debtors and their estates. In any event, the OCP Procedures include a requirement that each OCP file a Declaration of Disinterestedness before an OCP can be compensated.

152.   For the reasons set forth herein, I believe that the relief requested is in the best interests of the Debtors, their estates, their stakeholders, and other parties in interest, and therefore should be granted.

69

## EXHIBIT B

## Organizational Chart of the Company

