United States Bankruptcy Court
Southern District of Texas
ENTERED
July 24, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-90528 (CML)** |
| | § | |
| **BITCOIN DEPOT INC.,** ***et al.*****,** | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**ORDER (I) APPROVING (A) THE
SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (II) GRANTING RELATED RELIEF**

Upon the *Emergency Motion of Debtors for Entry of Orders (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Scheduling Auction, Sale Hearing, and Related Deadlines; (C) Approving (I) Sale Of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (II) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 98] (the "***Motion***"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "***Debtors***") seeking, among other things, entry of an order (the "***Sale Order***") (a) authorizing the sale of the Acquired Assets (as defined in the Asset Purchase Agreement) free and clear of all Liens, Claims, and Interests (as defined herein) (other than Assumed Liabilities and Permitted Encumbrances); (b) authorizing the assumption and assignment of certain Assigned Contracts (as defined in the Asset Purchase Agreement); and (c) granting related relief, all as more fully set forth

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bitcoindepot. The location of the Debtors' corporate headquarters is: 8601 Dunwoody Place, Sandy Springs, Georgia 30350.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as defined herein), as applicable.

in the Motion; and upon consideration of the *Declaration of Thomas Studebaker, Managing Director of Portage Point Partners LLC in Support of the Emergency Motion of Debtors for Entry of Orders (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Scheduling Auction, Sale Hearing, and Related Deadlines; (C) Approving (I) Sale Of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (II) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 99] (the "***Studebaker Declaration***"), the *Declaration of Teri Stratton in Support of the Sale* [Docket No. 443] (the "***Initial Stratton Declaration***"), and the *Supplemental Declaration of Teri Stratton in Support of the Sale*, to be filed before the Sale Hearing (together with the Initial Stratton Declaration, the "***Stratton Declarations***"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, dated May 24, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having entered the *Order (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Scheduling Auction, Sale Hearing, and Related Deadlines; and (C) Granting Related Relief* [Docket No. 193] (the "***Bidding Procedures Order***"), approving, among other things, the Bidding Procedures for the Assets; and upon the Purchaser and Debtors having executed that certain *Asset Purchase Agreement* by and among the Sellers (as defined in the Asset Purchase Agreement) and CalTel, Inc. as Purchaser

(together with all ancillary documents, as may be amended, modified, or supplemented, the "***Asset Purchase Agreement***"),[3] with respect to the sale of the Acquired Assets (the "***Sale Transaction***") and CalTel, Inc., (the "***Purchaser***") having been chosen as the Winning Bidder for the Acquired Assets in accordance with the Bidding Procedures; and the Court having conducted a hearing on July 24, 2026, (the "***Sale Hearing***") to consider the relief requested in the Motion as set forth in this Sale Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction, the Asset Purchase Agreement, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

A. **Findings and Conclusions**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. Without limiting the

[3] An unexecuted substantial final form copy of the Asset Purchase Agreement is attached hereto as **Exhibit 1**.

generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets, including the Acquired Assets, pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b); this Court has the authority to enter a Final Order.

C. **Venue**. Venue of these Chapter 11 Cases and approval of the Motion and the Sale Transaction is proper in this district under 28 U.S.C. §§ 1408 and 1409.

D. **Basis for Relief**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 of the Bankruptcy Rules, rules 4002-1(e) and 9013-1 of the Local Rules, and the Complex Case Procedures. The consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures and the Debtors and the Purchaser have complied with all of the applicable requirements of such sections and rules with respect to such transactions.

E. **Final Order; Immediate Effect**. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, and notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and authorizes the closing of all transactions contemplated hereby, including, without limitation, the Sale Transaction, without regard to any stay or delay in its implementation.

F. **Incorporation by Reference**. Findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

G. **Notice and Opportunity to Object**. Notice of the Motion, the executory contracts and unexpired leases to be assumed and assigned in connection with the Sale Transaction, the Auction, the Sale Hearing, the Sale Transaction, and the deadlines related thereto was provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Term Loan Agent, NFS, and VFS; (c) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (d) counsel to the Committee; (e) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (f) the Internal Revenue Service; (g) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (h) all state attorneys' generals in states where the Assets are located; (i) all municipalities in which the Assets are located; (j) all entities known to have asserted a lien or security interest against any of the Assets; (k) all potential bidders previously identified or solicited; and (l) all counterparties to the executory contracts and unexpired leases to be assumed and assigned in connection with the Sale Transaction.

H. The Debtors served notice substantially in the form of the *Notice of Sale, Bidding Procedures, Auction, and Sale Hearing* attached to the Bidding Procedures Order as **Exhibit 2** (the "***Sale Notice***") on all parties required to receive such notice under the Bidding Procedures Order and applicable rules. *See Affidavit of Service* [Docket No. 400]. Additionally, the Debtors posted the Sale Notice to the Debtors' case information website located at https://restructuring.ra.kroll.com/bitcoindepot/.

I. The Debtors served notice substantially in the form of the *Notice of Proposed Assumption and Assignment of Certain Executory Contracts* attached to the Bidding

Procedures Order as **Exhibit 3** (the "***Assumption and Assignment Notice***") on all parties required to receive such notice under the Bidding Procedures Order and applicable rules. *See Affidavit of Service* [Docket No. 430].

J. In accordance with the Bidding Procedures, the Debtors filed and served the *Notice of Winning Bidders and Adjourned Sale Hearing* [Docket No. 404] and the *Second Notice of Winning Bidders* [Docket No. 495].

K. The notices described in the foregoing paragraphs G-J are good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures, the assumption and/or assignment of the Assigned Contracts, the Auction, the identity of the Winning Bidder, the Sale Hearing, the Sale Transaction, the Cure Costs, the deadline to submit any Assumption and Assignment Objection or Supplemental Assumption and Assignment Objection, the deadline to submit any Sale Objection, and all other deadlines related thereto is or shall be required.

L. **Assets Property of the Estate**. The Acquired Assets sought to be sold and assigned by the Debtors to the Purchaser pursuant to the Asset Purchase Agreement are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

M. **Compliance with Bidding Procedures**. On June 10, 2026, the Court entered the Bidding Procedures Order approving, among other things, the implementation of the Bidding Procedures, in connection with one or more sales of all, substantially all, or any combination of the Debtors' assets. The Debtors, the Purchaser, and each of their respective professionals have complied, in good faith and in a non-collusive manner, in all respects with the Bidding Procedures Order and the bidding process was free of any fraud, collusion, or unfair dealing. The Bidding Procedures were substantively and procedurally fair to all parties and all

potential bidders and afforded notice and a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets, including the Acquired Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

N. **Sale Process**. As demonstrated by the Studebaker Declaration, the Stratton Declarations, and the evidence set forth at the Sale Hearing, the Debtors and their professionals (i) adequately marketed the Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bidding Procedures and (ii) conducted a fair and open sale process. The sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase all or any portion of the Assets, and the process conducted by the Debtors pursuant to the Bidding Procedures Order obtained the highest or best value for the Acquired Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Acquired Assets. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective Bidders have been afforded a reasonable and fair opportunity to bid for the Assets, including the Acquired Assets, or file an objection to the assumption and assignment of any Assigned Contract and/or the Sale Transaction, as the case may be. The sale process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Assets, including the Acquired Assets, has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects. The Bid Deadline passed on June 22, 2026, at 5:00 p.m. (prevailing central time). In accordance with the Bidding Procedures and in consultation with the Consultation Parties, the Debtors filed the *Notice of Adjournment of Auction for the Sale of the Debtors' Assets Free and*

*Clear of any and all Claims, Interests, and Encumbrances* [Docket No. 313], the *Second Notice of Adjournment of Auction for the Sale of the Debtors' Assets Free and Clear of any and all Claims, Interests, and Encumbrances* [Docket No. 321], and the *Notice of Rescheduled Auction for the Sale of the Debtors' Assets Free and Clear of any and all Claims, Interests, and Encumbrances* [Docket No. 337] moving the date of the Auction to June 29, 2026.

O. **Auction**. On June 29, 2026, pursuant to the Bidding Procedures, the Debtors and their advisors hosted an Auction to solicit the highest or otherwise best bids for the Assets. At the conclusion of the Auction, the Debtors determined, in their reasonable business judgment and in a manner consistent with their fiduciary duties, that the Purchaser's Qualified Bid was the highest or otherwise best bid with respect to the Acquired Assets sold at the Auction. The Debtors therefore identified the Purchaser as the Winning Bidder with respect to the Acquired Assets sold at the Auction, pursuant to the notice filed at Docket No. 404. The Debtors did not designate Winning Bidders for all of their Assets and, following the Auction, the Purchase submitted a Bid for additional Acquired Assets and the Debtors determined, in their reasonable business judgment and in a manner consistent with their fiduciary duties, that the Purchaser's Bid was the highest or otherwise best bid with respect to the additional Acquired Assets. The Debtors therefore identified the Purchaser as the Winning Bidder with respect to the Acquired Assets, pursuant to the notice filed at Docket No. 495. The transactions contemplated by the Asset Purchase Agreement constituted a Qualified Bid in accordance with the Bidding Procedures Order. As established by the record of the Sale Hearing, the Bidding Procedures established by the Bidding Procedures Order, including as it relates to the Auction, have been complied with in all material respects by the Debtors and the Purchaser and all of their respective representatives, professionals, and affiliates.

P. **Highest and Best Offer**. The Sale Transaction, including the form and total consideration to be realized by the Debtors under the Asset Purchase Agreement, (i) constitutes the highest or otherwise best offer received by the Debtors for the Acquired Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

Q. **Winning Bidder**. The Purchaser is the designated Winning Bidder, and the Asset Purchase Agreement is designated the Winning Bid for the Acquired Assets enumerated therein in accordance with the Bidding Procedures Order.

R. **Purchaser**. On the terms and subject to the conditions contained in the Asset Purchase Agreement, the Purchaser agreed to provide, as aggregate consideration for the Acquired Assets (the "***Purchase Price***"): (i) the assumption of the Assumed Liabilities (including the Purchaser's payment of the Cure Costs) and (ii) the Cash Payment, as that term is defined in the Asset Purchase Agreement. The allocation of the Purchase Price, determined in accordance with the Asset Purchase Agreement, is valid and enforceable for all purposes. The Purchaser's and the Debtors' allocations of the Purchase Price are the good faith determination of the value thereof.

S. **Business Justification; Fiduciary Duties**. The Debtors have demonstrated that entry into and consummation of the Asset Purchase Agreement constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. The Debtors have demonstrated compelling circumstances for the Sale Transaction outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sale Transaction is

necessary and appropriate to preserve and to maximize the value of the Debtors' estates. This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Purchaser pursuant to the terms and conditions set forth in the Asset Purchase Agreement. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. The Assigned Contracts being assigned to the Purchaser are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

T. The Debtors' decision to enter into the Asset Purchase Agreement and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, officers, and managers. Because the entry into and consummation of the Asset Purchase Agreement constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, and the Consultation Parties shall have or incur no liability to the estates or any holder of a Claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Asset Purchase Agreement or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the Asset Purchase Agreement, willful misconduct, or fraud, in each case as determined by a court of competent jurisdiction.

U. **Corporate Authority**. The Debtors (i) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and any actions required to be performed by the Debtors to consummate the Sale Transaction. No further consents or approvals of the Debtors, are required for the Debtors to consummate the Sale Transaction.

V. **Arm's-Length Sale and Purchaser's Good Faith**. The Asset Purchase Agreement was negotiated and is undertaken by the Debtors and Purchaser at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser (i) recognizes that the Debtors were free to deal with any other party interested in acquiring any of the Assets, including the Acquired Assets, (ii) complied with the Bidding Procedures Order in all respects, and (iii) willingly subjected its Bid to the competitive Bidding Procedures. All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale Transaction have been disclosed, and the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. As a result of the foregoing, the Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Purchaser has proceeded in good faith in all respects in connection with the Sale Transaction specifically and these Chapter 11 Cases generally.

W. **No Fraudulent Transfer**. The total consideration provided by the Purchaser pursuant to the Asset Purchase Agreement constitutes reasonably equivalent value and

fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Asset Purchase Agreement or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

X. **Free and Clear Transfer Required by Purchaser**. If the Debtors did not sell the Acquired Assets free and clear of all Liens, Claims, and Interests (other than the Assumed Liabilities and Permitted Encumbrances) such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale Transaction. The Purchaser would not have submitted a Bid, entered into the Asset Purchase Agreement, and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests, if the Sale Transaction and the assignment of the Assigned Contracts to the Purchaser were not free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances). Therefore, the Sale Transaction contemplated by the Asset Purchase Agreement free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

Y. As of the Closing Date, pursuant and subject to the terms of the Asset Purchase Agreement and this Sale Order, the transfer of the Acquired Assets and the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Purchaser with all of the Debtors' respective rights, title, and interests in the Acquired Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (other than Assumed Liabilities and Permitted Encumbrances). Notwithstanding anything to the contrary in the Asset Purchase Agreement, neither the Purchaser, nor any person or entity claiming by, through, or on behalf of the Purchaser (including, but not limited to, by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, use offensively or defensively, assert, sell, convey, assign, or file any claim that relates to actual or potential claims and Actions of the Debtors' bankruptcy estates under Sections 547 and 548 of the Bankruptcy Code to the extent such claims constitute Acquired Assets to be transferred to the Purchaser pursuant to the terms of the Asset Purchase Agreement.

Z. **Satisfaction of Bankruptcy Code Requirements**. The consummation of the Sale Transaction and the assumption and assignment of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363, and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction contemplated hereby.

AA. **Satisfaction of Section 363(f) Standards**. The Debtors are authorized to sell the Acquired Assets free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor or other person or entity asserting a Lien, Claim, or Interest, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a Lien, Claim, or Interest in the Acquired Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, or Interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of Liens, Claims, and Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Creditors or other persons or entities asserting a Lien, Claim, or Interest in or against the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, or Interest. Those holders of Liens, Claims, and Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code by having their Liens, Claims, and Interests, if any, in each instance against the Debtors, their estates, or any of the Acquired Assets, attach to the proceeds of the Sale Transaction ultimately attributable to the Acquired Assets in which such holder alleges Liens, Claims, and Interests.

BB. **No Successor or Other Derivative Liability**. The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not, as of the Petition Date, an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or equity holders exists now or has ever existed between the Purchaser and the Debtors. The conveyance of the Acquired Assets does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no

continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates. The Purchaser's acquisition of the Acquired Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing Date. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Acquired Assets. The Purchaser would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

CC. **Assigned Contracts**. Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Contracts that did not or do not timely file an objection to the assumption and/or assignment of the Assigned Contract(s) to which they are a counterparty are deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the Purchaser, and the Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to the Purchaser in accordance with the terms of the Asset Purchase Agreement, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their

predecessors, successors or assigns, shall have no further liability or obligation under the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Purchaser in accordance with the terms of the Asset Purchase Agreement and, other than with respect to Assumed Liabilities and Permitted Encumbrances, the Purchaser shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date (as defined in the Asset Purchase Agreement) and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Contract, that relates to any acts or omissions that arose or occurred prior to the Closing Date (as defined in the Asset Purchase Agreement). The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts being assigned to the Purchaser are an integral part of the Sale Transaction and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of the Debtors' estates.

DD. **Cure Costs and Adequate Assurance**. Pursuant to the Asset Purchase Agreement, the Cure Costs (as defined Asset Purchase Agreement) will be paid by the Purchaser in accordance with the terms of the Asset Purchase Agreement. The Purchaser has demonstrated adequate assurance of future performance of each Assigned Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the Purchaser or any of its permitted assignees to which such Assigned Contract is assumed and assigned by the Debtors, including a promise to perform the Debtors' obligations under such Assigned Contract for periods at or after the Closing

Date. The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts that are assumed. The Purchaser's payment of Cure Costs in accordance with the terms of the Asset Purchase Agreement and promise under the Asset Purchase Agreement to perform the obligations under the Assigned Contracts as of the Closing Date, after the Closing Date, shall constitute adequate assurance of future performance under such Assigned Contracts. Any objections to the Cure Costs, to the extent not otherwise resolved, are hereby overruled. To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective Assigned Contract(s) to the Purchaser and to have waived any other defaults or breaches. The Court finds that with respect to all Assigned Contracts, the payment of the Cure Costs as provided in the Asset Purchase Agreement is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Purchaser, of each Assigned Contract to be assumed and assigned to the Purchaser as of the Closing Date.

EE. **Assets Assignable**. Each and every provision of the documents governing the Acquired Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Acquired Assets, if any, have been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

FF. **Sale as Exercise of Business Judgment**. Entry into and consummation of the Asset Purchase Agreement constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Purchaser. Additionally: (i) the Asset Purchase Agreement constitute the highest and best offer for the Acquired Assets; (ii) the Asset Purchase Agreement and the closing thereon presents the best opportunity to realize the maximum value of the Acquired Assets and avoid a decline and devaluation of the Acquired Assets; (iii) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; and (iv) the Asset Purchase Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the sale prior to, and outside of, a chapter 11 plan.

GG. **No Sub Rosa Plan**. The Asset Purchase Agreement and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan. The Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

HH. **Cash Collateral Orders**. On May 19, 2026, the Court entered the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Confirming Application of the Automatic Stay, (IV) Scheduling a Second Interim Hearing on the Motion, and (V) Granting Related Relief* [Docket. No. 44] (the "***First Interim Cash Collateral Order***" and the second interim order [Docket No. 184], the "***Second Interim Cash Collateral Order***" and the third interim order [Docket No. 327], the "***Third Interim Cash Collateral Order***"

and the fourth interim order [Docket No. 454], the "***Fourth Interim Cash Collateral Order***" and the fifth interim order [Docket No. 488] granting such relief on a further interim basis, the "***Fifth Interim Cash Collateral Order***" and, together with the First Interim Cash Collateral Order, the Second Interim Cash Collateral Order, the Third Interim Cash Collateral Order, and the Fourth Interim Cash Collateral Order, the "***Cash Collateral Orders***"). Pursuant to the Cash Collateral Orders, the Assets, including certain of the Acquired Assets, are subject to the Adequate Protection Liens and the alleged Prepetition Liens (in each case, as such terms are defined in the Cash Collateral Orders). For the avoidance of doubt, the sale of the Acquired Assets to the Purchaser shall be free and clear of the Adequate Protection Liens and alleged Prepetition Liens.

II. **Time of the Essence; Waiver of Stay.** Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale Transaction must be approved and consummated within the time constraints set forth in the Bidding Procedures Order and the Asset Purchase Agreement to preserve and maximize the value of the Acquired Assets. Time, therefore, is of the essence in effectuating the Asset Purchase Agreement. As such, the Debtors and the Purchaser intend to close the sale of the Acquired Assets, will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in doing so, and may close the Transactions contemplated by the Asset Purchase Agreement at any time after the entry of this Sale Order subject to the terms and conditions of the Asset Purchase Agreement. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Asset Purchase Agreement. Accordingly, cause has been shown as to why this Sale Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h), 6006(d), and any applicable Local Bankruptcy Rule.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. **Approval of Sale Transaction**. The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Asset Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved.

2. **Objections Overruled**. Any objections and responses to the Motion or the relief requested therein that relate to the Sale Transaction and that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3. **Approval of Asset Purchase Agreement**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Asset Purchase Agreement is hereby approved as set forth herein and the Debtors are authorized to take any and all actions necessary to consummate the Sale Transaction, including the sale, transfer, and assignment of all of the Debtors' respective right, title, and interest in, to, and under the Acquired Assets to the Purchaser free and clear of any and all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) in accordance with the terms the Asset Purchase Agreement, with such Liens, Claims, and Interests attaching to the proceeds of the Sale Transaction. The Debtors have satisfied all requirements of §§ 363(b) and 363(f) of the Bankruptcy Code and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) (as defined herein).

4. **Sale and Transfer of Assets Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors shall transfer to the Purchaser, upon the Closing Date, all of the Debtors' respective right, title, and interest in and to, and possession of,

the Acquired Assets, which shall be immediately vested in Purchaser, and, other than Assumed Liabilities and Permitted Encumbrances, such title to the Acquired Assets shall be transferred to Purchaser shall be, free and clear of all Liens, Claims, and Interests including, without limitation:

(a) any and all charges, liens (statutory or otherwise), claims, mortgages, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, third-party interests, or any other restrictions or limitations of any kind with respect to the Acquired Assets;

(b) any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under (x) any labor, employment, or pension laws, (y) health or welfare, compensation or other employee plan, agreements, practices, and programs (including any Employee Benefit Plan) of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, or (z) any workers' compensation, occupational disease, or unemployment or temporary disability related law, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third-party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, managers, agents, or successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Acquired Assets, the Assigned Contracts, or the transactions contemplated by the Asset Purchase Agreement; and

(c) any and all equity or other interests of any kind or nature whatsoever in or with respect to (i) any of the Debtors or their respective affiliates, subsidiaries, or successors or assigns, (ii) the Acquired Assets, or (iii) the Assigned Contracts.

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or

unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing Date (collectively, the "***Liens, Claims, and Interests***"). Any and all such Liens, Claims, and Interests shall attach to the proceeds of the Sale Transaction.

5. **Preservation of Certain Causes of Action**. For the avoidance of doubt, any avoidance actions under Chapter 5 of the Bankruptcy Code or other claims, causes of action, or defenses of the Debtors or their estates which are not expressly identified as Acquired Assets in the Asset Purchase Agreement, including any claims, causes of action or defenses the Debtors or their estates may have against current and former officers and directors, shall be retained by the Debtors and their estates to the extent any such claims and causes of action exist.

6. **Binding Effect of Order**. This Sale Order and the Asset Purchase Agreement shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, and Interests in, against, or on all or any portion of the Acquired Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these Chapter 11 Cases or upon a conversion to case under chapter 7 of the Bankruptcy Code, and the Asset Purchase Agreement shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Purchaser hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest. The

Asset Purchase Agreement, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Purchaser. To the extent of any conflict between this Sale Order or the Asset Purchase Agreement and such future plan or order, the terms of this Sale Order and the Asset Purchase Agreement shall control.

7. **No Material Modifications**. The Asset Purchase Agreement and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not (x) have an adverse effect on the Purchaser or the Debtors or their estates or (y) adversely affect the rights of the Prepetition Secured Parties as to the proceeds of the Sale Transaction; *provided further* that any such proposed modification, amendment, supplement, or restatement that would have an adverse effect on the Debtors or their estates shall require a further order of this Court.

8. **No Bulk Sales**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Sale Order.

9. **Valid Transfer**. Effective upon the Closing Date, the transfer to the Purchaser of the Debtors' respective right, title, and interest in the Acquired Assets pursuant to the Asset Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' respective right, title, and interest in the Acquired Assets, and vests with or will vest in the Purchaser all right, title, and interest of the Debtors in the Acquired Assets, free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances).

10. **Fair Consideration**. The consideration provided by the Purchaser for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, or possession thereof, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or any other applicable law. Neither the Debtors nor the Purchaser have entered into the Transaction Agreements, including the Asset Purchase Agreement, or any agreement contemplated thereby or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

11. The Asset Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. None of the Debtors, the Purchaser, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

12. **Good Faith Purchaser**. The Sale Transaction contemplated by the Asset Purchase Agreement is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Purchaser has acted without collusion in undertaking the Sale

Transaction contemplated by the Asset Purchase Agreement. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Acquired Assets to the Purchaser (including the assumption and assignment by the Debtors of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

13. **Exculpation and Release**. None of the Purchaser (solely in its capacity as such) or any of its members or their respective affiliates, successors, assigns, and advisors (in each case, solely in their capacity as such) shall be subject to any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever by the Debtors, their estates, their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns arising out of the negotiation, due diligence in respect of, preparation, execution or delivery of the Asset Purchase Agreement, and the entry into and consummation of the Sale Transaction and the agreements and ancillary documents memorializing and effectuating the Sale Transaction, other than the Assumed Liabilities and Permitted Encumbrances being assumed by the Purchaser; *provided, however*, that the foregoing shall not release any claims or liability related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

14. None of the Debtors, their estates, their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors

or assigns shall be subject to any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever by the Purchaser or any of its members or their respective affiliates, successors, assigns, and advisors arising out of the negotiation, due diligence in respect of, preparation, execution or delivery of the Asset Purchase Agreement, and the entry into and consummation of the Sale Transaction and the agreements and ancillary documents memorializing and effectuating the Sale Transaction, but excluding the obligations of the Debtors under the Asset Purchase Agreement; *provided, however*, that the foregoing shall not release any claims or liability related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

15. For the avoidance of doubt, (i) nothing in paragraph 14 shall prevent the Purchaser from enforcing all terms of the Asset Purchase Agreement or any Transaction Agreement against the Sellers or release or exculpate the Sellers from any liability thereunder, and (ii) nothing in paragraph 13 shall prevent the Debtors from enforcing any and all terms of the Asset Purchase Agreement or any Transaction Agreement against the Purchaser or release or exculpate the Purchaser for any liability thereunder.

16. **Governmental Authorization to Effectuate Sale and Assignments**. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates

lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

17. Nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this order. Nothing in this Sale Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

18. **Authorization to Assign**. Notwithstanding any provision of any contract governing the Acquired Assets, including any Assigned Contract to be assumed and assigned to the Purchaser as of the Closing Date, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Acquired Assets, including any Assigned Contract, at or after the Closing Date, the Debtors are authorized to (i) assign the Acquired Assets to the Purchaser and (ii) assume and assign the Assigned Contracts to the Purchaser as of the Closing Date, in each case, which assignments shall take place on and be effective as of the Closing Date or such other date after the Closing Date, in each case, as provided in the Asset Purchase Agreement or as otherwise provided by a separate order of this Court.

(a) There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assignment of the

Acquired Assets or the assumption and/or assignment of the Assigned Contracts.

(b) The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are to be assumed and assigned to the Purchaser as of the Closing Date. Notwithstanding the foregoing, unless required by the Purchaser under the Asset Purchase Agreement for the Debtors to assume and assign any Assigned Contract, no Debtor shall be required by the Court to assume and assign any Assigned Contract, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract.

(c) The Debtors' assumption and assignment of the Assigned Contracts is subject to the consummation of the Sale Transaction with the Purchaser. To the extent that an Assumption and Assignment Objection (or Supplemental Assumption and Assignment Objection) by a counterparty to any Assigned Contract, including an objection related to the applicable Cure Cost, is not resolved prior to the Closing Date, the Purchaser, may, without any further approval of the Court or notice to any party, elect to (i) not have the Debtors assume and assign such Assigned Contract to it, or (ii) have the Debtors postpone the assumption of such Assigned Contract until the resolution of such Assumption and Assignment Objection (or Supplemental Assumption and Assignment Objection); *provided*, *however*, that the Debtors, the Purchaser, and the relevant non-debtor counterparty under each Assigned Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Cure Costs without further order of, or notice to, this Court, with any such agreed upon Cure Costs being paid to the appropriate counterparty by the Purchaser as a condition subsequent to such assumption and/ assignment of the relevant Assigned Contract.

19. **Assigned Contracts.** As of the Closing Date, subject to the provisions of this Sale Order and in accordance with the Asset Purchase Agreement, the Purchaser shall succeed to the entirety of the Debtors' respective rights and obligations in the Assigned Contracts first arising and attributable to the time period occurring on or after the Closing Date (as defined in the Asset Purchase Agreement) and shall have all rights thereunder; *provided that*, for the avoidance of doubt, any and all proceeds, coverage, and recoveries available under any of the Debtors' directors' and officers' liability policies, whether purchased prior to or after the Petition Date, shall not

constitute Assigned Contracts and do not otherwise constitute Acquired Assets to be transferred to the Purchaser.

(a) Upon Closing, (i) all defaults (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (ii) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before the Closing Date with respect to the Assigned Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the Purchaser, or the Assets that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing Date (other than claims against Purchaser with respect to the Assumed Liabilities). The Purchaser's promise pursuant to the terms of the Asset Purchase Agreement to pay the Cure Costs and the Purchaser's promise to perform the Debtors' obligations under the Assigned Contracts for the period on or after the Closing Date shall constitute adequate assurance of Purchaser's future performance under the Assigned Contracts being assigned to it as of the Closing Date within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

(b) Upon assumption of those Assigned Contracts to be assumed by the Debtors and assigned to the Purchaser as of the Closing Date, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in such Assigned Contract or other restrictions prohibiting assignment or transfer. To the extent any Assigned Contract is assumed and assigned to the Purchaser under this Sale Order, such assumption and assignment will not take effect until the Closing Date. Furthermore, other than the Assigned Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of such Assigned Contract.

(c) Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of or obligations under any Assigned Contract following the effective date of such assumption and assignment to the Purchaser, subject to the payment of the Cure Costs by the Purchaser in accordance with the terms of the Asset Purchase Agreement.

(d) All counterparties to the contracts to be assumed and assigned to Purchaser as of the Closing Date shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

(e) Notwithstanding the foregoing, the Debtors may, at the Purchaser's direction, amend the list of Potential Assigned Contracts and Leases Schedule to add or remove any Assigned Contract to or from such list of Potential Assigned Contracts and Leases Schedule prior to the Closing Date of the Sale Transaction in accordance with the terms of the Asset Purchase Agreement.

20. **OptConnect**. Within thirty (30) days of the Closing Date, the Purchaser shall return any routers ("***Routers***") provided to Bitcoin Depot Operating, LLC, d/b/a Bitcoin Depot ("***Bitcoin Depot***") by OptConnect Management LLC ("***OptConnect***"), pursuant to that certain *Amended and Restated Master Products and Services Agreement*, dated May 18, 2024, by and between Bitcoin Depot and OptConnect contained in the Acquired Assets to OptConnect unless the Purchaser has negotiated a new contract for the Routers and associated internet services with OptConnect within such thirty (30) day period, *provided*, *however*, that if, when the Purchaser takes possession of any Bitcoin ATM (a "***BTM***") there is no Router contained in such BTM, the Purchaser shall inform OptConnect by email that no Router was present and the Purchaser shall have no further obligations or liability to OptConnect with respect to such Router; *provided, however*, the absence of a Router in a purchased BTM shall not impact, affect or negate (i) any obligations or liability of Bitcoin Depot to OptConnect for such Routers; (ii) OptConnect's right to assert a claim against Bitcoin Depot for such missing Routers; and (iii) any rights and defenses of Bitcoin Depot with respect to such asserted claims. If requested by the Purchaser, OptConnect will provide Purchaser with packaging and Federal Express labels to facilitate the return of the Routers to OptConnect.

21. **Injunction**. Except as expressly provided in the Asset Purchase Agreement or this Sale Order, effective upon the Closing Date, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons or entities holding Liens, Claims, or Interests (other than Assumed Liabilities and Permitted Encumbrances) against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity or otherwise), shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims, or Interests against the Purchaser or any of its members or their respective affiliates, agents, advisors, representatives, officers, successors and assigns, the Acquired Assets, or the interests of the Debtors or the Purchaser in such Acquired Assets, including, without limitation, taking any of the following actions with respect to an interest (other than, with respect to the Purchaser only, the Assumed Liabilities and Permitted Encumbrances): (a) commencing or continuing in any manner any action or other proceeding against such parties or Acquired Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against such parties or Acquired Assets; (c) creating, perfecting or enforcing any liens, claims, encumbrances or other interests against such parties or Acquired Assets; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser or its affiliates, agents, advisors, representatives, officers, successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or

the agreements or actions contemplated or taken in respect thereof. All persons and entities are hereby enjoined from taking any action that would interfere with or adversely affect the Debtors' ability to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and this Sale Order. Following the Closing Date, no holder of a Lien, Claim, or Interest (including an "interest" as such term is used in section 363(f)) against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets.

22. **No Successor Liability**. As of and following the Closing Date, except as provided in the Asset Purchase Agreement, the entry of this Order and the approval of the terms of the Asset Purchase Agreement shall mean that the Purchaser (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Acquired Assets, shall not be deemed to: (a) be a legal successor or successor employer to any Debtor (including with respect to any health or benefit plans), or otherwise be deemed a successor to any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor; or (d) be liable or have any liability for any acts or omissions of any Debtor in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in the Asset Purchase Agreement, including, in the case of each of (a)-(d), without limitation, (i) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the

WARN Act (29 U.S.C. §§ 2101 et seq.) ("***WARN***"), to the greatest degree allowed by applicable law, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended) ("***CERCLA***"), the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (ii) in respect of (1) to the greatest degree allowed by applicable law, any environmental liabilities, debts, claims or obligations arising from conditions first occurring or first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

23. Without limiting the generality of the foregoing, and except as otherwise provided in the Asset Purchase Agreement or this Order, neither the Purchaser nor any of its affiliates shall have any responsibility for any (a) liability or other obligation of the Debtors related to the sale and transfer of the Acquired Assets to the Purchaser or with respect to the Excluded Liabilities, other than the Assumed Liabilities, or (b) claims against the Debtors or any of their predecessors or affiliates. By virtue of the Purchaser's purchase of the Acquired Assets, neither the Purchaser nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or its predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory

of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, to the greatest degree allowed by applicable law environmental (including, but not limited to, CERCLA), successor or transferee liability, de facto merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of the Debtors' employment agreements or health or benefit plans, any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing Date (collectively, with the potential claims set forth in paragraph 22, "***Successor Liability***"). The Purchaser has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of Successor Liability of the Purchaser. The Purchaser would not have acquired the Acquired Assets but for the foregoing protections against Successor Liability or transferee liability.

24. **Surrender of Possession**. Any and all Acquired Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Purchaser free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) and shall be delivered to the Purchaser and deemed delivered at the time of Closing (or such other time as provided in the Asset Purchase Agreement).

25. **Release of Liens, Claims, and Interests**. Effective upon the Closing Date, this Sale Order: (a) is and shall be effective as a determination that all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) of any kind or nature whatsoever

existing as to the Acquired Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Purchaser; (c) and all recorded Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances) against the Acquired Assets shall be deemed stricken from such persons' and entities' records, official and otherwise.

26. **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Liens, Claims, or Interests in or against the Acquired Assets shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Liens, Claims, or Interests, the Purchaser is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably requested by the Purchaser, in each case, at the Seller's sole expense, to release its Liens, Claims or other Interests in the Acquired Assets, if any, other than Permitted Encumbrances, as such encumbrances may have been recorded or may otherwise exist. The

Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, or Interests against the Acquired Assets (other than the Assumed Liabilities and Permitted Encumbrances). This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

27. **Transfer of Marketable Title**. As of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' respective right, title and interest in the Acquired Assets and/or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser at the Closing pursuant to the terms of the Asset Purchase Agreement, free and clear of all Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances).

28. **Access to Books and Records**. Notwithstanding anything to the contrary in the Asset Purchase Agreement or this Sale Order, following the Closing Date, the Purchaser shall use commercially reasonable efforts to cooperate with any reasonable request for access to books and records from the Debtors and their respective estates, successors and assignees, as applicable, and any representative of any of the foregoing persons, including any trustee or estate representative appointed in these Chapter 11 Cases (or any successor chapter 7 cases), and each of their respective advisors, to the extent such requested books and records relate to the Asset Purchase Agreement, the Acquired Assets, or the Assumed Liabilities and are necessary or appropriate for such requesting party to facilitate the winddown or other resolution of these Chapter 11 Cases (or any successor chapter 7 cases).

29. **Satisfaction of Conditions Precedent**. Neither the Purchaser nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Asset Purchase Agreement to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

30. **Segregated Account**. For the avoidance of doubt, nothing contained in this Order or any of the Transaction Agreements, including the Asset Purchase Agreement, shall alter the Debtors' obligations to deposit any identifiable proceeds received on account of the NFS Collateral or VFS Collateral (each as defined in the Fifth Interim Cash Collateral Order) in a segregated account in accordance with the Fifth Interim Cash Collateral Order. Accordingly, upon the closing of the Sale Transaction, the Debtors shall deposit into such segregated account the amount of such cash proceeds, as agreed by NFS and the Debtors, attributable to NFS Collateral with any and all Liens, Claims, and Interests attaching to such amounts to the same extent, validity and priority as existed immediately prior to the Sale Transaction; *provided*, *however*, that if the Debtors and NFS cannot reach agreement as to such amounts, all proceeds of the NFS Collateral shall be segregated and not distributed to any party until such dispute is resolved by further order of the Court; provided, further, that notwithstanding anything in this Order to the contrary, NFS retains the right to assert that the allocation of the Purchase Price with respect to the NFS Collateral is different than as the Debtors and Purchaser have determined under the Asset Purchase Agreement. Further, to the extent any cash proceeds of the NFS Collateral are deposited in the Tax Lien Segregated Account (as defined in the Fifth Interim Cash Collateral Order) any such amounts shall remain segregated within the Tax Lien Segregated Account until further order of the Court with all parties reserving their rights with respect to such cash proceeds.

31. **Retention of Jurisdiction**. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder; (ii) protect the Purchaser, or the Acquired Assets, from and against any Liens, Claims, and Interests (other than Assumed Liabilities and Permitted Encumbrances); (iii) compel delivery of all Acquired Assets to the Purchaser; (iv) compel the Debtors and the Purchaser to perform all of their respective obligations under the Asset Purchase Agreement; and (v) resolve any disputes arising under or related to the Asset Purchase Agreement or the Sale Transaction.

32. **Automatic Stay**. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

33. **Immediate Effect**. Notwithstanding any provision of the Bankruptcy Rules, including Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction, and the Debtors and the Purchaser are free to close the Sale Transaction under the Asset Purchase Agreement at any time pursuant to the terms thereof and take any other action or perform any act authorized by this Sale Order.

34. **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the Asset Purchase Agreement or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the

Asset Purchase Agreement and other related documents be authorized and approved in their entirety.

35. **Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Signed: July 24, 2026

Christopher Lopez
United States Bankruptcy Judge

# Exhibit 1

## Asset Purchase Agreement

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [●], 2026**

**BY AND AMONG**

**CALTEL, INC, AS PURCHASER,**

**AND**

**BITCOIN DEPOT INC.**

**AND**

**ITS SUBSIDIARIES AND AFFILIATES SIGNATORY HERETO**

**AS THE SELLERS**

---

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ........ **1**
Section 1.1 Purchase and Sale of the Acquired Assets ........ 1
Section 1.2 Excluded Assets ........ 2
Section 1.3 Assumption of Certain Liabilities ........ 2
Section 1.4 Excluded Liabilities ........ 2
Section 1.5 Assumption and Assignment of Certain Contracts ........ 3

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ........ **5**
Section 2.1 Consideration; Payment ........ 5
Section 2.2 Deposit ........ 5
Section 2.3 Closing ........ 5
Section 2.4 Closing Deliveries by the Sellers ........ 5
Section 2.5 Closing Deliveries by Purchaser ........ 6

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ........ **7**
Section 3.1 Organization and Qualification ........ 7
Section 3.2 Authorization of Agreement ........ 7
Section 3.3 Conflicts; Consents ........ 8
Section 3.4 Title to Acquired Assets ........ 8
Section 3.5 Assigned Contracts ........ 8
Section 3.6 Legal Proceedings; Orders. ........ 8
Section 3.7 Brokers ........ 9
Section 3.8 No Other Representations or Warranties ........ 9

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ........ **9**
Section 4.1 Organization and Qualification ........ 9
Section 4.2 Authorization of Agreement ........ 10
Section 4.3 Conflicts; Consents ........ 10
Section 4.4 Sufficient Funds ........ 10
Section 4.5 No Litigation ........ 11
Section 4.6 Brokers ........ 11
Section 4.7 No Additional Representations or Warranties ........ 11
Section 4.8 No Outside Reliance ........ 11

**ARTICLE V COVENANTS AND AGREEMENTS** ........ **12**
Section 5.1 Conduct of the Sellers ........ 12
Section 5.2 Competing Bids ........ 12
Section 5.3 Bankruptcy Matters ........ 13
Section 5.4 Further Assurances ........ 14
Section 5.5 Tax Matters ........ 14
Section 5.6 Notice of Certain Events. ........ 15
Section 5.7 Confidentiality ........ 15
Section 5.8 Governmental Approvals and Consents ........ 16
Section 5.9 Public Announcement ........ 17
Section 5.10 Receipt of Misdirected Assets; Liabilities. ........ 17

Section 5.11 Removal of Acquired Assets ....................18
Section 5.12 No Successor Liability ....................18

**ARTICLE VI CONDITIONS TO CLOSING ....................19**
Section 6.1 Conditions Precedent to the Obligations of Purchaser and the Sellers ....................19
Section 6.2 Conditions to Obligations of Purchaser ....................19
Section 6.3 Conditions to Obligations of Seller ....................20
Section 6.4 Waiver of Conditions ....................20

**ARTICLE VII TERMINATION ....................21**
Section 7.1 Termination of Agreement ....................21
Section 7.2 Effect of Termination ....................22

**ARTICLE VIII SURVIVAL & INDEMNIFICATION ....................22**
Section 8.1 Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers ....................22
Section 8.2 Purchaser's Indemnification Obligations ....................22
Section 8.3 Indemnification Actions ....................23

**ARTICLE IX MISCELLANEOUS ....................25**
Section 9.1 Expenses ....................25
Section 9.2 Approval ....................25
Section 9.3 Notices ....................25
Section 9.4 Binding Effect; Assignment ....................26
Section 9.5 Amendment and Waiver ....................26
Section 9.6 Third Party Beneficiaries ....................26
Section 9.7 Non-Recourse ....................26
Section 9.8 Severability ....................27
Section 9.9 Construction ....................27
Section 9.10 Complete Agreement ....................27
Section 9.11 Specific Performance ....................27
Section 9.12 Jurisdiction and Exclusive Venue ....................28
Section 9.13 Governing Law; Waiver of Jury Trial ....................28
Section 9.14 No Right of Set-Off ....................29
Section 9.15 Counterparts and PDF ....................29
Section 9.16 Bulk Sales Laws ....................29
Section 9.17 Fiduciary Obligations ....................30
Section 9.18 Sellers' Representative ....................30

**ARTICLE X ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ....................30**
Section 10.1 Certain Definitions ....................30
Section 10.2 Rules of Interpretation ....................36

**Exhibit A** Assignment and Assumption Agreement

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of [●], 2026, is made by and among, CalTel, Inc, a South Carolina corporation (together with its designees and assigns, "Purchaser"), Bitcoin Depot Inc., a Delaware corporation ("Bitcoin Depot" and, collectively with its Subsidiaries and Affiliates signatory hereto, the "Sellers" and each a "Seller"). Purchaser and the Sellers are referred to herein individually as a "Party" and together as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article X.

WHEREAS, on May 17, 2026, and May 18, 2026, each Seller, together with certain of such Seller's Affiliates, commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 26-90528 (collectively, the "Bankruptcy Cases").

NOW, THEREFORE, the Parties hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1 Purchase and Sale of the Acquired Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order at the Closing, each Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from such Seller, all of such Seller's right, title and interest in and to the Acquired Assets, free and clear of any and all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of such Seller's right, title and interest in and to, as of the Closing:

(a) the properties, rights, interests and other tangible and intangible assets of the Sellers set forth on Schedule 1.1(a);

(b) subject to Section 1.5 hereof, the Contracts set forth on Schedule 1.1(b) (each such Contract, an "Assigned Contract" and collectively the "Assigned Contracts");

(c) all security deposits, maintenance deposits, and any other deposits held by landlords, vendors, trade creditors, or any other party, in each case related to the other Acquired Assets;

(d) all proceeds relating to any and all insurance (other than directors and officers insurance), condemnation and similar proceeds related to other Acquired Assets, in each case, to the extent arising out of events, facts or circumstances occurring at or after the Closing;

(e) all of Sellers' rights under warranties, indemnities and all similar rights against third parties relating to the other Acquired Assets; and

(f) all Claims, setoffs, rights of recoupment, equity rights, defenses, or other rights or interest of Sellers in or to any refund, rebate, abatement or other recovery (including any such item relating to the payment of Taxes, other than relating to Income Taxes, Taxes attributable to Excluded Assets and Non-Income Taxes due prior to the Closing Date) related to other Acquired Assets.

**Section 1.2** **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, nothing contained herein shall be deemed to sell, transfer, assign, convey or deliver to Purchaser any right, title or interest in or to any assets other than the Acquired Assets (collectively, the "Excluded Assets"). For the avoidance of doubt and notwithstanding anything to the contrary herein, (a) any licenses, registrations, or permits authorizing Sellers under state law to operate as a money transmitter, or (b) any information about the identity of persons which was obtained through transactions using the Sellers' Bitcoin ATM kiosks, if any, shall be Excluded Assets.

**Section 1.3** **Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall assume from each Seller (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and such Seller shall transfer, assign, convey and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a) all Liabilities arising out of or relating to the ownership and operation of the Acquired Assets, but in all events only to the extent that such Liabilities thereunder (i) first arise at or after the Closing, (ii) are attributable to the period commencing at Closing, and (iii) do not relate to any breach, default or violation by Sellers on or prior to the Closing;

(b) all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(c) all Liabilities for (i) all Transfer Taxes and (ii) all Non-Income Taxes that are due on or after the Closing Date;

(d) all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs"), and any and all obligations under the Assigned Contracts that arise from facts, circumstances, events or obligations to be performed at or after the Closing, in each case as set forth on Section 1.3(d) of the Disclosure Schedules; and

(e) all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement.

**Section 1.4** **Excluded Liabilities**. Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers of any kind or nature whatsoever however and whenever arising, whether existing currently or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities").

**Section 1.5** **Assumption and Assignment of Certain Contracts**. The Sale Order shall provide for the assignment of the Assigned Contracts by the applicable Seller(s), to the maximum extent permitted by Law, to Purchaser, and the assumption by Purchaser of the Assigned Contracts (and all Assumed Liabilities relating thereto), effective upon the Closing in accordance with Section 1.1 and this Section 1.5.

(a) At the Closing, the Sellers shall assign, to the maximum extent permitted by Law, to Purchaser and Purchaser shall assume the Assigned Contracts and all Assumed Liabilities relating thereto.

(b) Notwithstanding any provision in this Agreement to the contrary, from and after the date of this Agreement through the Closing, Sellers will not reject or take any action (or fail to take any action necessary to prevent rejection by operation of Law) to reject, withdraw, repudiate, materially amend, terminate, or disclaim any Assigned Contract unless Purchaser has provided its prior written consent.

(c) In connection with the assignment to and assumption by Purchaser of any Assigned Contract pursuant to this Section 1.5, in addition to the Purchase Price, Purchaser shall make provision for the payment of all of the Cure Costs. Notwithstanding anything contained herein to the contrary, Purchaser shall only assume, and shall only be responsible for, Contracts being designated as an Assigned Contract as of the Closing, and which Assigned Contracts are in fact assumed and assigned to Purchaser at Closing pursuant to this Section 1.5 or Section 1.1(b).

(d) If the Sellers' assumption and assignment of any Assigned Contract by Sellers to Purchaser requires the consent of any Governmental Body or other third party to permit such assumption and assignment by the Sellers to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, then Purchaser and the applicable Seller shall use commercially reasonable efforts whether before or after the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Bodies and third parties necessary to assign such Assigned Contract to Purchaser and for Purchaser to assume such Assigned Contract; *provided*, *however*, that none of the Sellers shall be required to pay any amount or incur any obligation to any Person from whom such Consent or Governmental Authorization may be required in order to obtain such Consent or Governmental Authorization.

(e) Notwithstanding any provision herein to the contrary, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to or assumed by Purchaser to the extent that such Contract (i) is deemed rejected under Section 365 of the Bankruptcy Code, (ii) is terminated by any party thereto other than a Seller or its Subsidiary, or terminates or expires by its terms, prior to the Closing and is not continued or otherwise extended upon assumption or (iii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the Sellers' or their Subsidiaries' rights under such Contract, if such Consent or Governmental Authorization has not been obtained.

(f) Notwithstanding anything to the contrary in this Agreement, to the extent any Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of Sellers' right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to the Closing, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(f), then after the Closing and through the earlier of such time as such Consent or Governmental Authorization is obtained or the election of Purchaser, by written notice to Sellers and in the sole discretion of Purchaser, not to pursue any such Consent or Governmental Authorization, (A) Sellers shall use commercially reasonable efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing, and (B) Sellers and Purchaser shall cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser or Sellers under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Sellers or their Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (ii) provided, and to the extent, that Purchaser receives such economic rights and benefits, Purchaser shall assume and timely discharge any related burden (net of the amount of any related Tax benefit obtained by Sellers or any of their Affiliates) and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Sellers' right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Any Seller retaining such Acquired Asset due to the failure to receive such Consent or Governmental Authorization will not be required, in connection with the foregoing, to make any payments or offer or grant any accommodation (financial or otherwise, regardless of any provision to the contrary in the underlying Contract, including any requirements for the securing or posting of any bonds, letters of credit or similar instruments, or the furnishing of any guarantees) to any third party, except to the extent that Purchaser agrees to reimburse and make whole such Seller, to such Seller's reasonable satisfaction, for any payment or other accommodation made by such Seller at the request of Purchaser. Notwithstanding any provision in this Section 1.5 to the contrary, Purchaser shall not be deemed to have waived its rights under Section 6.2 hereof unless and until Purchaser either provides written waivers thereof or elects to proceed to consummate the Transactions at Closing. The obligations set forth in this Section 1.5 will terminate on the one-year anniversary of the Closing Date (except with respect to any Acquired Asset for which requisite Consent or Governmental Authorization has been granted, but such Acquired Asset has not yet been transferred and assigned, as to which such obligations will continue).

## ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING

**Section 2.1** **Consideration; Payment**. The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (a) the assumption of Assumed Liabilities and (b) a cash payment in an amount equal to [$39,684] (the "Cash Payment"), allocated among the Acquired Assets as set forth on Schedule 1.1(a). At the Closing, Purchaser shall deliver, or cause to be delivered, to Bitcoin Depot the Cash Payment and shall assume the Assumed Liabilities. The Cash Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the Sellers at least two (2) Business Days prior to the date such payment is to be made. For the avoidance of doubt, the Acquired Assets include all kiosk equipment identified by serial number on Schedule A, together with all rights, title, and interest in and to such equipment, all associated Assigned Contracts, Assigned Leases, merchant relationships, goodwill associated with such locations, and all related rights associated with the locations identified on Schedule A. In the event of any inconsistency between this Agreement and Schedule A, Schedule A shall control with respect to the identity of the Acquired Assets, Assigned Contracts, Assigned Leases, and kiosk equipment being acquired.

**Section 2.2** **Deposit**. On or prior to the date hereof, Purchaser has made one or more earnest money deposits with the Escrow Agent, by bank wire transfer of immediately available funds, in an amount equal to $5,050 (the "Deposit"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Sellers or Purchaser. If Closing occurs, the Deposit shall be credited against the amount required to be paid by Purchaser to Sellers at the Closing. If this Agreement is terminated pursuant to Section 7.1(b), Section 7.1(c), Section 7.1(e) or Section 7.1(i), then Sellers shall retain the Deposit together with all received investment income, if any, it being understood and agreed by the Parties that Sellers' right to the Deposit shall be in addition to any and all other remedies that Sellers may have against Purchaser with respect to any breach, violation, or default by Purchaser under this Agreement. If this Agreement is terminated prior to Closing for any other reason, then the Parties shall jointly instruct the Escrow Agent to return the Deposit to Purchaser within five (5) Business Days of such termination.

**Section 2.3** **Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, and the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference or electronic exchange of documents at 10:00 a.m. Central Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date." The Closing shall be effective as of 12:01 a.m. Central Time on the Closing Date for all purposes of this Agreement, including for Tax and accounting purposes.

**Section 2.4** **Closing Deliveries by the Sellers**. At or prior to the Closing, the Sellers shall deliver to Purchaser:

(a) a bill of sale and an assignment and assumption agreement in substantially the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement") duly executed by the Sellers;

(b) to the extent a United States person pursuant to Section 7701(a)(30) of the Code, an IRS Form W-9 executed by each Seller (or, if such Seller is disregarded, its regarded owner for U.S. federal income tax purposes);

(c) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Sellers, that each of the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied;

(d) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Sellers, certifying (1) that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or equivalent governing body) of Sellers authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transactions, and (2) the names and signatures of the officers of Sellers authorized to sign this Agreement and the other documents to be delivered hereunder and thereunder;

(e) a copy of the Sale Order; and

(f) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement and consummate the Transaction.

(g) Sellers shall provide to Purchaser a reasonable number (as determined by Sellers) of keys, key fobs, access credentials, lock codes, alarm codes, and other access devices or information solely to the extent in Sellers' possession or control and practicable to provide, in each case solely relating to the Acquired Assets. To the extent any such access devices or credentials are maintained by an armored-car provider or other third party, Sellers shall provide Purchaser with the name and contact information for such armored-car provider or other third party. Any costs associated with resetting or defaulting the lock systems shall be borne by Purchaser.

**Section 2.5 Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a) the Cash Payment, less the Deposit, free and clear of, and without any deduction or withholding on account of, any Tax;

(b) in accordance with Section 2.2, a written instruction instructing the Escrow Agent to release the Deposit to Sellers; and

(c) the Assignment and Assumption Agreement, duly executed by Purchaser.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Any matter set forth in any section of the Disclosure Schedules shall be deemed to be referred to and incorporated in any section to which it is specifically referenced or cross-referenced and also in all other sections of the Disclosure Schedules, as applicable, to which such matter's application or relevance is reasonably apparent on its face (even if there is any language on any such section that indicates there are no other disclosures applicable to such section). Except as disclosed in the correspondingly numbered section of the Disclosure Schedules (whether or not an express reference to the Disclosure Schedules is included herein), each Seller represents and warrants to Purchaser solely as of the date hereof as follows:

**Section 3.1** **Organization and Qualification**. Such Seller is duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation and has full corporate, limited liability company or limited partnership power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to operate the Acquired Assets as operated as of the date of this Agreement. Such Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the operation of the Acquired Assets operated by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.2** **Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a) Such Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b) the execution, delivery and performance by such Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c) this Agreement and the other Transaction Agreements to which such Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto and the Bankruptcy Court's entry of the Sale Order, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights

generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3** **Conflicts; Consents**. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) any applicable HSR Act waiting period has expired or been terminated and (c) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 3.3 of the Disclosure Schedules are made, given or obtained (as applicable), neither the execution and delivery by such Seller of this Agreement or the other Transaction Agreements, nor the consummation by such Seller of the Transactions, nor performance or compliance by such Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of such Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement or other governing documents, as applicable; (ii) violate any Law or Order applicable to any Seller; (iii) require the consent, notice or other action by any Person under, conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of acceleration, termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of the Assigned Contracts or any Acquired Asset, except as would not reasonably be expected to be material in the good faith discretion of Purchaser or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets. No consent, approval, Order, declaration or filing with, or notice to, any Governmental Body is required by or with respect to any Seller in connection with the execution and delivery of this Agreement and the consummation of the Transaction, except for the requisite Bankruptcy Court approvals and any filings required under the HSR Act.

**Section 3.4** **Title to Acquired Assets**. Except pursuant to the Bankruptcy Code or an order of the Bankruptcy Court, no Acquired Asset is subject to any Claim or Order that materially restricts in any manner the use, transfer, sale or licensing thereof, and no Affiliate of any Seller or any other third party has any ownership interest in any of the Acquired Assets. Sellers have, and at Closing, will transfer, convey and assign, good and valid title to, or a valid leasehold interest in, all of the Acquired Assets except as set forth on Section 3.4 of the Disclosure Schedules and subject to all associated Permitted Encumbrances, and Sellers are in possession or control of the Acquired Assets. The Sale Order shall provide that all of such Acquired Assets will be transferred to Purchaser free and clear of Encumbrances except for Permitted Encumbrances.

**Section 3.5** **Assigned Contracts**. True and complete copies of the Assigned Contracts have previously been Made Available to Purchaser or Purchaser's Advisors. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller(s) of the applicable Assigned Contracts in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases, to the Knowledge of Sellers and except as described on Section 3.5 of the Disclosure Schedules, (a) the Assigned Contracts are valid and binding on the applicable Seller and each other party thereto, and are in full force and effect, subject to the Enforceability Exceptions; (b) such Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, the relevant Assigned Contract; and (c) there are no material disputes pending or threatened under any Contract included in the Acquired Assets.

**Section 3.6** **Legal Proceedings; Orders.**

(a) Other than as set forth in Section 3.6(a) of the Disclosure Schedules or in connection with or as a result of the Bankruptcy Cases, there are no Claims pending or, to the Knowledge of Sellers, threatened in writing against or by Sellers relating to or affecting the Acquired Assets or the Assumed Liabilities.

(b) Except for Orders of the Bankruptcy Court, there are no outstanding Orders and, to the Knowledge of Sellers, no unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets.

**Section 3.7** **Brokers**. Except as set forth on Section 3.7 of the Disclosure Schedules, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions, in each case based upon arrangements made by or on behalf of a Seller or any of its Subsidiaries.

**Section 3.8** **No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Disclosure Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Sellers Express Representations"), Purchaser acknowledges and agrees that neither such Seller nor any other Person on behalf of such Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to such Seller, its businesses, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials) or in that certain virtual data room administered by the Sellers (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors by or on behalf of such Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither such Seller nor any of its Advisors nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including any information presentation, any information, statements, disclosures, documents, projections, forecasts or other material Made Available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information, except for the Sellers Express Representations. Purchaser acknowledges and agrees that the Acquired Assets are sold pursuant hereto strictly "AS IS, WHERE IS, WITH ALL FAULTS", subject only to the Sale Order. Sellers acknowledge and agree to Section 4.7.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Sellers as follows:

**Section 4.1** **Organization and Qualification**. Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the State of South Carolina and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence, as applicable) as

would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction by this Agreement.

**Section 4.2** **Authorization of Agreement**. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3** **Conflicts; Consents**. Assuming that (a) the Sale Order and all other requisite Bankruptcy Court approvals are obtained, (b) any applicable HSR Act waiting period has expired or been terminated, and (c) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 4.3 of the Disclosure Schedules are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's organizational documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions. No consent, approval, Order, declaration or filing with, or notice to, any Governmental Body is required by or with respect to any Seller in connection with the execution and delivery of this Agreement and the consummation of the Transaction, except for any filings required under the HSR Act.

**Section 4.4** **Sufficient Funds**.

(a) Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they

become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Assets and the related Assumed Liabilities. Purchaser acknowledges and agrees that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for all or any portion of the Purchase Price.

(b) Upon the consummation of the Transactions, (i) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) Purchaser will not be left with unreasonably small capital, (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature and (iv) the capital of Purchaser will not be impaired.

**Section 4.5** **No Litigation**. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would be reasonably likely to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the Transactions or Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or that would, individually or in the aggregate, reasonably be expected to delay the Closing.

**Section 4.6** **Brokers**. Except as set forth on Section 4.6 of the Disclosure Schedules, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions, in each case based upon arrangements made by or on behalf of Purchaser or any of its Subsidiaries.

**Section 4.7** **No Additional Representations or Warranties**. Except for the representations and warranties contained in this Article IV, the Sellers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Sellers by Purchaser. Purchaser acknowledges and agrees to Section 3.8.

**Section 4.8** **No Outside Reliance**. Notwithstanding anything contained in this Section 4.8 or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Sellers Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that the Acquired Assets are being acquired by Purchaser strictly "AS IS, WHERE IS, WITH ALL FAULTS", subject only to the Sale Order and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Sellers Express Representations), including in any information presentation, the Dataroom,

any projections or in any meetings, calls or correspondence with management of any Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future businesses, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Acquired Assets, or the quality, quantity or condition of any such asset, (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business associated with the Acquired Assets, including its results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of its independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, any information presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material Made Available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Sellers Express Representations (it being understood that Purchaser has relied only on the Sellers Express Representations).

## ARTICLE V
## COVENANTS AND AGREEMENTS

**Section 5.1** **Conduct of the Sellers**. Except (a) as required by applicable Law, Order or a Governmental Body or any Contract, (b) for any limitations or changes on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (c) as expressly contemplated, required or permitted by this Agreement, (d) to the extent related to an Excluded Asset or an Excluded Liability or (e) required in response to an Emergency, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), the Sellers shall use commercially reasonable efforts to (i) maintain the Acquired Assets and (ii) not sell, transfer, lease, mortgage, pledge, grant any Encumbrance (other than Permitted Encumbrances and Encumbrances to be removed by operation of the Sale Order) on or otherwise encumber or dispose of any of the Acquired Assets, or otherwise commit or agree to take any of the foregoing actions. For the avoidance of doubt, nothing contained in this Agreement shall be construed to give to Purchaser, directly or indirectly, rights to control or direct the operations of Sellers prior to the Closing. Notwithstanding the foregoing, Purchaser shall not be required to remove any kiosk that remains located pursuant to an Assigned Contract, lease, location agreement, or other agreement with the applicable location owner.

**Section 5.2** **Competing Bids**. This Agreement and the Transactions are subject to the Sellers' right and ability to consider higher or better competing bids with respect to the Acquired

Assets pursuant to the bidding procedures, as approved by the Bidding Procedures Order. In accordance with the Bidding Procedures Order, until the conclusion of the auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to: (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

**Section 5.3 Bankruptcy Matters**.

(a) The Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Assigned Contracts, including furnishing witness(es) to testify, affidavits or other documents, or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Sellers shall consult with Purchaser and its Representatives concerning any Order of the Bankruptcy Court relating to this Agreement or the Bankruptcy Cases (solely to the extent such Order is reasonably expected to materially impact this Agreement or the Transactions) and use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, proposed Orders and other material documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court; *provided*, *however*, that such obligation of the Sellers shall terminate upon the Closing except to the extent any such proceeding or related document is directly related to this Agreement or the Transactions. If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), the Sellers shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions; *provided* that the Sellers shall consult with Purchaser regarding the status of any such actions.

(b) The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (e) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to

the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (f) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (g) find that Purchaser shall have no Liability for any Excluded Liabilities.

**Section 5.4 Further Assurances.**

(a) Subject to the terms and conditions of this Agreement and any relevant Orders of the Bankruptcy Court, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of Purchaser and the Sellers shall use their commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions.

(b) From time to time, on or after the Closing Date until the dissolution and liquidation of the Sellers and at Purchaser's expense, the Sellers shall execute and deliver such other instruments of transfer to Purchaser as are reasonably necessary and as Purchaser may reasonably request in order to more effectively vest in Purchaser all of the Sellers' right, title and interest to the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(c) Nothing in this Section 5.4 shall (i) require the Sellers to make any expenditure or incur any obligation on their own or on behalf of Purchaser or (ii) prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

**Section 5.5 Tax Matters.**

(a) Purchaser shall bear and pay (i) any sales, use, purchase, transfer, deed, fixed asset, stamp, documentary registration, motor vehicle, value added, excise or other similar Taxes incurred or imposed with respect to the transactions described in this Agreement (collectively, the "Transfer Taxes") and (ii) required filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances, or other instruments required to convey title to the Acquired Assets to Purchaser. Except to the extent otherwise required by Law, Purchaser shall, at its own expense, timely file all Tax Returns and other documentation related to any Transfer Taxes.

(b) Section 5.5(b) of the Disclosure Schedule sets forth an allocation (the "Allocation") of the Purchase Price (and any other items properly treated as consideration for U.S. federal income Tax purposes), among the Acquired Assets in accordance with Section 1060 of the Tax Code and the applicable Treasury Regulations promulgated thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate). Purchaser and Sellers shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation and not take

any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

(c) After the Closing, none of Purchaser or its Affiliates shall take any action (including making any tax election) with respect to a Tax period (or portion thereof) ending on or before the Closing Date to the extent that such action could adversely affect Sellers or could otherwise increase the amount of any Taxes payable by either Sellers or their Affiliates.

(d) Purchaser shall cooperate in good faith, as and to the extent reasonably requested by any Seller, in connection with any Tax matters related to the Acquired Assets, including the preparation, filing and execution of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon a Seller's reasonable request) the provision of records and information that are reasonably relevant to any such Tax Return or audit, litigation or other proceeding and making employees available (as reasonably requested) on a mutually convenient basis to provide additional information and explanation of any materials provided under this Agreement. Purchaser agrees to retain all books and records with respect to Tax matters pertinent to the Acquired Assets relating to any Tax period beginning before the Closing Date until the expiration of the statute of limitations of the respective taxable periods and to abide by all record retention agreements entered into with any Governmental Body.

**Section 5.6 Notice of Certain Events.**

(a) From the date of this Agreement until the Closing, Sellers shall promptly notify Purchaser in writing of:

(i) any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (B) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 6.1 to be satisfied;

(ii) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions; and

(iii) any Claims commenced or, to the Knowledge of Sellers, threatened in writing against the Acquired Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.6 or that relates to the consummation of the Transactions.

**Section 5.7 Confidentiality**. The Confidentiality Agreement is hereby incorporated herein by reference and shall continue in full force and effect in accordance with its terms; *provided* that from and after the Closing, all of Purchaser's and its Affiliates obligations under the Confidentiality Agreement with respect to confidential information that constitutes an Acquired Asset or Assumed Liability, shall terminate and be of no further force or effect. From and after the Closing the confidential information and trade secrets included in the Acquired Assets ("Business

Confidential Information") will be the confidential information of Purchaser. Sellers will not use the Business Confidential Information for any reason (except to the extent permitted pursuant to the immediately following sentence). From and after the Closing, Sellers agree to keep confidential and not disclose the Business Confidential Information, except to the extent that (i) Purchaser shall have provided its prior written consent, (ii) such information has otherwise been made public by Purchaser, or (iii) Sellers are required by applicable Law (including, in connection with the Bankruptcy Cases) to divulge or disclose any such information (in which case Sellers shall promptly notify Purchaser, to the extent legally permitted, in advance of disclosing such information and use commercially reasonable efforts to cooperate with Purchaser to limit such disclosure, to the extent permitted under applicable Law).

**Section 5.8 Governmental Approvals and Consents.**

(a) Each Party shall, as promptly as possible, but in any event no later than ten (10) Business Days after the date hereof with regard to filings required under the HSR Act, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from any applicable Governmental Body that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement; *provided*, *however*, that none of the Sellers nor any of their Subsidiaries shall be required to pay any amount or incur any obligation to any Person from whom any such Consent or Governmental Authorization may be required in order to obtain such Consent or Governmental Authorization. Each Party shall cooperate fully with the other Party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The Parties shall not willfully take any action that will have the effect of materially delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals. Further, Purchaser shall not, and shall not permit its respective Affiliates to, acquire or agree to acquire any business or assets of any Person, if such acquisition or agreement would reasonably be expected to delay, impair, or impede any required approvals, or expiration of the waiting period, under the HSR Act.

(b) Sellers shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 3.3 of the Disclosure Schedules.

(c) Without limiting the generality of the Parties' undertakings pursuant to subsections (a) and (b) above, each Party shall use reasonable best efforts to:

(i) respond to any inquiries by any Governmental Body regarding antitrust or other matters with respect to the Transactions;

(ii) avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the Transactions; and

(iii) in the event any Order adversely affecting the ability of the Parties to consummate the Transactions has been issued, to have such Order vacated or lifted.

(d) All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either Party before any Governmental Body or the staff or regulators of any Governmental Body, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers or Purchaser with any Governmental Body in the ordinary course of business of such Seller or Purchaser, as applicable, consistent with past practice, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other Party hereunder in advance of any filing, submission or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each Party shall give notice to the other Party with respect to any meeting, discussion, appearance or contact with any Governmental Body or the staff or regulators of any Governmental Body, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

**Section 5.9** **Public Announcement**. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), including in connection with the Bankruptcy Cases, no Party shall make any public announcements in respect of this Agreement or the Transactions or otherwise communicate with any news media without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.10** **Receipt of Misdirected Assets; Liabilities**.

(a) From and after the Closing, if Sellers or any of their respective Affiliates receives, or Purchaser identifies, any right, property or asset that is an Acquired Asset, Sellers shall promptly transfer or cause such of their Affiliates to transfer such property, right, interest or other tangible or intangible asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Sellers for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Sellers, and such asset will be deemed the property of Sellers held in trust by Purchaser for Sellers until so transferred.

(b) From and after the Closing, if Sellers or any of their Affiliates are subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, Sellers shall promptly transfer or cause such of their Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and

after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to Sellers or their Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to Sellers or their Affiliates, and Sellers or their Affiliates shall assume and accept such Liability.

(c) The Sale Order shall provide that no Person may assert any set off, recoupment, or similar claims against Purchaser or the Acquired Assets based on any Claims against Sellers or their Affiliates, and that all Claims are channeled exclusively to the proceeds of sale.

**Section 5.11 Removal of Acquired Assets.**

(a) Within thirty (30) days following the Closing Date (the "Removal Period"), Purchaser shall remove, or cause to be removed, all Acquired Assets from the real property on which any of the Acquired Assets are located as of the Closing Date except pursuant to any entitlements under Assigned Contracts or as otherwise agreed with the owner of such real property, as set forth opposite any Acquired Asset on Schedule 1.1(a) (the "Properties").

(b) Purchaser shall be responsible for any damage caused by Purchaser or its Representatives in connection with the removal of the Acquired Assets, and Purchaser shall promptly repair, or cause to be repaired, any such damage at its sole cost and expense.

(c) Purchaser shall indemnify, defend and hold harmless each Seller Indemnified Person (as defined below) from and against all Liabilities, Actions and claims arising out of, attributable to or resulting from (i) the removal of the Acquired Assets, (ii) any damage caused by Purchaser or its Representatives in connection with such removal, or (iii) any failure by Purchaser to remove the Acquired Assets within the Removal Period. The provisions of Section 8.3 shall apply to any such indemnification claim *mutatis mutandis*.

**Section 5.12 No Successor Liability**. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to: (a) be the successor of Sellers, (b) have, de facto, or otherwise, merged with or into any Seller, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than Permitted Encumbrances to the extent, but only to the extent, to which any Acquired Asset is subject) against Sellers or any of Sellers' predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior

to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 5.12.

## ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.1 Conditions Precedent to the Obligations of Purchaser and the Sellers**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a) no court of competent jurisdiction or other Governmental Body shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions or causing the Transactions to be rescinded following completion thereof, in each case that is still in effect;

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order and shall not have been modified in a manner not reasonably acceptable to the Parties; and

(c) all approvals required to be obtained from any Governmental Body shall have been obtained, and any applicable waiting period (and any extension thereof) under the HSR Act shall have expired or been terminated.

**Section 6.2 Conditions to Obligations of Purchaser**. The obligations of Purchaser to consummate the Transactions shall be subject to the fulfillment or Purchaser's written waiver, at or prior to the Closing, of each of the following conditions:

(a) Other than the Fundamental Sellers Representations, the representations and warranties of Sellers contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material respect," "material," or "materially") on and as of the Closing with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), in each case, except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Fundamental Sellers Representations shall be true and correct in all material respects, on and as of the date of this Agreement and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b) Sellers shall have duly performed and complied in all material respects with all covenants and obligations required by this Agreement to be performed or complied with by it as of or prior to the Closing Date, including Section 2.4.

(c) Sellers shall have secured a release of any and all Encumbrances (other than Permitted Encumbrances), Claims, in each case, other than such releases in connection with any Acquired Assets or Assumed Liabilities.

(d) (i) all approvals, consents and waivers that are listed on Section 3.3 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Purchaser at or prior to the Closing, and such approvals, consents and waivers shall be reasonably satisfactory to Purchaser (other than those approvals, consents and waivers subject to Section 1.5(f) and with respect to which the Parties shall have agreed upon an accommodation pursuant to Section 1.5(f)), and (ii) all notices that are listed on Section 3.3 of the Disclosure Schedules shall have been delivered as promptly as practicable following the date of this Agreement, and in any event prior to the earlier of the Closing and the date on which notice is required to be delivered under the applicable Contract, to each Person who has a right to receive notice in connection with the Transactions, which notices shall be in a form reasonably satisfactory to Purchaser.

(e) The Sale Order shall be in form and substance reasonably satisfactory to the Purchaser and all objections to the sale shall have been overruled or resolved in a manner reasonably satisfactory to the Purchaser, including Section 2.1 and Section 2.5.

**Section 6.3** **Conditions to Obligations of Seller**. The obligations of Sellers to consummate the Transactions shall be subject to the fulfillment or Sellers' written waiver, at or prior to the Closing, of each of the following conditions:

(a) Other than the Fundamental Purchaser Representations, the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material respect," "material," or "materially") on and as of the Closing with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), in each case, except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Fundamental Purchaser Representations shall be true and correct in all material respects, on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b) Purchaser shall have duly performed and complied in all material respects with all covenants and obligations required by this Agreement to be performed or complied with by it as of or prior to the Closing Date.

**Section 6.4** **Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VI that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or the Sellers may rely on the failure of any condition set forth in this

Article VI, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VII
## TERMINATION

**Section 7.1 Termination of Agreement**. This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 7.1:

(a) by the mutual written consent of the Sellers and Purchaser;

(b) by written notice of either Purchaser or the Sellers, upon the issuance of a Final Order restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, provided that no Party may terminate this Agreement under this Section 7.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) by written notice of either Purchaser or the Sellers, if the Closing shall not have occurred on or before September 30, 2026 (the "Outside Date"), provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d) by Purchaser, if the Bankruptcy Court does not enter the Sale Order within fifteen (15) Business Days of the conclusion of the Sale Hearing;

(e) by Bitcoin Depot if (i) all of the conditions set forth in Section 6.1 and Section 6.2 have been satisfied, or waived by Purchaser (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by Bitcoin Depot to Purchaser, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (ii) Bitcoin Depot has confirmed in writing to Purchaser that all of the conditions set forth in Section 6.1 and Section 6.2 have been satisfied or waived by Bitcoin Depot (other than (x) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by Bitcoin Depot to Purchaser, capable of being satisfied if the Closing were to occur at such time and (y) those conditions which have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (iii) Bitcoin Depot has confirmed in writing to Purchaser that the Sellers are ready, willing and able to effect the Closing and (iv) Purchaser does not consummate the Closing within two (2) Business Days following the receipt by Purchaser of such notice;

(f) by written notice from either Purchaser or Sellers, if prior to the entry of the Sale Order any Seller enters into one or more Alternate Transactions with one or more Persons other than Purchaser or the Bankruptcy Court approves an Alternate Transaction other than with Purchaser;

(g) by written notice from Bitcoin Depot to Purchaser, if a Seller or the board of directors (or similar governing body) of any of the Sellers determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with such Person's or body's fiduciary duties;

(h) by Purchaser, if (i) at any time, (A) there has been a material breach by Sellers of this Agreement such that any of the conditions set forth in Section 6.2 are not capable of being satisfied by the Outside Date as a result of such breach or failure and (B) such breach or failure is not cured within twenty (20) days after written notice thereof is provided by Purchaser to Sellers; or

(i) by Sellers, if (i) at any time, (A) there has been a material breach by Purchaser of this Agreement such that any of the conditions set forth in Section 6.3 are not capable of being satisfied by the Outside Date as a result of such breach or failure and (B) such breach or failure is not cured within twenty (20) days after written notice thereof is provided by Sellers to Purchaser.

**Section 7.2 Effect of Termination**. In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement, provided that this Section 7.2 and Article VIII shall survive any such termination, provided, further, that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE VIII
### SURVIVAL & INDEMNIFICATION

**Section 8.1 Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing; *provided* that the indemnification obligations of Purchaser set forth in Section 5.11 and Section 8.2 shall survive for twenty-four (24) months following the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms.

**Section 8.2 Purchaser's Indemnification Obligations**. Subject to the terms of this Agreement, from and after the Closing Date, Purchaser shall be responsible for, shall pay, and shall indemnify, defend and hold harmless the Sellers, each Affiliate of the Sellers and each of their respective Representatives (collectively, the "Seller Indemnified Persons") from and against all Liabilities, Actions and claims arising out of, attributable to or resulting from any of the Assumed Liabilities.

**Section 8.3** **Indemnification Actions**. All claims for indemnification under this Article VIII shall be asserted and resolved as follows:

(a) To make a claim for indemnification, defense or reimbursement under this Article VIII, a Seller Indemnified Person shall notify the Purchaser of its claim, including the specific details (including supporting documentation in such Seller Indemnified Person's possession or control of the alleged Liabilities and such Seller Indemnified Person's good faith estimate of the applicable claim) of and specific basis under this Agreement for its claim (the "Claim Notice").

(b) In the event that any claim for indemnification set forth in any Claim Notice is based upon a claim by a third party (unaffiliated with any Seller, Purchaser or any of their respective Affiliates) against the Seller Indemnified Person (a "Third Party Claim"), the Seller Indemnified Person shall provide its Claim Notice promptly after the Seller Indemnified Person has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim in such Seller Indemnified Person's possession or control; *provided* that the failure of any Seller Indemnified Person to give notice of any Third Party Claim as provided in this Section 8.3 shall not relieve the Purchaser of its obligations under this Article VIII except to the extent such failure results in insufficient time being available to permit the Purchaser to effectively defend against the Third Party Claim or otherwise prejudices the Purchaser's ability to defend against the Third Party Claim.

(c) Subject to Section 8.3(e), in the case of a claim for indemnification based upon any Third Party Claim, the Purchaser shall have thirty (30) days from its receipt of the Claim Notice to notify the Seller Indemnified Person whether it admits or denies its obligation hereunder to defend the Seller Indemnified Person against such Third Party Claim under this Agreement. The Seller Indemnified Person is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests and that is not materially prejudicial to Purchaser's interest. Failure of Purchaser to admit its liability to defend a Seller Indemnified Person within such 30-day period shall be deemed a denial of liability to so defend such Seller Indemnified Person. If the Purchaser fails to notify the Seller Indemnified Person within such thirty (30) day period regarding whether the Purchaser admits or denies its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, then until such date as the Purchaser admits or it is finally determined by a non-appealable judgment that such right or obligation exists, the Seller Indemnified Person may file any motion, answer or other pleading, settle any Third Party Claim or take any other action that the Seller Indemnified Person deems necessary or appropriate to protect its interest, regardless of whether the Purchaser is prejudiced or adversely impacted by any such actions.

(d) If Purchaser admits its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, as applicable, then Purchaser shall have (i) the right and obligation to diligently prosecute and control the defense of such Third Party Claim at the sole cost and expense of Purchaser and (ii) have full control of such defense and proceedings, including any compromise or settlement thereof unless the

compromise or settlement includes the payment of any amount by, the performance of any obligation by, or the limitation of any right or benefit of, the Seller Indemnified Person, in which event such settlement or compromise shall not be effective without the consent of the Seller Indemnified Person, which shall not be unreasonably withheld or delayed. If requested by the Purchaser, the Seller Indemnified Person agrees at the cost and expense of the Purchaser to cooperate in contesting any Third Party Claim which the Purchaser elects to contest; *provided*, *however*, that the Seller Indemnified Person shall not be required to bring any counterclaim or cross-complaint against any Person. The Seller Indemnified Person may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Purchaser pursuant to this Section 8.3(d); *provided*, that the Seller Indemnified Person may file initial pleadings as described in the last sentence of Section 8.3(c) if required by court or procedural rules to do so within the thirty (30) day period in Section 8.3(c). A Purchaser shall not, without the written consent of the Seller Indemnified Person, settle any Third Party Claim or consent to the entry of any judgment with respect thereto that (A) does not result in a final resolution of the Seller Indemnified Person's liability with respect to the Third Party Claim (including, in the case of a settlement, an unconditional written release of the Seller Indemnified Person from all further liability in respect of such Third Party Claim) or (B) may materially and adversely affect the Seller Indemnified Person (other than as a result of money damages borne solely by Purchaser hereunder).

(e) If Purchaser does not admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement or admits its obligation but thereafter fails to diligently defend or settle the Third Party Claim, as applicable, then the Seller Indemnified Person shall have the right, but not the obligation, to defend and control the defense against the Third Party Claim (at the sole cost and expense of Purchaser if the Seller Indemnified Person is entitled to indemnification hereunder), with counsel of the Seller Indemnified Person's choosing, subject to the right of Purchaser to admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, as applicable, at any time prior to settlement or final determination thereof. If Purchaser has not yet admitted its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Agreement, the Seller Indemnified Person shall send written notice to the Purchaser of any proposed settlement and the Purchaser shall have the option for ten (10) days following receipt of such notice to admit in writing its obligation to defend the Seller Indemnified Person against such Third Party Claim under this Article VIII, and if such right or obligation is so admitted, assume the defense of the Third Party Claim, including the power to reject the proposed settlement.

(f) In the case of a claim for indemnification not based upon a Third Party Claim (a "Direct Claim"), such Direct Claim shall be asserted by giving the Purchaser a reasonably prompt Claim Notice. Such Claim Notice by the Seller Indemnified Person shall describe the Direct Claim in reasonable detail, shall include copies of all available material written evidence in such Seller Indemnified Person's possession or control thereof and shall indicate the estimated amount, if reasonably practicable, of Liabilities that have been or may be sustained by the Seller Indemnified Person. Purchaser shall have sixty (60) days from its receipt of the Claim Notice to (i) cure the Liabilities complained of, (ii) admit its

obligation to defend the Seller Indemnified Person against such Direct Claim under this Agreement, or (iii) dispute the claim for such Liabilities. If Purchaser does not notify the Seller Indemnified Person within such sixty (60) day period that it has cured the Liabilities or that it disputes the claim for such Liabilities, the Purchaser shall be deemed to have disputed its obligation to indemnify, defend and hold harmless the Seller Indemnified Person against such Direct Claim under this Agreement.

(g) Each Seller Indemnified Person is an express third party beneficiary of this Article VIII and shall be entitled to rely on and enforce the terms hereof, along with any other defined terms or provisions of this Agreement necessary to avail itself of the rights granted under this Article VIII.

## ARTICLE IX
### MISCELLANEOUS

**Section 9.1 Expenses**. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.

**Section 9.2 Approval**. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 9.3 Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, or (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Caltel, Inc
PO Box 827
Conway, SC 29528
Attention: Larry Scott
Email: lscott@caltelinc.com

Notices to the Sellers:

Bitcoin Depot Inc.
2870 Peachtree Road, Suite 327
Atlanta, GA 30305
Attention: Tom Studebaker
Email: tstudebaker@pppllc.com

with copies to (which shall not constitute notice):

Vinson & Elkins LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Attention: David Meyer; Paul Heath; Michael Gibson
Email: dmeyer@velaw.com; pheath@velaw.com; mgibson@velaw.com

**Section 9.4** **Binding Effect; Assignment**. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, the Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; *provided* that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated by Sellers without the prior written consent of Purchaser, and any attempted assignment or delegation without such prior written consent shall be null and void. Purchaser may, with reasonable notice to Sellers, assign the Agreement and any of Purchaser's rights and obligations hereunder to a controlled Affiliate or other wholly-owned subsidiary of Purchaser, provided that (a) at the time of such assignment such controlled Affiliate or other wholly-owned subsidiary of Purchaser has the financial wherewithal to fulfill all payment obligations hereunder and (b) no such assignment shall relieve Purchaser of its obligations under this Agreement.

**Section 9.5** **Amendment and Waiver**. Any provision of this Agreement or the Disclosure Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 9.6** **Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (a) for purposes of (i) Section 5.11 and Article VIII, the Seller Indemnified Persons and (ii) Section 9.7, the Non-Recourse Persons and (b) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 9.7** **Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement or the negotiation, execution or

performance of this Agreement, may only be brought against the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, (a) no past, present or future shareholder, member, partner, manager, director, officer, employee, incorporator, Affiliate, agent or Advisor of any Party or such Person's successors or permitted assigns (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any claim, action, suit or legal proceeding based on, in respect of or by reason of the transactions contemplated hereby and (b) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 9.7 and shall be entitled to enforce this Section 9.7 as if a party directly hereto.

**Section 9.8 Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**Section 9.9 Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

**Section 9.10 Complete Agreement**. This Agreement, the Disclosure Schedules, the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**Section 9.11 Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of him, her or it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 9.12 without proof of damages or otherwise, this being in addition

to any other remedy to which they are entitled under this Agreement and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.11 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this Section 9.11 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit the Sellers from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 9.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 9.11 be used, alone or together with any other provision of this Agreement, to require the Sellers to remedy any breach of any representation or warranty made by the Sellers herein.

**Section 9.12 Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, a Texas Business Court in a Division of the Texas Business Court in which the Party may establish proper venue (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Texas) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 9.13 Governing Law; Waiver of Jury Trial**.

(a) Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Texas or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Texas to apply.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.13(B).

**Section 9.14 No Right of Set-Off**. Purchaser, on its own behalf and on behalf of its successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser or any of its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 9.15 Counterparts and PDF**. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 9.16 Bulk Sales Laws**. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except

Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**Section 9.17 Fiduciary Obligations**. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of its shareholders, members, partners, managers, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with any of their fiduciary obligations or applicable Law. The Sellers retain the right to pursue any transaction or restructuring strategy that, in the Sellers' business judgment, will maximize the value of their estates.

**Section 9.18 Sellers' Representative**. Each Party agrees that Bitcoin Depot has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any closing condition, agree to any amendment to this Agreement, or to manage any indemnification process on behalf of the Seller Indemnified Party. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Bitcoin Depot on behalf of the Sellers. Any action taken (or to be taken) by the Sellers' Representative in connection with this Agreement, any Transaction Agreement or the transactions contemplated hereby or thereby shall be deemed to be the action (or obligation) of the Sellers, and for the avoidance of doubt, any breach by the Sellers' Representative of the covenants set forth herein shall be deemed to be a breach of the applicable Seller. No Seller may revoke the authority of the Seller's Representative. Any costs incurred by the Sellers' Representative in its capacity as such shall be paid by the Sellers, collectively. Sellers' Representative shall not resign until a successor representative shall have been appointed.

## ARTICLE X
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 10.1 Certain Definitions**. For purposes of this Agreement, capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings set forth below.

(a) "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(b) "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other Representatives of such Person.

(c) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled

by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d) "Alternate Transaction" shall mean a transaction in which some or all of the Acquired Assets are sold or conveyed to a buyer or entity other than the Purchaser, including pursuant to a plan of reorganization, at a higher and better price for the Acquired Assets than offered by Purchaser.

(e) "Bidding Procedures Order" means the Order (A) Approving (I) Bidding Procedures, (II) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (III) Assumption and Assignment Procedures; (B) Scheduling Auction, Sale Hearing, and Related Deadlines; and (C) Granting Related Relief [Docket No. 193].

(f) "Business Day" means any day other than a Saturday, Sunday or other day on which banks in Atlanta, Georgia are authorized or required by Law to be closed.

(g) "Claim" means all actions, claims, counterclaims, suits, proceedings, demand, lawsuit, arbitration, inquiry, audit, notice of violation, litigation, citation, summons, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of subpoena, investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

(h) "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

(i) "Confidentiality Agreement" means that certain letter agreement, dated as of May 26, 2026, by and between Bitcoin Depot and CalTel, Inc.

(j) "Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, including any purchase order, service order, sales order, service contract, schedule, work order or similar document.

(k) "Disclosure Schedules" means the disclosure schedules delivered by the Sellers in accordance with the terms of this Agreement (with specific reference to the representations and warranties in Article III to which the information in such schedule relates).

(l) "Emergency" means a sudden or unexpected event that causes, or risks causing, (i) substantial damage to all or any portion of the assets or the property of any third party, (ii) imminent death or serious bodily injury to any Person or (iii) imminent

damage or substantial risk of damage to natural resources (including wildlife) or the environment.

(m) "Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(n) "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(o) "Escrow Agent" means Kroll Restructuring Administration LLC.

(p) "Final Order" means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any of the Bankruptcy Cases (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Bankruptcy Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

(q) "Fundamental Purchaser Representations" means the representations and warranties contained in Section 4.1 (*Organization and Qualification*), Section 4.2 (*Authorization of Agreement*), Section 4.3 (*Conflicts; Consents*) and Section 4.6 (*Brokers*).

(r) "Fundamental Sellers Representations" means the representations and warranties contained in Section 3.1 (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3 (*Conflicts; Consents*), Section 3.5 (*Title to Acquired Assets*) and Section 3.7 (*Brokers*).

(s) "Governmental Authorization" means any permit, license, certificate, approval, consent, waiver, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any applicable Law.

(t) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(u) "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(v) "Income Taxes" means (a) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains, alternative minimum, and net worth Taxes, but excluding ad valorem, property, excise, severance, production, sales, use, real or personal property transfer or other similar Taxes), (b) Taxes based upon, measured by, or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (a) above or (c) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (a) or (b) above.

(w) "Knowledge of Sellers", or words of like import, means the actual knowledge, after reasonable inquiry (which in no event encompasses constructive, imputed or similar concepts of knowledge) of David Gray, who, for the sake of clarity and avoidance of doubt, shall not have any personal Liability or obligations regarding such knowledge.

(x) "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation or Order issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body of competent jurisdiction.

(y) "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, Tax, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(z) "Made Available" means such information or documents have been (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) made available in the Dataroom but only to the extent made accessible therein to Purchaser or its Representatives, in each case at least two (2) Business Days prior to the Closing.

(aa) "Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to cause or become, individually or in the aggregate, materially adverse to (a) the Acquired Assets (including the value thereof) and Assumed Liabilities, or (b) the ability of the Sellers to consummate the Transactions on a timely basis; *provided* that none of the following (or the consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which the Sellers operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from, or relating to financial, banking, or securities markets; (v) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any change in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (vii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities; (viii) Effects in, arising from or relating to any existing event, occurrence or circumstance that is publicly known, disclosed, set forth in the Disclosure Schedule, Made Available or with respect to which Purchaser has knowledge as of the date of this Agreement and any changes or developments in, or Effects or results arising from or relating to, such matters; (ix) Effects in, arising from or relating to any action required to be taken under any existing Contract to which the Sellers or their Subsidiaries (or any of their assets or properties) is bound; (x) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xi) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transaction or breach by Purchaser of this Agreement or (xii) (A) the commencement or pendency of the Bankruptcy Cases or any acts, omissions, events or circumstances, directly or indirectly, arising out of or caused by

the commencement or pendency thereof; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of the Sellers or their Affiliates or (3) the assumption or rejection of any Assigned Contract or (C) any Order of the Bankruptcy Court or any actions or omissions of the Sellers or their Affiliates in compliance therewith.

(bb) "Non-Income Taxes" means any Taxes other than Income Taxes, including ad valorem, use, property, excise, sales, severance, production, use or other similar Taxes based upon the acquisition, operation or ownership of the Acquired Assets, but excluding, for the avoidance of doubt, Transfer Taxes.

(cc) "Order" means any order, injunction, judgment, decree, ruling, writ or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(dd) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet delinquent or being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens, (iv) licenses granted on a non-exclusive basis, (v) Encumbrances that are Assumed Liabilities and (vi) solely prior to Closing, any Encumbrances that will be removed or released or otherwise rendered ineffective by operation of the Sale Order.

(ee) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(ff) "Representative" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

(gg) "Sale Hearing" means a hearing before the Bankruptcy Court at which the Sellers will seek entry of the Sale Order.

(hh) "Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to Sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing the Sellers to consummate the Transactions, in form and substance reasonably acceptable to the Parties.

(ii) "Subsidiary" means, of any Person, any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than 50% of the voting power or Equity Interests are owned or controlled directly or

indirectly by such Person, or one or more of the Subsidiaries of such Person, or a combination thereof.

(jj) "Tax" or "Taxes" means any taxes, assessments and other governmental charges in the nature of a tax imposed by any Governmental Body, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(kk) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(ll) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto and any amendments thereof.

(mm) "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(nn) "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(oo) "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

**Section 10.2 Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Disclosure Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, section of the Disclosure Schedules and exhibit references contained in this Agreement are references to sections, clauses, sections of the Disclosure Schedules and exhibits in or to this Agreement, unless otherwise specified. All exhibits and Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Disclosure Schedule or exhibits but not otherwise defined therein shall be defined as set forth in this Agreement.

(b) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c) The words "to the extent" shall mean "the degree by which" and not simply "if."

(d) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f) The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g) All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(i) A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(j) A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**CALTEL, INC**

By: ___________________________________
Name: Larry Scott
Title: President

**<u>SELLERS</u>:**

**BITCOIN DEPOT INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**KUTT, INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BCD MERGER SUB LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BT HOLDCO LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**KIOSK HOLDCO LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**MCA SERVICES GROUP, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**CASH RAMP LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BITCOIN DEPOT OPERATING LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**LUX VENDING KIOSK, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**INTUITIVE SOFTWARE LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**DIGITAL GOLD VENTURES INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BITACCESS INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**MINTZ ASSETS, INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**EXPRESS VENDING INC.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**KIOSK TECHNICIANS, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BTM INTERNATIONAL HOLDINGS 1 LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**BTM INTERNATIONAL HOLDINGS II LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________